UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

BRIAN CLIFF SUNIGA,

      Petitioner,

v.                                                                  No. 5:22-CV-124-H

ERIC GUERRERO, Director, Texas
Department of Criminal Justice,
Correctional Institutions Division,

      Respondent.

## MEMORANDUM OPINION AND ORDER

Before the Court is the petitioner's amended federal habeas petition, which asserts thirteen claims for federal habeas relief. Dkt. No. 36. In his habeas petition, the petitioner requests an evidentiary hearing on certain asserted disputed questions of fact. *Id.* at 21. In addition, before the Court are the petitioner's renewed motion for discovery (Dkt. No. 74) and motion for a stay and abeyance (Dkt. No. 63).

As explained below, the Court denies all relief requested in the petitioner's amended federal habeas petition (Dkt. No. 36). The Court denies the petitioner's renewed motion for discovery (Dkt. No. 74), his motion for a stay and abeyance (Dkt. No. 63), and his request for an evidentiary hearing (Dkt. No. 36 at 21). Finally, the Court denies a Certificate of Appealability on all claims in the amended federal habeas petition.

## 1.    Factual and Procedural Background

### A.    Factual Background

#### i.    The Capital Offense

Around 10 p.m. on December 26, 2011, two Hispanic males identified at trial as Suniga and his cousin Sesilio Lopez Jr.—one wearing distinctive whiteout contacts and the

other with a star tattoo beneath one eye—entered the One Guy from Italy restaurant on 50th Street in Lubbock, Texas.[1]  Suniga and Lopez Jr. pointed their guns at Jonathan Rowser (the cashier) and demanded that Jonathan give them the money in the cash register. Dkt. No. 49-28 at 74–75 (Jonathan Rowser).  When Jonathan refused to comply, an employee, Lauren Krachala, attempted to retreat, but the gunmen pointed their guns at her. She dropped to the floor, as did another employee, Ashley Sellers.  *Id.* at 134 (Krachala), 179–80 (Sellers).  When Jonathan still had not opened the cash register, the two men grabbed a tip jar sitting on the counter and turned to leave through the restaurant's front door.  *Id.* at 78–82 (Jonathan Rowser).

As the gunmen walked past the door of the restaurant's restroom, David Rowser (Jonathan Rowser's older brother) stepped out of the of the restroom, which he had been cleaning.  *Id.* at 148 (Marissa Bustos), 181 (Sellers), 231 (Matthew Sommermeyer).  The gunman with whiteout contacts began shouting at David and asked if he wanted "to be a hero?"  *Id.* at 151 (Bustos), 231 (Sommermeyer).  But before David could respond, the gunman with whiteout contacts shot David three times, once in the neck and twice in the chest—including one bullet that pierced major veins near the heart.  *Id.* at 148 (Bustos), 231 (Sommermeyer).  The shooter then shouted "[t]hat's what you get" and ran out of the front

---

[1] At trial, numerous eyewitnesses testified, without contradiction, that the two gunmen were tattooed Hispanic males wearing hoodies, between 5' 10" and 6' 1" tall, with one wearing distinctive whiteout contact lenses and the other having a star tattooed beneath one of his eyes. Dkt. No. 49-28 at 71–79 (Jonathan Rowser), 101 (Eric Salazar), 132–33 (Lauren Krachala), 146–48, 168 (Marissa Bustos), 188–91, 205 (Cherakee Ybarra), 225–28 (Matthew Sommermeyer).  It was likewise undisputed at trial that both gunmen pointed their guns at restaurant employees and demanded all the money in the cash register.  *Id.* at 74–75 (Jonathan Rowser), 133 (Lauren Krachala).  Suniga's mother also testified at the punishment phase that, after meeting with her son in jail following his arrest, she knew that Suniga fatally shot David Rowser.  Dkt. No. 49-33 at 181–82.

door.  *See id.* at 83–84, 93 (Jonathan Rowser).[2]  David, bleeding profusely from the mouth

and chest, died minutes later in his younger brother's arms after begging Jonathan to "help

me."  *Id.* at 84–86 (Jonathan Rowser), 136 (Krachala), 181 (Sellers), 196 (Cherakee

Ybarra).[3]  Each of the surviving restaurant employees and three restaurant customers who

witnessed the capital offense was severely traumatized.[4]  All three bullets were found in

David during the autopsy, and no bullet casings were recovered from the crime scene.

As the two gunmen fled the restaurant, one of them slipped and fell on the way out.

Another employee of the restaurant, just minutes before the shooting, had finished mopping

the floor near the front door area, and the area immediately inside and outside the front

door was clean before the incident.  But right after the gunmen had left the restaurant and

fled in their car, the employee saw three business cards laying near the door.  The employee

picked one card up briefly, but then realized he should leave the cards in place and put the

card back where he had found it.  The employee did not touch the other two cards.  Police

photographed and collected all three business cards for forensic testing.

---

[2] Suniga asserts that there was no evidence identifying which of the gunmen shot David.  But both
Jonathan Rowser and restaurant patron Matthew Sommermeyer testified that the gunman wearing
whiteout contact lenses yelled at and shot David Rowser.  *Id.* (Jonathan Rowser); *see also id.* at
231–32 (Sommermeyer).

[3] Lubbock Police officers who responded to the crime scene testified that David Rowser was
unresponsive when they arrived.  *Id.* at 246–48 (Germaine Shanks), 255 (Robert O'Neil).  A
Lubbock paramedic who responded to the scene testified that David Rowser had no breath or
pulse when she arrived.  *Id.* at 268 (Shelly Parker).  David Rowser was pronounced dead later that
night at the hospital.  *Id.* at 271 (Parker).

[4] A Lubbock Police Officer who responded to the dispatch about the robbery testified at the
guilt-innocence phase that everyone at the restaurant appeared to be in shock.  Dkt. No. 49-28 at
246–47 (Germaine Shanks).  Two female restaurant employees testified that they fell to the ground
during the robbery when the gunmen pointed guns at them.  *Id.* at 134–35 (Lauren Krachala), 178–
80 (Ashley Sellers).  Two of the restaurant patrons who witnessed the robbery and murder testified
at trial that they were still traumatized by what they had witnessed at the restaurant more than two
years earlier.  *Id.* at 205 (Cherakee Ybarra), 236 (Matthew Sommermeyer).

On February 29, 2012, a Lubbock County grand jury indicted Suniga on one count of capital murder for intentionally causing the death of David Rowser by shooting David while in the course of committing, and attempting to commit, the robbery of Jonathan Rowser.[5]

### ii.    The guilt-innocence phase of trial

The guilt-innocence phase of Suniga's trial started on May 13, 2014.[6]  At trial, the jury heard testimony and saw evidence establishing how law enforcement was able to identify the two gunmen who robbed the restaurant as Suniga and Lopez Jr.  The front desk clerk and the general manager of a motel in Lubbock testified that they met Suniga and Lopez Jr. when the two men stayed at the motel several times in November and December 2011.  Dkt. No. 49-29 at 10–18 (Jeanie Morcam), 20–34 (Cynthia Arcos).  The employees testified that they had seen and conversed many times with Suniga and Lopez Jr., as they had stayed at the hotel many times.  They testified that Suniga—and only Suniga—often wore whiteout contacts when checking in and out of the motel and when Suniga entered the motel lobby to get ice during his many stays.  They also testified that Lopez Jr. had a star tattooed under one of his eyes.  The motel employees testified that when they heard media reports describing the perpetrators of the robbery and murder at the restaurant, they both immediately recognized Suniga and Lopez Jr. as fitting the descriptions and contacted authorities to identify the perpetrators and the vehicle in which the two men often traveled.  Motel records verified that Suniga had regularly checked into the motel in November and

---

[5] Suniga's indictment in Cause No. 2012-434109 appears at Dkt. No. 51-22 at 9.  Another copy, from Suniga's state habeas proceeding, appears at Dkt. No. 52-28 at 6.

[6] The full transcription of testimony and other evidence from Suniga's capital-murder trial appears at Dkt. Nos. 49-28 through 49-35.  The exhibits admitted into evidence at Suniga's capital-murder trial appear at Dkt. Nos. 49-36 through 49-43.

December 2011, his last checkout being December 24. *See id.* at 24 (Arcos) (discussing State Exhibits Nos. 82 through 90).

The prosecution also presented the physical evidence linking Suniga to the crime—specifically, the evidence of the business cards that appeared on the floor after the robbery but were not there before. Dkt. Nos. 49-28 at 235 (Sommermeyer), 97–99, 109, 116–17 (Eric Salazar), 250 (Germain Shanks), 254 (Robert O'Neil); 49-29 at 157, 162–65, 224–25 (Darren Lindly). One of the business cards at the scene (State Exhibit 554) was an Apache Oil Corporation business card for Kenneth Poe. Dkt. No. 49-29 at 164 (Lindly). Poe testified that he gave Suniga his Apache Oil card and wrote the name and phone number of Poe's acquaintance, Ricky Mares, on the back of the card to help Suniga find a job. *Id.* at 55–61 (Kenneth Poe). The Apache Oil card at the scene bore Mares's name and phone number in Poe's handwriting on the back. *Id.* at 55–61 (Poe), 165 (Lindly). The other two business cards found at the scene were a Wells Fargo business card and a Sharpshooters business card. *Id.* at 162, 165, 224–25 (Lindly). DNA testing of the three cards revealed that (1) the Apache Oil and Sharpshooters cards each contained a mixture of DNA; (2) Suniga's DNA could not be excluded as a possible source of the DNA mixtures on the Apache Oil and Sharpshooters cards; and (3) the only DNA recovered from the Wells Fargo business card matched Suniga's DNA. Dkt. No. 49-30 at 78, 84–87 (Sarah Rothwell).

In addition, the day after the crime, police stopped a vehicle matching the description given by the motel employees in Taylor County, Texas. Suniga and Lopez Jr. were in the car. Inside the car, police recovered a gold lid with a slot cut into it that matched the description of the lid of the restaurant's tip jar that was stolen during the

robbery, which was presented to the jury as State Exhibit 651. Dkt. No. 49-29 at 87 (Chris Ortiz).

Further, the manager of a convenience store in Lubbock had surveillance footage recorded at 7:15 p.m. on December 26, 2011, which showed an adult male wearing whiteout contact lenses purchasing two cans of beer. This video was admitted into evidence and shown to the jury as State Exhibit 91. *Id.* at 46–54 (Leeann Bowman). A Lubbock Police Detective testified that he had watched the surveillance video, which was recorded on the evening of the robbery-murder, and he believed Suniga was the man wearing whiteout lenses in the video. Dkt. No. 49-30 at 14–59 (Richard Tray Mayner).

The same detective also testified that (1) the witnesses at the crime scene identified the taller of the two gunmen—who wore the whiteout lenses—as David Rowser's shooter; (2) Suniga was taller than Lopez Jr.; (3) witnesses at the crime scene identified the lid with a slot cut into it, which was recovered from the vehicle that police stopped in which Suniga was riding as a passenger (State Exhibit 651) as the lid for a type of jalapeno jar used as a tip jar at the restaurant; (4) the lid recovered by police in Taylor County matched the type of lid on a sample jalapeno jar police in Lubbock obtained from the restaurant; (5) State Exhibit 651 fit on a sample jalapeno jar that Lubbock police obtained from the restaurant; and (6) the eyewitnesses at the crime scene identified the shooter as the gunman in the whiteout contacts, not the gunman with the facial tattoo of a star. *Id.*

The Chief Medical Examiner, who supervised (but did not personally perform) the autopsy and signed the autopsy report of David Rowser, also testified at trial. He testified that (1) David died as a result of three gunshot wounds; (2) three bullets were recovered from David's body; (3) one bullet entered the back of David's neck at the midline, moved

right to left, back to front, hit the seventh and sixth cervical vertebrae and was recovered at the first thoracic vertebrae; (4) another bullet entered David's upper left chest mid-clavicle, was fired from an indeterminate range, moved front to back, right to left, and downward in trajectory through the body perforating the right lung, causing hemorrhaging and the right lung to collapse, and was recovered from David's back muscles; (5) the third bullet, also fired from an indeterminate range, entered mid-chest, moved front to back, right to left, and slightly downward, penetrated the pericardium, the right atrium of the heart, and the superior vena cava (a large blood vessel); and (6) David's toxicology was negative for both drugs and alcohol. *Id.* at 76–130 (Dr. Sridhar Natarajan).

On May 15, 2014, the jury returned its guilt-innocence verdict, unanimously finding Suniga guilty beyond a reasonable doubt of the capital-murder charge in the indictment. Dkt. No. 49-31 at 42–43.[7]

### iii.    The punishment-phase evidence

The punishment phase of Suniga's trial started on May 16, 2014.  For the prosecution's evidence, the jury first heard victim-impact testimony from David Rowser's parents.[8]  The jury then heard sentencing-related testimony from many witnesses:

- A Lubbock County Detention Center (LCDC) corporal testified about incidents in which Suniga was disciplined for excessive noise at night and for blocking the air vents in his cell.  Dkt. No. 49-32 at 27 – 35 (Whitney Clemens).

- Another LCDC officer testified about an incident in which Suniga was written up for disrespecting and using profanity toward a jail employee.  *Id.* at 37–40 (David Crockett White).

---

[7] The guilt-innocence verdict form appears at Dkt. Nos. 52-28 at 18; 51-30 at 299.  The guilt-innocence jury charge appears at Dkt. No. 51-30 at 288–98.

[8] Dkt. No. 49-32 at 15–19 (Sherry Pennington), 21–26 (David Rowser).

- A retired LCDC employee testified about an incident in which Suniga was cited for inciting riotous behavior by assisting another inmate in throwing wet toilet paper around the detention area.  *Id.* at 42–46 (Christopher Brunson).

- The healthcare director for the company that provided services to LCDC testified that Suniga's medical records established that Suniga denied any history of drug use, sexual abuse as a child, and violent behavior or anger-management problems.  Dkt. *Id.* at 47–65 (Mike Callum).[9]

- A pair of employees of Desta Drilling testified about Suniga's brief employment with their company.[10]

- Four LCDC employees testified about a video-recorded visit between Suniga and a woman, during which Suniga identified himself as "Foros" and about the LCDC's gang unit's subsequent decision to classify Suniga as a confirmed member of the Tango Blast prison gang.[11]

---

[9] Callum testified that the only medical issues reflected in Suniga's LCDC medical records were dental issues, which were treated at that facility.

[10] Dkt. No. 49-32 at 69–71 (Desirae Sias, custodian of Suniga's employment records), 72–84 (Amanda Smith, office manager).  Smith testified that Desta hired Suniga on August 3, 2011, and he left on October 23, 2011, for failing to meet job requirements (because Suniga no longer wished to work for Desta) and that Suniga was eligible to be rehired by Desta at any time.  Smith also testified that Suniga's paycheck records reflected that $270 per month was withheld for "child support."  *Id.* at 77.  Despite the state court records, there is no specific factual allegation currently before this Court establishing to whom this "child support" was paid.  Suniga's mother and eldest brother testified at the punishment phase that they did not believe Suniga had ever made any effort to provide financially for his children (save for once sending $100 to his eldest son).  The record currently before this Court fails to establish that any state court has ever issued an order directing garnishment of Suniga's wages for the purpose of paying child support.

[11] One LCDC administrator testified that (1) discussions of gang-related or criminal activity are prohibited during visitations between inmates and outsiders during visitation, and (2) Suniga had a recorded visit with Linda Bazan on April 30, 2014.  Dkt. No. 49-32 at 85–97 (Ruby Doss).  An LCDC software technician identified the recording of that visit.  *Id.* at 99–102 (David Hodges).  Two LCDC gang-intelligence officers explained that, based on Suniga's star tattoo, his self-identification as a "Foros" during the recorded visit, and other evidence, LCDC classified Suniga as a "confirmed" Tango Blast member.  *Id.* at 104–23 (Jesse Collins); *Id.* at 125–44 (Chris Garza); *see also id.* at 140–41 (explaining the star tattoo on Suniga's hand).  Collins testified at length about (1) a Texas Syndicate inmate who reported that he was threatened by two Tango Blast members—Suniga and another inmate; (2) Suniga's self-identification as a "Foros"—a Fort Worth member of the Tango Blast gang—during his recorded visit with Bazan, and (3) the ensuing decision by LCDC to classify Suniga as a Tango Blast member.  *Id.* at 107–22.  Garza testified that Tango Blast is a fast-rising prison gang that engages in criminal activity inside and outside of prison, are known for their youth and aggressiveness, and that Suniga's Tango Blast membership was based on evidence such as Suniga's visit with Bazan, the threat to the member of a rival prison gang, and his association with Lopez Jr. and other individuals in jail.  *Id.* at 130–43.

– 8 –

- An investigator for the Lubbock County District Attorney's Office, who was also a fingerprint examiner, testified that Suniga's fingerprints matched those on five judgments in criminal cases from Tarrant County, which were admitted into evidence as State Exhibits 706–10, and matched fingerprints on a Texas Department of Criminal Justice (TDCJ) pen packet, which was admitted into evidence as State Exhibit 711.[12]

- A Fort Worth Police Officer testified that he had responded to a September 8, 2008, domestic-violence report and observed Suniga's wife with a badly bloodied face. Dkt. No. 49-33 at 22–27 (Leticia Villareal).[13]

- A Tarrant County Sheriff's Department booking officer testified that in October 2004, he observed Suniga receiving a neck tattoo from another inmate in direct violation of established jail policies and procedures, for which Suniga received a disciplinary violation. *Id.* at 32–33 (Michael Tahmahkera).

- A Tarrant County jail kitchen employee testified about an August 2006 incident in which Suniga was written up for disappearing into the restroom for extended periods, a violation that resulted in Suniga's loss of trusty status. *Id.* at 36–41 (Patricia Flennoy).

- A Texas Child Protective Service (CPS) employee testified about an investigation of a report of domestic violence in July 2008, in which (1) an inspector observed noticeable injuries to the face of Suniga's wife (though Suniga's wife refused to explain the injuries); (2) Suniga admitted that he had sold methamphetamine in the past; (3) Suniga denied assaulting his wife[14] but admitted to a prior domestic-violence conviction with a different partner; and (4) CPS issued a child safety plan after

---

[12] Dkt. No. 49-32 at 146–78 (Will Calfin). The Tarrant County criminal judgments admitted into evidence at the punishment phase established that Suniga was convicted (1) on July 28, 2004, of possession of a prohibited weapon (State Exhibit No. 706); (2) on April 4, 2004, of driving with a suspended license (State Exhibit No. 707); (3) on February 28, 2004, of unlawfully carrying a weapon (State Exhibit No. 708); (4) on October 12, 2000, of misdemeanor assault causing bodily injury to a family member (State Exhibit No. 709); and (5) on October 6, 2004, of possession of less than 200 grams of methamphetamine (State Exhibit No. 710). *Id.* at 158–60. The last of these judgments indicated that, as a result of his conviction for possession of a controlled substance, Suniga's probation was revoked, and he was sentenced to serve three years in prison. *Id.* at 160. Suniga's pen packet established that (1) he had been arrested nine times for a variety of offenses, including unlawfully carrying a weapon, criminal mischief, and multiple misdemeanor assaults and (2) Suniga admitted to marijuana and cocaine use. *Id.* at 159–62.

[13] Officer Villarreal testified that Suniga's wife was angry and uncooperative and would not allow her face to be photographed. *Id.* at 24–25.

[14] Megan Suniga testified during her grand-jury testimony that while Suniga was a "great guy" when not on drugs, on two occasions Suniga assaulted her while he was using drugs. Dkt. No. 51-24 at 45–57.

Suniga and his wife refused to make their children available to interview with CPS. *Id.* at 42–54 (Heather Darder).

- A Tarrant County Probation Department employee provided testimony identifying Suniga's prior probation records, which were admitted into evidence as State Exhibit 713 and established that (1) Suniga pled guilty to possession of methamphetamine packaged for resale, and (2) Suniga's probation was later revoked after Suniga refused to participate in job training and Alcoholics Anonymous programs and refused to obtain gainful employment, as required by the terms of his probation. *Id.* at 55–73 (Mary Jo Gutierrez).[15]

- A TDCJ parole supervisor provided testimony identifying Suniga's parole records, which were admitted into evidence as State Exhibit 714 and established that Suniga (1) tested at the highest levels for academic and vocational skills abilities; (2) never tested positive for drugs or alcohol during his two years on parole; (3) displayed no mental health issues; and (4) reported daily marijuana use (between ten and fifteen cigarettes per day) from ages 15 to 25, monthly methamphetamine consumption of 1 gram from ages 23 to 25, and consumption of six 12-ounce cans of beer per day about three to four times per week. Dkt. No. 49-33 at 74–96 (Tim McGaugh).

The defense presented testimony from eight members of Suniga's family and an expert on prison classification within the TDCJ.

Suniga's brother Eric testified that Eric is the oldest of three boys, that he graduated from high school, college, and served two tours in the Navy without financial support from his family. Eric also testified that their parents divorced when the defendant was about three years old, though their mother soon remarried to Albert Trevino, whom Eric described as a great stepfather. Eric also testified that their family moved to Massachusetts for several years when Trevino joined the Army and that the Suniga children enjoyed their time there. Eric testified that their family lost contact with Trevino when Trevino was transferred to California, but their mother chose to take her sons to live in Copperas Cove, Texas. Eric testified that their mother and Trevino divorced while the family resided in Copperas Cove.

---

[15] Gutierrez also testified that (1) Suniga reported to probation that he had sold methamphetamine since he was fifteen; (2) his family refused to cooperate with probation's efforts to locate him; and (3) he went to prison for three years following the revocation of his probated sentence. *Id.*

Eric noted that their mother worked at Fort Hood and was a hard worker to ensure that the three brothers were provided for and to instill a good work ethic, although the family lacked a father figure during their years in Copperas Cove.  Eric stated that his mother and two younger brothers moved to the Fort Worth area after he left home for college and that during his family's time in the Fort Worth area, Sesilio Lopez Sr.—who had once been married to their mother's sister and was a known drug trafficker and heavily into drugs and alcohol himself—often resided with his mother and younger brothers.  Eric did not see his family often after he left home for college.  Eric testified that his brother Michael (the middle brother) has alcohol and drug issues and was serving a prison sentence.  Eric drinks but does not consider himself to be an alcoholic and currently works as a stockbroker.  Eric noted that Sesilio Lopez Sr. has two sons—Lopez Jr. and Jonathan Lopez.  Eric also testified that many of his uncles and cousins have been to prison for narcotics-related offenses and almost all have alcohol-related problems.  Finally, Eric testified that his mother married again, and that his brother Brian has seven children, though Eric doubted whether his brother has ever provided financially for any of his children.  *Id.* at 105–26 (Eric Suniga).

Suniga's mother, Rosalinda Davis, testified that she grew up in West Texas, where her father was a farmer.  Rosalinda testified that she left home at nineteen to marry Augustine Suniga, who was in the Air Force.  Her two oldest sons were born at Dyess AFB, and Brian Suniga was born in Austin.  She testified that Augustine Suniga struggled with alcohol and eventually died of pancreatic cancer.  She divorced Augustine in 1984, when Brian was three or four, and married Albert Trevino in 1986.  She stated that she moved to Massachusetts for several years after Albert joined the Army, but they separated when Albert transferred to Fort Hood, and she chose to instead take her sons to Copperas Cove

and work at Fort Hood, although they did not divorce until the late 1990s. She noted that when Brian was in fifth grade, the middle son Michael graduated from high school and Army Basic Training, at which time she moved to the Fort Worth Area. However, Michael was later discharged from the Army due to alcohol problems, and he moved into the home in Fort Worth. Rosalinda testified that Michael is an alcoholic who was then currently serving a prison sentence stemming from his alcohol problems. Rosalinda also stated that she considered Eric to be an alcoholic as well because he is divorced and drinks daily. Rosalinda described her late father as a "weekend alcoholic" with alcohol issues. *Id.* at 162. She also noted that her siblings all have alcohol problems and that some have gone to prison for selling drugs. Rosalinda noted that Lopez Sr., who had once been married to her sister, lived with her (and Michael and Brian) for a time in Fort Worth, but Lopez Sr. later went to prison for dealing drugs. Rosalinda testified that alcohol had played a major role in her family for several generations. She said that Brian quit going to school after ninth grade, at a time she was working long hours. She also noted that Brian has seven children but married only one of the mothers of his children. She said she believes that Brian has never supported his children financially, except for once giving $100 to his eldest son, who suffers from congenital physical and developmental problems. *Id.* at 129–88 (Rosalinda Davis). Finally, Rosalinda also testified that she had seen the convenience-store surveillance footage, in which Brian bought beer in whiteout lenses, and recognized Brian in the video. *Id.* at 182.[16]

---

[16] Suniga's mother also testified that Eric is an alcoholic, which is why she believes Eric is divorced, and that Michael is an alcoholic and has three felony convictions for driving while intoxicated. *Id.* at 184–87. This testimony is repetitive of testimony by Suniga's mother earlier during the punishment phase or by Michael Suniga during the punishment phase.

Suniga's former stepfather, Albert Trevino, testified as well. He testified that he had not seen Suniga for 25 years and that his involvement in Suniga's life ended when he moved to California and Rosalinda moved to Copperas Cove. He stated that Rosalinda raised her sons to know right from wrong. *Id.* at 189–98 (Albert Trevino).

Suniga's maternal aunt, Delores Garcia, testified that her four brothers have all been to prison. She also testified that Rosalinda and Augustine divorced because Augustine abused alcohol. Delores noted that Rosalinda worked hard, but she also liked to party and often left Michael and Brian unsupervised. She said that Michael lived with her in Fort Worth for a time and had graduated from high school during that time. Delores also noted that her sister was currently in prison, but not all of her siblings have been to prison. *Id.* at 211–24 (Delores Garcia). Delores also testified that, when she was a child, her father would get drunk when their mother was gone and sexually abuse her sister Alma, but the state trial court excluded that testimony because there was no showing that Brian Suniga had any personal knowledge that his grandfather ever sexually abused his aunt Alma and because Delores testified that Rosalinda had no involvement in, and no personal knowledge of, Alma's abuse by their father. *Id.* at 207–11 (Delores Garcia).

Suniga's cousin Becky Garcia (Delores's daughter) testified that she saw Brian Suniga during holidays growing up, that his parents were casual drinkers, and that alcohol has always been part of their family get-togethers. She noted that Brian once had problems with alcohol, but she believed that his current problems stemmed from drugs. She knew that Suniga had seven children with five women but had not provided for his children financially. She testified that Suniga worked for Lopez Sr. selling drugs (mostly powder and marijuana) and that her uncle George went to prison for helping Lopez Sr. deal drugs. She

stated that Brian's brother Michael was currently in state prison and had also gone to federal prison for dealing drugs. She also testified that Brian had been involved in two instances of domestic violence, one with his wife Megan and one with the mother of Brian's eldest son. She stated that Brian's mother was emotionally distant during Brian's childhood and Brian's mother liked to party, as well as noting that Brian's uncles dealt drugs. She noted that while Brian was a happy child, he grew more emotionally closed-off as he grew older. *Id.* R.R. 238–66 (Becky Garcia).

Becky Garcia's husband, Bruce Castro, testified that he had been married to Becky since 1999 and that he had met Brian through Becky. Bruce testified that he used marijuana, methamphetamine, and alcohol with Brian many times when he was younger, although drugs made Bruce depressed, paranoid, and tired. Bruce said he was able to get clean from drugs because of the support of Becky and his family, while Brian lacked support. Bruce also testified that Brian did not have a relationship with any of Brian's children. *Id.* at 267–76 (Bruce Castro).

Frank AuBuchon, a former TDCJ administrator, testified on direct examination by Suniga's lawyers about the different types of prison facilities that TDCJ operates and how TDCJ classifies inmates upon intake for security purposes, the nature of good-time credits, TDCJ's disciplinary system, and the availability of administrative segregation for unruly inmates. He also testified that, if given a life sentence, Suniga would most likely enter TDCJ as a G-3 level inmate who could never be elevated above that level. Dkt. No. 49-34 at 10–36, 65–66, 68–69 (Frank AuBuchon). On cross-examination by the State, AuBuchon admitted that in 2014, a group of TDCJ inmates escaped from the Connally Unit (one of its highest-security units), traveled to the DFW area, and murdered a law-enforcement officer

– 14 –

before the inmates were apprehended.  AuBuchon also testified that in 2013, four murders and over 1100 serious assaults took place in TDCJ facilities and that TDCJ remains a dangerous place.  He admitted that G-3 inmates are allowed contact visitation and that weapons are available within TDCJ facilities.  AuBuchon noted that one of TDCJ's largest security risks is the rapid growth of the Tango Blast prison gang within the inmate population and that, because the growth has been so rapid and extensive, it is impossible for TDCJ to contain all Tango Blast members in administrative segregation.  He also testified that weapons and violence can be found even within the administrative segregation areas of TDCJ facilities.  Finally, he also agreed that part of the threat posed by the rising Tango Blast population is the gang's relationship with Mexican drug cartels.  *Id.* at 36–65, 66–69 (Frank AuBuchon).

Suniga's brother Michael testified that he was currently serving a state sentence for his fourth DWI conviction, following revocation of his probation.  Michael testified that he also had been previously convicted of possession with intent to distribute a controlled substance.  Michael stated that his parents divorced when he was six and that his mother subsequently remarried to Albert Trevino, who was not a hands-on parent but was a good provider.  Michael stated that after his mother and Albert split, his family moved to Copperas Cove, where he drank alcohol on weekends and fell in with the wrong crowd.  He testified that Brian witnessed him get into many fights, usually over girls, and that their mother sent Michael to live with his aunt Delores in Fort Worth (where Michael graduated from high school).  Michael stated that he was discharged from the Army after nine months due to excessive drinking and fraternizing with enlisted female personnel.  At that time, Michael returned to Fort Worth, where he lived with Lopez Sr.—who was selling drugs—

along with his mother and Brian.  Michael testified that he supported himself by selling marijuana.  Michael said he had been an alcoholic since he was fifteen and that family events during his childhood centered around alcohol.  Michael noted that many of his uncles sold drugs with Lopez Sr. and that one of his cousins shot a man, in retaliation for which a group of people fired shotguns and Mac-9s into their mother's home and set the house on fire.  Michael testified that he and Brian hid inside the kitchen to avoid the gunfire.  Michael testified that after that incident, Brian (then age sixteen) became more apprehensive and began using methamphetamine.  Finally, Michael testified that Eric was generally absent from their lives after Eric went to college and that their mother was a hard worker and a good provider.  *Id.* at 73–106 (Michael Suniga).

Michael also testified that he was sexually abused as a child by his uncle Larry, and he did not tell Brian about that abuse until about eight years before Brian's capital-murder trial.  *Id.* at 107–09 (Michael Suniga).  But the state trial court excluded this testimony because there was no showing that Brian Suniga had any personal knowledge of the alleged sexual abuse at the time it happened, and Brian only learned about the abuse as an adult many years later.  In objecting to this testimony, the prosecution pointed out that, in a recorded conversation between Suniga and his mother, Suniga stated that he had only recently heard about Michael's allegation of sexual abuse by their uncle.  *Id.* at 100–01; Dkt. No. 52-38 at 348–56 (transcript of the recorded conversation).[17]

Finally, Maria Suniga (Augustine Suniga Sr.'s second wife) testified that she married Augustine and moved with him to West Texas after Augustine and Rosalinda divorced.

---

[17] The passage of that conversation to which the prosecutor apparently alluded appears at Dkt. No. 52-38 at 249–50.

Maria testified that she always considered herself to be Brian Suniga's step-grandmother and that when Brian visited her home in Seagraves, he called her Abuelita and treated her nicely. Dkt. No. 49-33 at 227–37 (Maria Suniga).

### iv.   The punishment-phase verdict

On May 20, 2014, the jury returned its punishment phase verdict, finding unanimously and beyond a reasonable doubt that there was a probability Suniga would commit criminal acts of violence that would constitute a continuing threat to society. Dkt. No. 51-30 at 354. The jury also found unanimously and beyond a reasonable doubt that Suniga actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken. *Id.* at 355. Finally, considering all the evidence—including Suniga's background, character, and personal moral culpability—the jury found that there were not sufficient mitigating circumstances to warrant a sentence of life imprisonment without parole rather than a death sentence. *Id.* at 356.[18] The state trial court issued its judgment on June 3, 2014. Dkt. Nos. 51-30 at 386–88; 52-28 at 30–32.

---

[18] The punishment-phase jury charge appears at Dkt. Nos. 51-30 at 347–53.

**B.    Appellate History**

**i.    The direct appeal**

Suniga appealed his conviction and his sentence.[19]  The Texas Court of Criminal

Appeals (TCCA) affirmed Suniga's conviction and sentence in an opinion issued on March

6, 2019.[20]  *Suniga v. State*, No. AP-77,041, 2019 WL 1051548 (Tex. Crim. App. Mar. 6,

2019).  The Supreme Court denied on October 15, 2019, Suniga's subsequent petition for a

writ of certiorari.  *Suniga v. Texas*, 140 S. Ct. 375 (2019).

---

[19] Suniga's appellant's brief asserted seventeen points of error, including arguments that the state trial court failed to address an attorney conflict of interest, erred in excluding Suniga's counsel from an ex parte meeting with a juror, erred by denying motions to change venue, erred in excluding mitigating evidence of intra-family sexual and other abuse, violated Suniga's confrontation rights by admitting testimony from a medical examiner who did not perform David Rowser's autopsy and admitting hearsay testimony from another prosecution witness, and erred by denying a motion to suppress evidence from the vehicle stop the day after the murder.  He also argued that the trial court erred by refusing to give a jury instruction about eyewitness testimony, by overruling Suniga's challenges for cause to ten venire members, by denying several challenges to the statutory definition of mitigating evidence, by denying several challenges to Texas's capital-sentencing special issues, and by failing to impose a burden of proof for the mitigation special issue.  Finally, Suniga argued that cumulative error warranted reversal of Suniga's conviction and sentence.  Dkt. No. 50-22.

[20] The TCCA initially abated Suniga's first appeal and remanded to the state trial court for evidentiary development on Suniga's claim that he was improperly excluded from an ex parte conference between the trial judge and a selected juror.  Dkt. No. 50-12.  Suniga sought a second abatement of his direct appeal to clarify the state court record, which the TCCA granted.  Dkt. No. 50-17.  Following the trial court's issuance of findings of fact, the TCCA affirmed Suniga's conviction and sentence in an unpublished opinion.  *Suniga v. State*, No. AP-77,041, 2017 WL 431904 (Tex. Crim. App. Feb. 1, 2017).  The TCCA subsequently withdrew that opinion and issued its March 6, 2019, final opinion on direct appeal.

### ii.    The state habeas proceeding

On October 5, 2015, the Texas Office of Capital & Forensic Writs filed Suniga's

initial application for state habeas corpus relief and accompanying affidavits and exhibits.[21]

The State responded, with accompanying controverting affidavits and exhibits, on March

31, 2017.[22]  The state trial court held an extended evidentiary hearing on May 3–7, May 10–

12, and May 28, 2021.[23]

Suniga and the State filed their proposed findings of fact and conclusions of law on

October 12, 2021.[24]  On December 27, 2021, the state habeas trial court adopted most of the

State's proposed findings and conclusions, concluded that Suniga was not entitled to state

habeas relief, and recommended denial of Suniga's initial state habeas application.  Dkt.

---

[21] Dkt. Nos. 52-28 at 293–500, 52-29 at 3–145.  In Suniga's initial state habeas application, he argued that his counsel rendered ineffective assistance by failing to prepare for trial, attack and rebut future-dangerousness evidence, investigate Suniga's background and present available mitigating evidence, and object to the prosecution's peremptory challenges to minority members of the venire. He also argued that his conviction resulted from prosecutorial misconduct by using perjured testimony from Rachel Pereida and withholding impeachment evidence related to Pereida.  He argued that the jury was exposed to external influences and engaged in premature deliberations and that the trial court engaged in misconduct by interviewing a juror ex parte.  He also argued that the Texas capital-sentencing special issues were unconstitutional, and that Lubbock County's selection of death-penalty cases was racially biased in violation of his equal-protection rights.  He argued that Texas's death penalty was unconstitutionally arbitrary and that the future-dangerousness special issue was unconstitutionally vague.  Finally, he argued that the statutory definition of mitigating evidence was unconstitutionally narrow.  Suniga also submitted almost 2,400 pages of affidavits, medical records, educational records, and other exhibits to the state trial court in support of his initial application.  Dkt. Nos. 52-29 at 145–500; 52-30; 52-31; 52-32; 52-33; 52-34; 52-35; 52-36 at 1–89.

[22] Dkt. Nos. 52-36 at 121–247; 52-37 at 1–164.  The State also furnished the state trial court with affidavits and other exhibits opposing Suniga's initial state habeas application.  Dkt. Nos. 52-37 at 165–500; 52-38; 52-39 at 7–21.  These exhibits included the affidavits of Suniga's lead state trial counsel Edward Ray Keith (Dkt. Nos. 52-38 at 317–23; 52-39 at 15–21) and co-counsel Dennis Reeves (Dkt. No. 52-38 at 499–500; 52-39 at 7–13).

[23] The transcript of the hearing appears at Dkt. Nos. 51-34 through 51-40; 52-1; 52-2; *see also* Dkt. No. 51-33 (master index for hearing).  The exhibits appear at Dkt. Nos. 52-3 through 52-20.  The agreed order designating the issues for the hearing appears at Dkt. No. 52-39 at 164–74.

[24] Dkt Nos. 52-42 at 120–52; 52-43 at 3–246 (Suniga's proposed findings and conclusions); 52-43 at 248–500; 52-44 at 3–53 (the State's proposed findings and conclusions).

No. 52-44 at 55–65.  The TCCA denied Suniga's initial state habeas application based on the trial court's findings and conclusions and the TCCA's own review of the record.  *Ex parte Suniga*, No. WR-86,575-01, 2022 WL 2064609 (Tex. Crim. App. June 8, 2022).

### iii.    Proceedings in this Court

Suniga filed his original federal habeas corpus petition in this Court in June 2023.  Dkt. No. 17.  The Court permitted Suniga to file an amended petition.  Dkt. Nos. 21; 22.  Suniga filed his amended petition in November 2023.  Dkt. No. 36.  The respondent responded (Dkt. No. 44) and submitted the state-court record to the Clerk of Court (Dkt. Nos. 49; 50; 51; 52).  Suniga replied (Dkt. No. 55), the respondent sur-replied (Dkt. No. 61), and Suniga replied to the sur-reply (Dkt. No. 65).

Suniga requested certification of a constitutional question (Dkt. No. 57), and this Court subsequently certified the constitutional question and gave notice to the United States (Dkt. No. 59).  The parties and the United States have since briefed the constitutional question (Dkt. Nos. 65; 69; 75).  Suniga moved for a stay and for abeyance of this proceeding.  Dkt. No. 63.  The respondent responded (Dkt. No. 67), and Suniga replied (Dkt. No. 70).  Suniga also filed a renewed motion for discovery.  Dkt. No. 74.  The respondent responded (Dkt. No. 78), and Suniga replied (Dkt. No. 79).

Suniga's federal habeas claims in his amended petition are thus ripe for review, as are his motion for a stay and his renewed motion for discovery.  The certified constitutional question was resolved by the Court in a separate order.  Dkt. No. 81.

### 2.    Standard of Review for Habeas Claims

Because Suniga filed this federal habeas corpus action after the effective date of the Anti-Terrorism and Effective Death Penalty Act (AEDPA), this Court's review of his claims

for federal habeas corpus relief is governed by AEDPA. *Penry v. Johnson*, 532 U.S. 782, 792 (2001).

Under AEDPA, "a federal court may disturb a final state-court conviction in only narrow circumstances." *Brown v. Davenport*, 596 U.S. 118, 125 (2022). If the state court already ruled on the merits of the habeas petitioner's claim, then the petitioner must show that the state-court decision was either (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see also Davenport*, 596 U.S. at 125. The federal habeas court's review of claims is "limited to the record that was before the state court that adjudicated the [habeas] claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

As to the first prong, the phrases "contrary to" and "unreasonable application of" have independent meanings. *See* 28 U.S.C. § 2254(d). A state court's decision is "contrary to" clearly established law if it "applies a rule that contradicts the governing law set forth in" Supreme Court cases or "confronts a set of facts that are materially indistinguishable from a [Supreme Court decision] and nevertheless arrives at" a different result. *Mitchell v. Esparza*, 540 U.S. 12, 15–16 (2003) (citation omitted); *see also Norris v. Davis*, 826 F.3d 821, 827 (5th Cir. 2016). A state court need not cite or even be aware of Supreme Court precedent, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Mitchell*, 540 U.S. at 16 (citation omitted).

A state court's decision "involved an unreasonable application of" clearly established law if it "correctly identifies the governing legal rule but applies it unreasonably to the facts

of a particular prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 407–08 (2000); *see also*

*Roberts v. Thaler*, 681 F.3d 597, 604 (5th Cir. 2012). A federal habeas court may not grant

relief because it concludes, based on its independent judgment, that the state court's decision

"applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at

365. Instead, the state court's application of clearly established federal law must be

"objectively unreasonable." *McDaniel v. Brown*, 558 U.S. 120, 133 (2010). Even if the

petitioner has a "strong case for relief," that "does not mean the state court's contrary

conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). Rather, the

petitioner must show that the state court's ruling "was so lacking in justification that there

was an error well[-]understood and comprehended in existing law beyond any possibility for

fairminded disagreement." *Id.* at 103.

　　Federal law is "clearly established" by the holdings, rather than dicta, of Supreme

Court decisions existing at the time the state court rendered its decision. *Davenport*, 596

U.S. at 136. Lower court decisions cannot clearly establish federal law for purposes of

AEDPA. *Id.* And Supreme Court decisions do not clearly establish federal law through

"holdings that speak only at a high level of generality." *Id.*

　　As to the second prong, a state-court decision must be "based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding" to

provide a ground for federal habeas relief. 28 U.S.C. § 2254(d). A state court's factual

determination "is not unreasonable merely because the federal habeas court would have

reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301

(2010). And it is not enough for the petitioner to show that "reasonable minds reviewing

the record might disagree about the finding in question." *Davenport*, 596 U.S. at 135 (citation omitted).

In addition, under Section 2254(e)(1), the state court's determination of factual issues "shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). The federal habeas petitioner has the "burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.*; *see also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). However, the Supreme Court has "left open the question whether [Section] 2254(e)(1) applies in every case presenting a challenge under [Section] 2254(d)(2)." *Wood*, 558 U.S. at 300.

Finally, when a state court has ruled on the merits of the petitioner's claim, "a federal court cannot grant relief without first applying both the test" that the Supreme Court outlined in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), "and the one Congress prescribed in AEDPA," as described above. *Davenport*, 596 U.S. at 122. In *Brecht*, the Court held that a habeas petitioner should not receive federal habeas relief based on trial error unless he shows that the error had a "substantial and injurious effect or influence" on the verdict. 507 U.S. at 637; *see also Davenport*, 596 U.S. at 133. Thus, a petitioner must also show that any error was not harmless within the meaning of *Brecht*. *Davenport*, 596 U.S. at 122.

Additionally, a petitioner "must exhaust available state remedies before presenting his claim to a federal habeas court." *Davila v. Davis*, 582 U.S. 521, 527 (2017); 28 U.S.C. § 2254(b)(1)(A). Thus, unless there is "an absence of available State corrective process" or other "circumstances exist that render such process ineffective to protect the rights of the applicant," the federal habeas court shall not grant a habeas petition unless the petitioner first exhausted his state remedies. 28 U.S.C. § 2254(b)(1); *Davila*, 582 U.S. at 527. If a petitioner brings a petition with both exhausted and unexhausted claims, the federal habeas

– 23 –

court may stay the federal habeas suit pending exhaustion, *see Rhines v. Weber*, 544 U.S. 269, 279 (2005), or dismiss the petition without prejudice, *see Whitehead v. Johnson*, 157 F.3d 384, 387 (5th Cir. 1998).

But even if a petitioner fails to exhaust the available state-court remedies, the federal habeas court is nevertheless authorized to deny habeas relief "on the merits." 28 U.S.C. § 2254(b)(2). Because there is no state-court decision to review when considering an unexhausted claim, the federal court reviews the unexhausted claims de novo. *See In re Paredes*, 587 F. App'x 805, 814 (5th Cir. 2014) (footnote omitted).

Likewise, if the federal petition includes a claim that the petitioner did present to the state court, but the state court failed to adjudicate a claim (or some portion of the claim) on the merits, then the federal habeas court reviews that claim (or portion of the claim) de novo. *Porter v. McCollum*, 558 U.S. 30, 39 (2009). However, "a federal court may not review federal claims that were procedurally defaulted in state court—that is, claims that the state court denied based on an adequate and independent state procedural rule." *Davila*, 582 U.S. at 527.

3.   **Suniga is not entitled to any federal habeas relief.**

   A.   **The twelfth claim—that the Texas capital-sentencing special issues are unconstitutional—is frivolous and does not warrant federal habeas relief.**

In his twelfth claim for federal habeas relief in his amended petition, Suniga argues that the Texas capital-sentencing special issues violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights. Dkt. No. 36 at 198–201. The Court disagrees.

Under Texas Code of Criminal Procedure art. 37.071(2)(b), when a defendant is tried and found guilty of a capital defense in which the State seeks the death penalty, the court conducts a separate sentencing proceeding in which the State and the defendant or defense

– 24 –

counsel may present evidence relevant to sentencing. Once evidence closes, the court begins by submitting two special issues to the jury, which the State must prove beyond a reasonable doubt: (1) "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society"; and (2) "whether the defendant actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken." *Id.* art. 37.071(2)(b), (c). The jury must return a special verdict of "yes" or "no" on these two issues. *Id.* art. 37.071(2)(c). When the jury considers these two initial questions, the trial court must give the jury various charges, including a charge that it may not answer either question "yes" unless the jury unanimously agrees, and the jury may not answer "no" unless 10 or more jurors agree. *Id.* art. 37.071(2)(c).

The trial court must also instruct the jury that if it answers "yes" to both initial issues, then the jury must answer another issue: "[w]hether, taking into consideration all of the evidence, including the circumstances, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed." *Id.* art. 37.071(2)(e)(1). The court also shall instruct the jury that, if the jury answers that some circumstance or circumstances warrant a sentence of life without parole rather than the death sentence, the court will sentence the defendant to life without parole. *Id.* art 37.071(2)(e)(2). In addition, the trial court must give the jury various charges in answering the third issue under subsection 37.071(2)(e)(1), including that the jury must answer "yes" or "no," the jury may not answer "no" (that no such circumstance exists) unless the jury unanimously agrees, and it may not answer "yes" (that such

circumstance exists) unless 10 or more jurors agree. *Id.* art. 37.071(2)(f). The court must also charge the jury that the jury "shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness." *Id.* art. 37.071(2)(f)(4). These rules for the numbers of jurors that must agree to a result for these special issues are collectively known as the "Texas twelve/ten rule."

If the jury answers "yes" to the two initial questions and "no" to the third question, the court shall impose the death sentence. *Id.* art. 37.071(2)(g). If the jury answers "no" to either of the two initial questions or answers "yes" to the third question, or if the jury cannot answer any of the three issues, the court shall impose a sentence of life imprisonment without parole. *Id.* But under this procedure, "[t]he court, the attorney representing the state, the defendant, or the defendant's counsel may not inform a juror or prospective juror of the effect of a failure of a jury" to reach the unanimous or 10-juror agreement required on the three special issues. *Id.* art. 37.071(2)(a)(1).

Suniga argues the Constitution requires that the state trial court instruct the jury at the special-issues stage that even a single hold-out juror (that is, one juror opposing the remaining eleven when the special verdict must be unanimous) would result in the trial court imposing a life sentence. Whether reviewing the TCCA's rejection of this claim deferentially under AEDPA or considering it de novo, the Court denies habeas relief on this claim.

### i.    Procedural history

In his state direct appeal, Suniga argued that the Texas twelve/ten rule violated his Eighth and Fourteenth Amendment rights because it is confusing and misleading by failing to advise the jury that a single hold-out juror results in a life sentence. Dkt. No. 50-22 at

199–208.  The TCCA rejected this argument on the merits.  *Suniga*, 2019 WL 1051548, at

*52–54.

In his state habeas proceeding, Suniga argued that the Texas twelve/ten rule violated

his Sixth Amendment rights, along with his Eighth and Fourteenth Amendment rights, for

the same reasons.  Dkt. No. 52-29 at 98–106.  The state habeas trial court concluded that

this claim "was either raised and rejected on direct appeal or should have been raised on

direct appeal and is therefore procedurally barred from relief."  Dkt. No. 52-44 at 64

(citation omitted).  On appeal from the state habeas trial court, the TCCA agreed that it

would "not review the merits of these habeas claims because they were either raised and

rejected on direct appeal or [Suniga] failed to raise them."  *Ex parte Suniga*, 2022 WL

2064609, at *2.

### ii.    Eighth Amendment standard for capital sentencing

Under the Eighth Amendment, capital sentencing for homicide must meet two

requirements.  First, the jury must find an "aggravating circumstance" that applies "only to

a subclass of defendants convicted of murder" and is not unconstitutionally vague.  *Tuilaepa*

*v. California*, 512 U.S. 967, 971–72 (1994).  Second, the jury must determine "whether a

defendant eligible for the death penalty should in fact receive that sentence."  *Id.*

For the first requirement—eligibility for the death penalty—the Eighth Amendment

requires that "a capital sentencing scheme must 'genuinely narrow the class of persons

eligible for the death penalty and must reasonably justify the imposition of a more severe

sentence on the defendant compared to others found guilty of murder."  *Loving v. United*

*States*, 517 U.S. 748, 755 (1996) (quoting *Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988)).

This narrowing is achieved by requiring that the jury find at least one aggravating

– 27 –

circumstance.  *Id.*  The aggravating circumstance may either be contained in the definition of the capital offense (in which case, the jury finds the aggravating circumstance at the guilt-innocence phase) or may be found separately from the capital offense at the sentencing phase.  *Id.*

For the second requirement—selection for the death penalty—the Eighth Amendment requires that the capital-sentencing system must "permit a jury to render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime."  *Kansas v. Marsh*, 548 U.S. 163, 174 (2006).  The system must allow the jury "the opportunity to consider all evidence relevant to mitigation."  *Id.* at 171.  But the State need not instruct the jury on its obligation to consider mitigating evidence.  *Buchanan v. Angelone*, 522 U.S. 269, 275 (1998).  Instead, the State is allowed to "determine the manner in which a jury may consider mitigating evidence," so long as the State does not preclude the consideration of mitigating evidence.  *Marsh*, 548 U.S. at 171.

The sentencing court need not instruct the jury "as to the consequences of a breakdown in the deliberative process"—that is, when the "jury is unable to produce a unanimous sentence recommendation."  *Jones v. United States*, 527 U.S. 373, 382 (1999).  The refusal to give such an instruction does not affirmatively mislead the jury about its role in the sentencing process.  *Id.*

### iii.   AEDPA and de novo review

Suniga presents this Court with both (1) Fifth, Eighth, and Fourteenth Amendment arguments that the TCCA rejected on the merits during Suniga's state direct appeal, and (2) a Sixth Amendment argument that the TCCA held during Suniga's state habeas corpus

proceeding had procedurally defaulted.  Suniga's twelfth claim fails under both AEDPA and de novo review.

In *Jones*, the Supreme Court rejected Suniga's Eighth Amendment argument against the Texas twelve/ten rule when it held that there is "no merit" to the argument that "the Eighth Amendment requires a jury be instructed as to the consequences of a breakdown in the deliberative process."  527 U.S. at 382.  In addition, the Fifth Circuit has repeatedly rejected Suniga's Fifth, Eighth, and Fourteenth Amendment arguments that a Texas capital-murder defendant is constitutionally entitled to a jury instruction about the consequences of a hung jury or a single holdout juror.  There is no clearly established federal law requiring that a capital-sentencing jury be instructed about the effect of a holdout juror on any of the capital-sentencing special issues.  *Young v. Davis*, 835 F.3d 520, 528 (5th Cir. 2016); *see also, e.g.*, *Sprouse v. Stephens*, 748 F.3d 609, 623 (5th Cir. 2014).  Whether applying AEDPA review to the state court's decision or conducting de novo review, *Jones* forecloses this claim.

Suniga's arguments to the contrary fail.  First, Suniga's reliance on *Caldwell v. Mississippi*, 472 U.S. 320 (1985), is misplaced.  In *Caldwell*, the Supreme Court held that it is "constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere."  *Id.* at 328–29.  To establish a *Caldwell* violation, "a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law."  *Dugger v. Adams*, 489 U.S. 401, 407 (1989).  No such error of misleading the jury about its role as the ultimate arbiter of Suniga's sentence occurred here.  Indeed, the Supreme Court and the Fifth Circuit have

– 29 –

rejected the argument that a refusal to give an instruction about a potential jury breakdown affirmatively misleads the jury regarding its role in the sentencing process. *Jones*, 527 U.S. at 382; *see also Alexander v. Johnson*, 211 F.3d 895, 897 n.5 (5th Cir. 2000).

Second, Suniga's argument based on *Mills v. Maryland*, 486 U.S. 367 (1988), also fails. Under *Mills*, "each juror [must] be permitted to consider and give effect to mitigating evidence when deciding the ultimate question whether to vote for a sentence of death." *McKoy v. North Carolina*, 494 U.S. 433, 442–43 (1990). But "*Mills* is not applicable to the capital[-]sentencing scheme in Texas" because, even without an instruction about the effect of a holdout juror, all jurors are still able to "take into account any mitigating circumstance." *Miller v. Johnson*, 200 F.3d 274, 289–90 (5th Cir. 2000) (citation omitted).

Third, while Suniga also claims that *Simmons v. South Carolina*, 512 U.S. 154 (1994), supports his claim, "*Simmons* is irrelevant" to the constitutionality of "jury instructions concerning voting thresholds." *Young*, 835 F.3d at 528. In *Simmons*, the Supreme Court "held that if state law does not allow parole from a life sentence, a capital defendant is entitled to have the jury notified of that fact." *Id.* Because *Simmons* concerned an entirely different question and in no way qualified the Supreme Court's holding in *Jones*, this argument also fails.[25] *See id.*

Finally, contrary to Suniga's argument, the Texas twelve/ten rule does not create "a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494

---

[25] The trial court instructed the sentencing jury that if the jury found that circumstances warranted a sentence of life imprisonment without parole, then the court would sentence Suniga to imprisonment for life without parole and that Suniga would, under that sentence, be ineligible for release on parole. Dkt. No. 51-30 at 349.

U.S. 370, 380 (1990).  The Supreme Court has consistently applied this standard to evaluate challenges to punishment-phase jury instructions.  *See, e.g.*, *Weeks v. Angelone*, 528 U.S. 225, 226 (2000).  The petitioner must demonstrate more than a "slight possibility" that the jury believed that it was precluded from considering relevant evidence.  *Id.* at 236.

This Court must analyze the challenged language included in the jury charge within the context of the overall jury charge.  *Cupp v. Naughten*, 414 U.S. 141, 146–47 (1973).  The Court must approach the instructions as a jury would, meaning "with a 'commonsense understanding of the instructions in the light of all that has taken place at the trial.'"  *Johnson v. Texas*, 509 U.S. 350, 368 (1993) (quoting *Boyde*, 494 U.S. at 381).  Here, nothing in Suniga's punishment-phase jury charge can reasonably be construed as foreclosing his jury's consideration of any of the potentially mitigating evidence presented during his trial.  There is no reasonable likelihood that the jury interpreted the Texas twelve/ten instructions to mean that a juror lacked the ability to vote consistent with their conscience and all the evidence or to mean that a juror's decision to vote inconsistent with other jurors had no legal impact.  Instead, even without an instruction about the effect of a holdout juror, "all jurors" could still "take into account any mitigating circumstance," and "[o]ne juror cannot preclude the entire jury from considering a mitigating circumstance."  *Miller*, 200 F.3d at 288–89 (citation omitted).

In sum, Suniga's claim that the Texas twelve/ten rule violates the Eighth Amendment and the Due Process Clause of the Fifth and Fourteenth Amendments fails under AEDPA because the state court's decision was not contrary to any clearly established law.  But even if the Court were to apply de novo review, Suniga's claim would still fail for all the reasons explained above.

Suniga also seeks to attack the Texas twelve/ten rule by presenting a juror affidavit, which states that she experienced confusion during deliberations and that she did not want to give the death penalty.  Dkt. No. 17-8 at 213–14.  But that affidavit is not properly before this Court, under either AEDPA or de novo review.  *See Young*, 835 F.3d at 528–29. Federal Rule of Evidence 606(b)(1) makes juror affidavits inadmissible regarding "the effect of anything on that juror's or another juror's vote" or "any juror's mental processes concerning the verdict or indictment."  And "Rule 606(b) forbids consideration of juror affidavits in federal habeas cases."  *Young*, 835 F.3d at 529.  Because Suniga presents the affidavit to show the juror's thought processes and does not allege any facts that bring the affidavit within any exception under Rule 606(b)(2), the Court disregards the affidavit as it relates to this claim.

Finally, as to Suniga's procedurally barred Sixth Amendment claim, Suniga identifies no authority supporting the theory that the Sixth Amendment requires the sentencing court to instruct the jury on the effect of a holdout juror.  Indeed, Suniga's reliance on the Sixth Amendment here violates the non-retroactivity rule announced in *Teague v. Lane*, 489 U.S. 288 (1989).  *Teague* forbids federal courts from "granting habeas corpus relief to a state prisoner based on a [new] rule announced after his conviction and sentence became final."  *Caspari v. Bohlen*, 510 U.S. 383, 389 (1994).  A holding is a "new rule" under *Teague* "if it breaks new ground, imposes a new obligation on the States or Federal Government, or was not dictated by precedent existing at the time the defendant's conviction became final."  *O'Dell v. Netherland*, 521 U.S. 151, 156 (1997) (internal quotation marks and citation omitted) (emphasis omitted).  Under this doctrine, unless a reasonable jurist hearing the defendant's claim at the time the defendant's conviction or sentence

became final would have felt compelled by existing precedent to rule in the defendant's favor, a federal habeas court will not grant the requested relief. *Id.* at 156, 164. "*Teague* remains applicable after the passage of AEDPA." *Robertson v. Cockrell*, 325 F.3d 243, 255 (5th Cir. 2003).

A conviction and sentence become final under *Teague* "when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied." *Caspari*, 510 U.S. at 390. Suniga's conviction became final for *Teague* purposes no later than October 15, 2019, when the Supreme Court finally denied his petition for certiorari seeking review of the TCCA's opinion affirming his conviction and sentence. *Suniga v. Texas*, 140 S. Ct. 375 (2019).

When Suniga's conviction and sentence became final, no precedent binding on this Court had held that the capital-sentencing court must, under the Sixth Amendment, instruct a capital-sentencing jury that a hung jury would result in a life sentence for the defendant. And Suniga does not provide any precedent to support this theory, either. *See* Dkt. No. 36 at 198–201. Thus, besides the lack of authority to support Suniga's Sixth Amendment argument for this claim, *Teague* forecloses the ruling for which Suniga advocates.

In conclusion, the TCCA's rejection on the merits during Suniga's direct appeal of his Eighth Amendment and due-process challenges to the Texas twelve-ten rule and the absence of a hung-jury instruction from his punishment-phase jury charge was neither contrary to, nor involved an unreasonable application of, clearly established federal law, and it did not result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Suniga's trial and direct appeal. Suniga's twelfth

– 33 –

claim thus does not warrant federal habeas corpus relief under AEDPA. But even when reviewed de novo, Suniga's twelfth claim fails. Finally, *Teague* forecloses Suniga's Sixth Amendment challenge.

### B. The tenth claim—that the trial court erred by excluding proffered evidence of mitigating personal history—does not warrant federal habeas relief.

In his tenth claim, Suniga argues that the state trial court erred in excluding proffered additional mitigating evidence in the form of testimony from three witnesses. First, the trial court excluded testimony from the defendant's brother, Michael Suniga, that their uncle Larry sexually abused Michael during their childhood. Second, the trial court excluded testimony from the defendant's mother, Rosalinda Davis, about the problems that alcohol caused in the life of the defendant's eldest brother, Eric Suniga. Finally, the trial court excluded the testimony from the defendant's aunt, Delores Garcia, about Delores's father's physical and verbal abuse of her mother and his sexual abuse of Delores's sister. Dkt. No. 36 at 183–89. Suniga argues that excluding this evidence violated the Fifth, Sixth, Eighth, and Fourteenth Amendments. *Id.* Whether reviewing the TCCA's rejection of this claim deferentially under AEDPA or considering it de novo, the Court denies habeas relief on this claim.

### i. Procedural history

Suniga presented a similar argument on direct appeal. Dkt. No. 50-22 at 114–23. The TCCA rejected the argument on the merits. *Suniga*, 2019 WL 1051548, at *20–28. In its opinion on direct appeal, the TCCA determined that the trial court properly excluded Michael's testimony about his sexual abuse by his father because the defendant "was not aware of that abuse until many years later" and because, under Texas law, the fact that another person in the defendant's family was sexually abused does not affect the defendant's

culpability for his crime and does not make a finding of mitigation any more or less probable. *Id.* at *26. It also noted that Eric, who is eight years older than the defendant, admitted that he did not interact with the defendant very much after Eric finished high school and left home, so the trial court did not err by concluding that "whatever alcohol-related problems Eric had later in life were not relevant to" the defendant. *Id.* at *27. Finally, the TCCA found that the trial court did not abuse its discretion by excluding the challenged testimony of the defendant's aunt Delores because (1) the defendant's mother Rosalinda also testified about her father's alcoholism but did not testify about any abuse of her mother by her father, so there was no sign that the testimony that Delores witnessed such abuse would be relevant; and (2) Rosalinda did not know about her father's sexual abuse of Rosalinda's sister, Alma, until the defendant was in jail awaiting trial for the capital offense, so Delores's testimony about that abuse was not relevant to the defendant. *Id.* at *26–27.

In his state habeas proceeding, Suniga again argued that the trial court's challenged evidentiary exclusions violated the Eighth and Fourteenth Amendments. Dkt. No. 52-29 at 135. The state habeas trial court concluded that this claim was "either raised and rejected on direct appeal or should have been raised on direct appeal" and was thus "procedurally barred from relief." Dkt. No. 52-44 at 64 (citation omitted). TCCA agreed that it would "not review the merits" of the claim because it was either raised and rejected on direct appeal or [Suniga] failed to raise them." *Ex parte Suniga*, 2022 WL 2064609, at *2.

### ii.    Standard for determining constitutional error in the exclusion of evidence

State court errors in the admission or exclusion of evidence warrant federal habeas relief only if the evidentiary ruling violates a specific federal constitutional right, such that

the defendant's trial was rendered fundamentally unfair. *Bigby v. Dretke*, 402 F.3d 551, 563 (5th Cir. 2005); *see also Payne v. Tennessee*, 501 U.S. 808, 825 (1991); *Prystach v. Davis*, 854 F.3d 830, 840 (5th Cir. 2017). The question before this Court is not whether the state trial court properly applied state evidentiary rules. *Bigby*, 402 F.3d at 563. Instead, the "sole inquiry" is whether the exclusion of the challenged evidence "violated the Constitution." *Id.* If the exclusion of evidence rendered the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a basis for relief. *Id.*

"Relief will be warranted only when the challenged evidence played a crucial, critical, and highly significant role in the trial." *Gonzales v. Thaler*, 643 F.3d 425, 430 (5th Cir. 2011) (quotation marks and footnote omitted). The challenged evidence must be considered in the context of the entire trial. *Id.* at 430–31. The Due Process Clause "does not afford relief where the challenged evidence was not the principal focus at trial and the errors were not so pronounced and persistent that it permeates the entire atmosphere of the trial." *Id.* at 431 (quotation marks and footnote omitted). Showing such fundamental unfairness is "a high hurdle, even without AEDPA's added level of deference." *Id.*

### iii.    AEDPA and de novo review

Suniga argues that the trial court's evidentiary rulings violated the Eighth Amendment because Suniga should have been permitted to present to the jury all mitigating evidence that could reasonably warrant a non-death sentence. Dkt. No. 36 at 186. Suniga frames his argument as a challenge to the trial court's evidentiary rulings that certain evidence was irrelevant to mitigation, as well as a challenge to the trial court's factual determination that Suniga was not aware as a child of Michael's sexual abuse. *Id.* at 187–88. But, in substance, Suniga's argument is a back-door attack on the Texas

capital-sentencing statute's definition of mitigating evidence as "evidence that a juror might regard as reducing the defendant's moral blameworthiness." Tex. Code Crim. P. art. 37.071(2)(f)(4).[26]

Suniga's argument goes too far. First, the Supreme Court has consistently used the term "relevant mitigating evidence" to describe evidence that tends to diminish a convicted capital-murder defendant's moral blameworthiness or lessen the reprehensible nature of the offense—that is, evidence that relates to the defendant's own character or background or to the circumstances of the capital offense—not evidence about the moral blameworthiness of anyone in the defendant's family. *See, e.g.*, *Brewer v. Quarterman*, 550 U.S. 286, 293–96 (2007) (the defendant's depression, troubled childhood, and substance abuse); *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 259 (2007) (the defendant's childhood deprivation and lack of self-control); *Tennard v. Dretke*, 542 U.S. 274, 283–88 (2004) (the defendant's low intellectual functioning). True, the Supreme Court has held that there are "virtually no limits . . . placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances." *Payne*, 501 U.S. at 822. But that rule does not displace "the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense." *Lockett v. Ohio*, 438 U.S. 586, 604 n.12 (1978) (plurality opinion); *see also Woodson v. North Carolina*, 428 U.S. 280, 303 (1976) (noting that the capital-sentencing process must afford "particularized consideration of relevant aspects of the character and record of [the] convicted defendant").

---

[26] To the extent that Suniga argues that the TCCA erroneously construed Texas evidentiary rules in affirming the trial court's exclusion of the challenged mitigating evidence, "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *see also Garza v. Stephens*, 738 F.3d 669, 677 (5th Cir. 2013).

Further, Suniga's argument that the challenged evidence should have been admitted under *Tennard* also fails. 542 U.S. 274. In *Tennard*, the Supreme Court stated that the relevance in the context of mitigating evidence should be construed just as expansively as in other contexts. *Id.* at 284. But *Tennard* did not address the meaning of mitigating evidence or circumstances as those terms are used in Texas's capital-sentencing statute or announce an evidentiary rule about the admission of mitigating evidence that is unrelated to the defendant's character or personal history or the circumstances of his capital offense. *See id.*

Moreover, Texas's definition of "mitigating evidence" is not unconstitutionally narrow because the Texas definition "does not unconstitutionally preclude the jury from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense" that could provide a basis for a sentence less than death. *Blue v. Thaler*, 665 F.3d 647, 665–66 (5th Cir. 2011) (quoting *Beazley v. Johnson*, 242 F.3d 248, 260 (5th Cir. 2001)) (internal quotation marks and emphasis omitted). As a result, trial judges "still retain their traditional authority to exclude irrelevant evidence that does not bear" on the defendant's moral blameworthiness or to exclude potentially mitigating evidence for other reasons, such as because it is speculative. *See Rhoades v. Davis*, 914 F.3d 357, 366 (5th Cir. 2019); *see also Hummel v. Davis*, 908 F.3d 987, 994 (5th Cir. 2018); *Prystach*, 854 F.3d at 840 (agreeing that excluding speculative evidence did not deny fundamental fairness). On this basis alone, the Court determines that the trial court's evidentiary rulings were not contrary to, or an unreasonable application of, clearly established federal law.

Finally, Suniga does not identify any Supreme Court opinion that requires a capital sentencing jury to give mitigating consideration to any evidence or circumstance unrelated

to a defendant's own moral blameworthiness, personal moral culpability, or the circumstances of the capital offense. The Court therefore determines that the trial court's evidentiary rulings were not contrary to, or an unreasonable application of, clearly established federal law.

In addition, even were the Court to review Suniga's claim de novo, the state trial court's challenged evidentiary rulings did not render Suniga's trial fundamentally unfair. Suniga's trial counsel presented a substantial mitigation case detailing the difficulties that Suniga faced growing up. *See supra* Factual Background § 1.A.iii. Although the facts are set out in more detail above, the defense presented evidence that Suniga was the youngest child of a twice-divorced mother who moved her children several times during Suniga's formative years and often worked long hours, which prevented her from adequately supervising her sons. In addition, the jury heard evidence that Suniga's mother was emotionally unavailable to Suniga, liked to party when she was not working, and lived for a time with Lopez Sr., a known drug-dealer. She allowed Suniga to drop out of school in the ninth grade and work for Lopez Sr., and she came from a family in which alcohol abuse played a role at every family function. The jury also heard Eric's and Rosalinda's testimony that Eric had issues with alcohol. Rosalinda testified that she considered Eric to be an alcoholic, which Eric denied despite his admission that he drank alcohol regularly.

Next, the jury heard testimony from Michael that Brian experienced significant negative influences in his life growing up, including from Michael's long history of alcohol abuse (and multiple DWI convictions) and federal-court conviction for dealing drugs. Michael also testified that he worked for a well-known drug dealer after his discharge from the military. Michael told the jury that he and the defendant survived a violent and

traumatic home invasion that left Brian emotionally withdrawn.  He also told the jury that Brian witnessed Michael's misogynistic and harmful teenage behavior and fights.  Michael said that Brian knew that Michael sold drugs, that Brian himself later abused drugs, and that at fifteen Brian started selling drugs for Lopez Sr.  In addition, Michael testified about Brian's family life, such as his seven children from five women and Brian's failure to financially support his children.  Finally, the jury heard during the punishment phase that, despite his lengthy criminal record (which included multiple acts of violence and multiple criminal convictions), his family nonetheless considered Brian to be a good person and a loving, even if unsupportive, father.

The excluded evidence added very little of substance to the mitigation case that was presented to Suniga's capital-sentencing jury.  The proffered testimony of Suniga's mother about Eric's adult battles with alcohol concerned matters that took place long after Brian's childhood.  Michael's testimony about his own child sexual abuse by an uncle also disclosed that he did not believe Brian was aware of the abuse until Michael told Brian about eight years before Brian's capital-murder trial, when Brian was in his early-to-mid-twenties. There was no evidence that Rosalinda, much less Brian, was ever aware of Delores's accusation of sexual abuse by Delores's father (Brian's late grandfather) until Delores testified at Brian's trial.  Moreover, the proffers of the ultimately excluded evidence about bad acts by Suniga's family members were not accompanied by any testimony from an expert explaining how the alleged culture of alcohol and sexual abuse within Suniga's extended family impacted Suniga during his development.  Under these circumstances, this Court concludes the state trial court's challenged evidentiary rulings did not render Suniga's trial fundamentally unfair.

Indeed, the Court concludes that even if the trial court's challenged evidentiary rulings were erroneous in some way, they were harmless error. Before this Court may grant federal habeas relief on a claim decided on the merits by the state court, the Court must determine that the state-court rulings had a "substantial and injurious effect or influence" on the trial's outcome. *Davenport*, 596 U.S. at 126 (2022) (citation omitted).

None of the proffered additional mitigating testimony would have impacted the jury's answers to the eligibility special issues in a manner favorable to the defense. As to the selection special issue, the proffered mitigating evidence was largely cumulative and cut both ways. Even without the proffered mitigating evidence, the jury heard that Brian Suniga came from a family with many members who routinely abused alcohol and engaged in criminal drug-trafficking during Brian's childhood. The jury also heard that Eric, Michael, and Brian's father Augustine all had issues with alcohol and that Michael and Brian dealt and abused drugs. Finally, the jury knew that Brian did not respond well to the negative influences in his life, including the attack on his home and his mother's irresponsible behavior and association with Lopez Sr.

Moreover, relevance in the mitigation context carries its usual meaning, so the trial court may reasonably insist that proffered mitigation evidence bears some relationship to the defendant's own background, character, culpability, or the circumstances of his capital offense. *Tennard*, 542 U.S. at 285. Here, there was no evidence proffered to the state trial court showing that Suniga's development was harmed by Eric's alleged alcohol problem (which apparently occurred when Brian was an adult), by Michael's confession to an adult Brian that Michael had been sexually abused by their uncle many years before, or by the sexual abuse of Brian's aunt by Brian's grandfather (of which Brian appears to have been

– 41 –

unaware before trial).  Without a showing of how these matters impacted Suniga's development, the challenged evidentiary exclusions did not render the punishment phase of Suniga's trial fundamentally unfair and did not rise above harmless error.

Finally, Suniga identifies no authority supporting his theory that the trial court's evidentiary exclusions violated the Sixth Amendment.  Recognizing such a rule would, for the reasons already identified in Section 3.A.iii, *supra*, violate *Teague*'s non-retroactivity rule. Thus, besides the lack of authority to support Suniga's Sixth Amendment argument for this claim, *Teague* forecloses the ruling for which Suniga advocates.

In conclusion, the TCCA's rejection on direct appeal of Suniga's Eighth Amendment and due process challenges to the trial court's exclusion of proffered mitigation evidence was neither contrary to, nor involved an unreasonable application of, clearly established federal law, and it did not result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Suniga's trial and direct appeal.  Suniga's tenth claim thus does not warrant federal habeas corpus relief under AEDPA.  But even when reviewed de novo, Suniga's tenth claim fails because his trial was not rendered fundamentally unfair and because any error was harmless.  Finally, *Teague* forecloses Suniga's Sixth Amendment challenge to the trial court's evidentiary rulings.

> **C.      The second claim—that Suniga was denied a fair trial due to the trial court's denial of his motions to change venue—does not warrant federal habeas relief.**

In his second claim, Suniga argues that he was denied a fair trial in violation of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights when the trial court denied his multiple motions requesting a change of venue.  Dkt. No. 36 at 92–108.  The Court disagrees.

i.        **Procedural history**

Suniga presented a similar argument on direct appeal.  Dkt. No. 50-22 at 84–112. The TCCA rejected the argument on the merits.  *Suniga*, 2019 WL 1051548, at *14–20.  The TCCA first noted that individual jury voir dire began on March 31, 2014.  *Id.* at *14.  Nine jurors had been selected by April 23.  *Id.*  Then, on April 24, Suniga's trial counsel complained of television and newspaper reports that contained details about the case and its aftermath, stating that police believed Suniga and Lopez Jr. were part of the Tango Blast gang, identifying them as the defendants in the Rowser murder case, and describing a recent DPS report on gang activity in West Texas.[27]  *Id.*  The same day, the state trial court issued a gag order in response to those complaints.[28]  *Id.* at *15.  On April 25, Suniga filed his first motion for change of venue, accompanied by two conclusory citizen affidavits asserting the belief that Suniga could not get a fair trial in Lubbock County because of pervasive publicity and news coverage.[29]  *Id.*  Then, at a hearing on April 28, the trial judge placed the nine jurors who had been selected under oath and questioned them about their exposure to the recent press coverage of the case.  *Id.* at *16.  When asked as a group whether any of them had seen the news coverage from the previous week, none responded affirmatively.  *Id.* After the hearing, the trial judge denied Suniga's first motion for change of venue but instructed a court employee to contact the remaining prospective jurors to remind them not to watch or read any news accounts relating to the case.  *Id.*  On May 2, Suniga's counsel renewed the motion for a change of venue, citing a newspaper article that had appeared the

---

[27] Dkt. No. 49-20 at 9–19.

[28] Dkt. No. 51-30 at 117.

[29] Dkt. No. 51-30 at 120–42.

previous day addressing the Tango Blast gang and gang tattoos, but not specifically mentioning Suniga. *Id.*

On May 5, Suniga filed his second motion to transfer venue, arguing that two recent news articles had appeared, one that quoted law enforcement officers (of which one was an expert in Suniga's trial), and another that was a video report discussing Suniga's first motion to transfer venue and depicting Suniga in an orange jumpsuit and handcuffs being escorted by officers.[30] *Id.* at *17; Dkt. No. 51-30 at 229–56. Suniga's attorneys also provided a local newspaper article reporting on gang tattoos, which identified the five-pointed star tattoo's association with the Tango Blast gang, included County personnel explaining that not all jail inmates who had tattoos were hardened criminals, and reporting that prosecutors often used gang tattoos against criminal defendants. *Suniga*, 2019 WL 1051548, at *17. At a hearing on May 6, the trial court denied Suniga's second motion for change of venue, noting that nothing in the local newspaper article addressed Suniga or his connection to the Tango Blast gang. *Id.*; Dkt. No. 49-27 at 9. On May 13, before the jury entered the courtroom, Suniga's counsel re-urged his previous motions for change of venue, and the trial court denied it. *Suniga*, 2019 WL 1051548, at *17; Dkt. No. 49-28 at 20.

### ii. Sixth Amendment standard for the right to trial by an impartial jury

A criminal defendant is entitled to a transfer of his trial to a different venue "if extraordinary local prejudice will prevent a fair trial," which is a "basic requirement of due process." *Skilling v. United States*, 561 U.S. 358, 378 (2010) (citation omitted). *Skilling*

---

[30] Dkt. No. 51-30 at 229–56. The second motion to transfer venue was signed and dated on May 5, 2014, but the file stamp is dated May 12, 2014. *Id.* at 229. The TCCA explained that Suniga's trial counsel began bench-filing motions with the trial court to prevent media access to the defense's motions. *Suniga*, 2019 WL 1051548, at *17 n.13.

emphasized that showing juror exposure to news accounts "alone [does not] presumptively deprive[] the defendant of due process." *Id.* at 380 (citation omitted). The Court noted that juror impartiality "does not require ignorance." *Id.* at 381 (emphasis omitted). Instead, the defendant must show an "extreme case" in which the "trial atmosphere" was "utterly corrupted by press coverage." *Id.* at 380–81. For example, those extreme circumstances existed in a case in which an interview of the defendant admitting to the commission of the crimes charged against him was broadcast three times to "tens of thousands of people" in a community of around 150,000 people. *Id.* at 379 (discussing the facts of *Rideau v. Louisiana*, 373 U.S. 723 (1963)). In other cases, the Supreme Court has applied a presumption of prejudice where courtrooms were "overr[u]n" with press and created a "carnival atmosphere" within the trial. *Id.* at 380.

In sum, "pretrial publicity—even pervasive, adverse publicity—does not inevitably lead to an unfair trial." *Id.* at 384 (quoting *Nebraska Press Ass'n. v. Stuart,* 427 U.S. 539, 554 (1976)). Several facts weigh on whether there was unconstitutional juror prejudice: "the size and characteristics of the community in which the crime occurred," whether the publicity contained a "confession or other blatantly prejudicial information," the time between the event charged in the indictment and the trial, whether the trial resulted in acquittal on any charges or any other result that undermines the presumption of juror bias, and the presence of any "extensive screening questionnaire and followup voir dire" about media exposure and bias. *Id.* at 382–85 (emphases omitted).

### iii.    AEDPA review

The TCCA reasonably rejected Suniga's claims related to the denial of his motions for a change of venue. Applying a presumption of prejudice "is only rarely applicable and is

confined to those instances where the petitioner can demonstrate an extreme situation of inflammatory pretrial publicity that literally saturated the community in which his trial was held." *Busby v. Dretke*, 359 F.3d 708, 725–26 (5th Cir. 2004) (citation omitted). Here, the pretrial publicity relevant to Suniga's trial did not even begin to approach the extensive and pervasive, carnival-like atmospheres the Supreme Court has described. *See Skilling*, 561 U.S. at 380. Nor was anything as pervasively prejudicial in the news accounts and broadcasts before Suniga's trial as occurred in *Rideau*, where news media broadcast the defendant's police-interview confession. *See id.* at 379. Mentions of the "suspected" membership of Suniga and his co-defendant Lopez Jr. came with comments from officials suggesting that tattoos were far-from-conclusive evidence of gang membership. The initial reports of Suniga's suspected gang membership and involvement in the Rowser murder reported in April 2014 were apparently so non-inflammatory and non-pervasive that the nine jurors who had been selected by April 23 had not seen or heard about them. Presumptive prejudice is inappropriate absent a "trial atmosphere" that is "utterly corrupted by press coverage." *Dobbert v. Florida*, 432 U.S. 282, 303 (1977) (citation omitted). The TCCA reasonably concluded the Supreme Court's line of presumed-prejudice cases did not apply to the denial of Suniga's motion for change of venue.

Moreover, the pretrial news media reports about gang activity in West Texas, including those addressing the threat posed by the Tango Blast gang, were not nearly as pervasive as were the detailed accounts, photographs, and video of pretrial proceedings in other cases in which the Court has applied a presumption of prejudice. *See, e.g.*, *Skilling*, 561 U.S. at 379–80. Nor were those reports either factually inaccurate or anywhere as overtly prejudicial as the repeated broadcast of a confession. *See id.* Suniga does not identify any

pretrial media reports broadcast or published prior to his trial claiming that Suniga had confessed to Rowser's murder or that any irrefutable evidence of Suniga's guilt existed. Likewise, while there was evidence at trial strongly suggesting Suniga's membership in the Tango Blast gang, there was no evidence at trial (or any pretrial reports) suggesting David Rowser's murder was in any way gang-related.

As for the relevant factors identified in *Skilling*, Lubbock County's total population approaches 300,000, nearly double the size of the small Louisiana parish from which the *Rideau* case originated. Almost two years passed between David Rowser's murder and the start of jury selection for Suniga's trial. Finally, the same trial judge who presided for weeks over individual voir dire in Suniga's case—and who had the firsthand opportunity to hear venire members, discuss the jurors' familiarity with the crime and the suspect, and discuss how publicity affected jurors' ability to render a verdict based on the law and the evidence presented at trial—denied Suniga's venue-change motions. When pretrial publicity is at issue, "primary reliance on the judgment of the trial court makes good sense" because the judge "sits in the locale where the publicity is said to have had its effect" and may base his evaluation on his "own perception of the depth and extent of news stories that might influence a juror." *Skilling*, 561 U.S. at 386 (quoting *Mu'Min v. Virginia,* 500 U.S. 415, (1991)).

The Court thus concludes that the TCCA's rejection of this claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law, and it did not result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Suniga's trial and direct appeal. Suniga's second claim in his amended petition does not warrant federal habeas corpus relief under AEDPA.

– 47 –

**D.    The fifth claim—that Suniga's trial counsel allegedly had a conflict of interest—does not warrant federal habeas relief.**

In his fifth claim, Suniga argues that his trial counsel had a conflict of interest and that the trial court failed to adequately investigate the conflict, in violation of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights.  Dkt. No. 36 at 127–34.  The Court disagrees.

### i.    Procedural history

Suniga presented a similar argument on direct appeal, which the TCCA rejected. Dkt. No. 50-22 at 59–67; *Suniga v. State*, 2017 WL 431904, at *2–5.  The TCCA began by noting that the trial court held a hearing on January 29, 2014, a few days after defense counsel informed the court that Suniga wanted another attorney to represent him.  *Suniga*, 2017 WL 431904, at *2.[31]  Suniga told the court at the hearing that he wanted new representation, primarily because Suniga felt that defense counsel was aligned with the State, had told Suniga things that were untrue, and told Suniga that he thought Suniga might be guilty.  *Id.*  Thus, Suniga explained, Suniga felt that his defense counsel was not acting in Suniga's best interest.  *Id.*  The trial judge asked Suniga if there were any further conflicts, and Suniga responded by reiterating the same concerns.  *Id.* at *3.  The trial judge denied the request for new counsel.  *Id.*  At the end of the hearing, the judge and the parties confirmed that voir dire would begin on March 13, 2014.  *Id.*

On April 16, defense counsel made an ex parte record before the judge that Suniga had filed a grievance against each attorney on his defense team and against the director of

---

[31] The transcript of the hearing appears at Dkt. No. 49-2 at 43–46.  The TCCA's opinion accurately summarizes the hearing.  The discussion between the trial court and Suniga's trial counsel on April 16, 2014, appears at Dkt. No. 49-15 at 9–10.

the Public Defender's Office, which had been summarily dismissed. *Id.* Defense counsel asked if the matter should be addressed in front of the State and said he would do so. *Id.* The judge told defense counsel that "I don't think there's any need to worry about it." *Id.* The voir dire then proceeded. *Suniga*, 2019 WL 1051548, at *2–3.

The TCCA denied the claim on the merits on direct appeal, concluding that the appropriate Sixth Amendment focus is on the adversarial process and not on the defendant's relationship with his lawyer. *Suniga*, 2019 WL 1051548, at *3–5. The TCCA concluded that the Sixth Amendment's aim is to guarantee an effective advocate for each criminal defendant, not to ensure that a defendant will always be represented by the lawyer that the defendant prefers. *Id.* at *3. The TCCA thus determined that the trial court has no duty to search for counsel that the defendant prefers and that, here, the trial court adequately inquired into the bases for Suniga's dissatisfaction with his trial attorney because Suniga had the chance to explain the perceived conflict and his reasons for requesting new counsel. *Id.* at *4. In addition, defense counsel did not request to withdraw or state that there was a conflict of interest that would impair his representation. *Id.* Thus, Suniga's stated concerns were not valid grounds for substituting counsel, as personality conflicts and disagreements concerning trial strategy are typically not valid grounds for withdrawal, and neither are statements that the defendant is dissatisfied with counsel. *Id.* In addition, the TCCA concluded that a defendant's filing of a civil action against his appointed defense attorney is not a per se conflict that warrants the attorney's disqualification. *Id.*

Suniga also raised the alleged conflict just six weeks before voir dire, even though he had been represented by the same attorneys for almost two years. *Id.* at *5. And when defense counsel informed the trial judge that Suniga had filed a grievance, defense counsel

– 49 –

did not move to withdraw, and the grievance had been dismissed. *Id.* Thus, the TCCA

concluded that the trial judge did not abuse his discretion by not removing defense counsel.

*Id.*

### ii.    Standard for ineffective-assistance claims based on a conflict of interest

"Under the Sixth Amendment, if a defendant has a constitutional right to counsel, he

also has a corresponding right to representation that is free from any conflict of interest."

*United States v. Palacios*, 928 F.3d 450, 454 (5th Cir. 2019) (quoting *United States v. Infante*,

404 F.3d 376, 389 (5th Cir. 2005)).  Unless the alleged conflict of interest arises from

multiple representation, the standard for determining whether there was an unconstitutional

conflict of interest arises under *Strickland v. Washington*, 466 U.S. 668 (1984).  *United States v.*

*Bernard*, 762 F.3d 467, 476 (5th Cir. 2014).  The *Strickland* standard "requires a showing that

counsel's performance was deficient, in that it fell below an objective standard of

reasonableness, as well as a showing of prejudice, which is defined as a reasonable

probability that counsel's error changed the result of the proceeding." *Palacios*, 928 F.3d at

454 (citation omitted).  If a defendant asserts a conflict arising from multiple representation,

then prejudice is presumed if the defendant can show the existence of an "actual conflict,"

meaning that defense counsel was compelled to compromise his duty of loyalty because of a

competing duty owed to a current or former client. *Id.* at 455.

### iii.    AEDPA review

The TCCA reasonably concluded that the state trial court did not err by refusing to

grant Suniga substituted counsel after conducting an adequate inquiry into Suniga's

generalized complaint that he was unhappy with his trial counsel.  "Merely a 'vague,

unspecified possibility of conflict' does not trigger a duty to inquire." *United States v. Fields*, 483 F.3d 313, 353 (5th Cir. 2007) (quoting *Mickens v. Taylor*, 535 U.S. 162, 168–69 (2002)).

The state trial court's hearing on January 29, 2014, established that Suniga's dissatisfaction with his trial counsel arose from generalized dissatisfaction with his trial counsel, not from concerns of multiple representation or from a conflict arising from the counsel's present or past representation of a different person. *See Suniga*, 2017 WL 431904, at *2–3. Likewise, in the April 16 ex-parte conference between the trial judge and defense counsel, the discussion of Suniga's grievance filing was solely focused on the same generalized dissatisfactions. *Id.* at *3.

An indigent criminal defendant has no right to the appointment of counsel of his own choice. *Christeson v. Roper*, 574 U.S. 373, 377 (2015); *Morris v. Slappy*, 461 U.S. 1, 14 (1983). Likewise, the Sixth Amendment right to counsel does not guarantee an accused a "meaningful attorney-client relationship." *Morris*, 461 U.S. at 14. Moreover, even "suspicions that [a defendant's] attorneys were in cahoots with the Government" and "generic assertions of a conflict of interest [does] not impose upon the court a duty to inquire further." *Fields*, 483 F.3d at 353. More than a defendant's generalized dislike or distrust of counsel is necessary to establish the type of irreconcilable conflict that warrants substitution of counsel. *United States v. Sterling*, 99 F.4th 783, 790–91 (5th Cir. 2024).

Here, Suniga's motion for new counsel came less than two months before jury selection, after Suniga's trial counsel had been representing him for two years. *Suniga*, 2019 WL 1051548, at *5. Suniga presented the state trial court with no fact-specific allegations showing there had been a total or extensive breakdown in the communication process between himself and his trial counsel. Likewise, Suniga did not identify any

multiple-representation issues.  Instead, Suniga offered the trial court only a general suspicion that his trial counsel might not subjectively believe in Suniga's innocence.  Suniga cites no clearly established federal law establishing a right to substitution of counsel under such circumstances—nor could he, given that such generalized assertions of a conflict of interest cannot establish a Sixth Amendment violation.  *See Fields*, 483 F.3d at 353.

Further, even assuming that Suniga's trial counsel's representation was deficient, Suniga has failed to show prejudice under *Strickland*.  The prosecution's case against Suniga was overwhelming.  *See supra* Factual Background § 1.A.ii.  Any rational team of defense counsel charged with defending Suniga in January 2014 would have comprehended the daunting nature of the task facing them.  The TCCA reasonably concluded that Suniga's asserted dissatisfaction, just six weeks before jury selection, with his trial counsel's attitude toward the possibility of gaining an acquittal did not mandate substitution of the defense counsel who had been representing Suniga for about two years.

In sum, the TCCA's rejection on the merits of Suniga's first point of error on direct appeal was neither contrary to, nor involved an unreasonable application of, clearly established Federal law.  Moreover, it did not result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Suniga's trial and direct appeal.  Suniga's fifth claim in his amended habeas petition does not warrant federal habeas corpus relief under AEDPA.

### E.    The third claim—that the trial court committed judicial misconduct—does not warrant federal habeas relief.

In his third claim, Suniga argues that the trial judge engaged in judicial misconduct that violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights.  During voir dire, the trial judge had an ex parte meeting with a courthouse employee who had been selected

as a juror (Juror P.W.), during which Juror P.W. expressed her fear of encountering prisoners in the courthouse, although she had never seen Suniga there. A court reporter transcribed the conversation. Suniga and his counsel were then permitted to review the transcript, after which Suniga's counsel requested that Juror P.W. be dismissed for cause. The trial court denied the request. Suniga's counsel then requested an additional peremptory strike, which the trial judge also denied. Suniga argues that the trial court denied Suniga the opportunity to remove a biased juror and replace her with an impartial juror, in violation of his constitutional rights. Dkt. No. 36 at 108–15.

### i.    Procedural history

*The Voir Dire.* Juror P.W., an employee of a Lubbock County Justice of the Peace, underwent voir dire examination on April 15, 2014. *See* Dkt. No. 49-14 at 9–109. During examination by the prosecution, Juror P.W. testified that, as explained by the prosecutor, she understood the difference between murder and capital murder, the prosecution's burden of proof, and the presumption of innocence. She testified that she understood that some defendants choose not to testify at their own trial, and she would not hold a failure to testify against a defendant. She testified that she understood that eyewitnesses can often see things differently because they witness events from different vantage points. She stated that she understood that, in a Texas capital-murder trial, the jury makes the ultimate determination on the sentence. She testified that she understood, as explained by the prosecutor, the concept of a sentence of life without parole and the Texas capital-sentencing special issues. She said she had visited a prison between 10 and 15 years prior with a church group and had later visited a county jail with a different ministry group. She testified that she believed

that she could be part of a capital-murder proceeding that included both a guilt-innocence determination and a sentencing determination. *Id.* at 9–63.

During the prosecution's voir dire of Juror P.W., the prosecution asked about Juror P.W.'s possible exposure to a sign that said "Hostages will not be allowed" during a prior prison visit. *Id.* at 45–46. Defense counsel objected to the question and, outside the juror's presence, argued the question was improper because it improperly attempted to suggest prisons were dangerous places. *Id.* at 46. The trial judge sustained the defense's objection but authorized more questions about the juror's general thoughts about being inside a prison. *Id.* at 47. Juror P.W. was brought back in, and voir dire continued.

During questioning by the defense, Juror P.W. testified that her adopted nephew's criminal conviction, which she disclosed in her questionnaire answers, would have no impact on her ability to serve as a juror. She agreed that she understood, as explained by defense counsel, the presumption of innocence, the concept of reasonable doubt, and the prosecution's burden to prove every element of the offense by a reasonable doubt. She also stated that she hoped that if any of her sons participated in a serious matter, they would receive the presumption of innocence. She testified that if a person felt like they might incriminate themselves, they should be allowed not to testify. She stated that she did not believe she would struggle to evaluate the credibility of an expert witness. She said she understood that there may be times in which the attorneys would confer with the court outside the jury's hearing. She testified that she understood, as explained by both attorneys, the difference between intentional murder and capital murder and that she believed the death penalty was not the appropriate sentence for all murders. She testified that she understood the concept of a life sentence without parole. She also said that she understood,

as explained by defense counsel, the two phases of a capital-murder trial and the Texas capital-sentencing special issues.  She testified that she understood that each juror could decide what each believed constituted mitigating evidence and that she was prepared to respect other jurors' views of what they considered to be mitigating evidence.  She testified that she understood that mitigating evidence was not required to have a connection to the crime itself.  Finally, she testified that she understood that the jury would ultimately decide the appropriate sentence.  *Id.* at 64–109.

After her voir dire, the defense challenged Juror P.W. for cause based on the improper question about the hostage-taking prison sign, arguing that it created the possibility of bias based on her personal experience inside TDCJ.  The trial judge overruled the defense's challenge for cause.  Neither party exercised a peremptory strike against Juror P.W.  Then she was selected as a juror.  *Id.* at 110–11.

***The May 1 Meeting and Aftermath.***  On May 1, 2014, the trial judge spoke with Juror P.W. in the presence of the court reporter because someone had told the judge that Juror P.W. had seen Suniga in the basement of the courthouse.  Juror P.W. told the judge that she had not seen Suniga in the basement or anywhere.  Juror P.W. further told the judge that she had never seen anyone in "real clothes" in the basement and had only seen prisoners in jumpsuits there before.  She asked the judge whether any prisoners had seen her in the basement.  The judge responded that he did not know.  Juror P.W. told the judge that she had asked another courthouse employee if Suniga had been in the basement, and that employee told her that Suniga "comes every day."  Juror P.W. had not known that, but she had not been in the basement regularly in the past few weeks.  She also told the judge that when she was in the basement, she stayed in her office with the door closed, and if she was

– 55 –

in the hallway, she kept her head down to avoid any eye conduct because "it's scary enough

to have to work down there knowing they're there.  But no, I've never seen [Suniga]."  The

trial court told Juror P.W. "[t]hat's all I need to know then."  Dkt. No. 50-36 at 9–10.

> The conversation concluded with these remarks:
>
> THE COURT: Everything else okay?
> JUROR P.W.: Yeah.
> THE COURT: I suspect we're going to have a jury within the next few days,
> I'm hoping.  So—
> JUROR P.W.: All right. No. No, I've not had any—
> THE COURT: Okay.
> JUROR P.W.: No.  That would scare me to death. I'm sorry.
> THE COURT: Well, we don't want to do that.

*Id.* at 10.  After the ex parte meeting, the defense attorney requested a transcript of the

meeting with Juror P.W.  *Id.* at 81–82.

The next day, having reviewed the transcript, the defense attorney challenged Juror

P.W. for cause for two reasons.  Defense counsel first argued that the ex parte meeting

violated section 33.03 of the Texas Code of Criminal Procedure, which requires the

defendant to be present at trial.  Second, the defense argued that the implication of the

juror's final remarks to the judge—that "No, I've not had any . . . No.  That would scare me

to death."—meant that "being around a defendant scares her to death . . . or passing folks in

the basement hallway would scare her to death."  The defense argued that a juror who

expressed that view "cannot afford a defendant the presumption of innocence if she's scared

to death of them."  The defense also argued that Juror P.W. would be unable to assess the

defendant's credibility, if he testified, if she was scared to death of the defendant.  The

defense also argued that Juror P.W.'s statement to the judge established a bias against

criminal defendants.  The Court denied the challenge for cause.  Dkt. No. 49–25 at 9–11.

The defense next noted that it was out of peremptory strikes but requested an additional peremptory strike to exercise against Juror P.W.  The prosecutor opposed any additional peremptory strike because it was "a big to[-]do about nothing," as the premise of the ex parte meeting—that Juror P.W. had seen Suniga in the basement—was false and because "[s]he never in that transcript told the Court that she is scared of this Defendant." The prosecution also argued that the defense had peremptory strikes available during Juror P.W.'s voir dire "as well as when this information came to light" but chose to use those strikes on other jurors.  The trial judge then denied the defendant's motion for an additional peremptory strike and denied for a second time the challenge for cause.  *Id.* at 11, 16–17.

**State Direct Appeal.**  Suniga presented some of his present complaints on direct appeal.  Dkt. No. 50-22 at 28–45.  First, Suniga argued that the trial court should have struck for cause Juror P.W. based on her inability to give Suniga the presumption of innocence and because she was prejudiced on the issue of future dangerousness.  Second, Suniga argued that his rights under the Confrontation Clause and a state statute to be present at trial were violated by the trial judge's meeting with Juror P.W. outside the presence of Suniga and his counsel.  Third, Suniga argued that other state statutes also conferred him a right to be present at trial, which was violated by the ex parte meeting.

The TCCA noted that Suniga failed to object at trial on Sixth Amendment grounds and on one of the statutory grounds he raised on direct appeal.  *Suniga*, 2019 WL 1051548, *5 & n.5.  Even so, the TCCA considered Suniga's arguments, noting his rights under the Sixth Amendment's Confrontation Clause and state statutes and held that the trial judge's ex parte meeting with Juror P.W. violated Suniga's constitutional rights.  *Id.* at *10–11.

– 57 –

However, the TCCA concluded that the error was harmless. The TCCA first determined that it should "consider whether the defendant's presence bears a reasonably substantial relationship to his opportunity to defend himself." *Id.* at *11 (citations omitted). The TCCA then noted that Suniga and his counsel were present during Juror P.W.'s voir dire, so both had the opportunity to see each other and determine whether they had seen each other before. *Id.* Then, Suniga's counsel received notice of the ex parte meeting and a transcript before noon the next day. *Id.* After reviewing the transcript, Suniga "did not seek to question" Juror P.W., even though she worked in the courthouse and trial had not yet started. *Id.* Further, Suniga failed to assert—and the record did not support—that Suniga personally had any information about Juror P.W. not in his attorney's possession that would have affected the Court's questioning. *Id.*

As to Juror P.W.'s comments about encountering detainees in the basement and being "scare[d] . . . to death," the TCCA determined that Suniga's contention that Juror P.W. lacked impartiality was "purely speculative" and that Suniga failed to point to "any evidence showing that [Juror P.W.] reacted in a fearful manner to [Suniga's] presence during other court proceedings." *Id.* at *12. Next, the TCCA noted that during voir dire, Juror P.W. stated that she understood the presumption of innocence and agreed that she would give that presumption to Suniga. *Id.* The TCCA interpreted her statements to the judge as "express[ing] a generalized fear of encountering pre-trial detainees, perhaps including [Suniga], in the courthouse basement." *Id.* But because Suniga never requested to specifically question Juror P.W. about whether she could overcome that fear or prejudice and follow the law, the generalized statement of fear "did not disqualify her." *Id.* at *13.

– 58 –

Thus, the TCCA held that the trial court did not abuse its discretion by not permitting Suniga's counsel to strike Juror P.W.

    ***State Habeas Proceeding.***  In his initial state habeas corpus application, Suniga urged a slightly different argument: that his Sixth Amendment right to a fair and impartial jury (rather than his Confrontation Clause right and right to be present at trial) was violated by the state trial court's ex parte meeting with Juror P.W. and by the trial court's refusal to grant his challenges for cause and his request for an additional peremptory strike.  Dkt. No. 52-29 at 71–79.  The state habeas trial court concluded that Suniga procedurally defaulted on this claim because his Sixth Amendment claims were either resolved on direct appeal or could have been raised on direct appeal and recommended that state habeas relief be denied.[32]  The TCCA denied state habeas relief based on the trial court's findings and conclusions and the TCCA's own review.  *Ex parte Suniga*, 2022 WL 2064609, at *2.

    ii.    **Legal standards**

    a.    **Standard for the right to an impartial jury**

    The Sixth Amendment, through the Fourteenth Amendment, provides that every defendant has the right to trial by an impartial jury. *Morgan v. Illinois*, 504 U.S. 719, 727 (1992).  "[A]n impartial jury consists of nothing more than 'jurors who will conscientiously apply the law and find the facts.'" *Lockhart v. McCree*, 476 U.S. 162, 178 (1986) (quoting *Wainwright v. Witt*, 469 U.S. 412, 423 (1985)).

    "The right to an 'impartial' jury 'does not require *ignorance.*'" *Tsarnaev v. United States*, 595 U.S. 302, 312 (2022) (quoting *Skilling v*, 561 U.S. at 381).  After all, "[n]otorious

---

[32] The state habeas trial court adopted the State's proposed findings of fact and conclusions of law. Dkt. No. 52-44 at 63.  The State's proposed findings and conclusions appear at Dkt. Nos. 52-43 at 499–500; 52-44 at 3–10.

crimes are[,] almost[] as a matter of necessity, brought to the attention of those informed citizens who are 'best fitted' for jury duty." *Id.* (quoting *Reynolds v. United States*, 98 U.S. 145, 155–56 (1879)). Instead, the Sixth Amendment requires that jurors possess "no bias or prejudice that would prevent them from returning a verdict according to the law and evidence." *Id.* (quoting *Connors v. United States*, 158 U.S. 408, 413 (1895)).

Jury selection is an exercise that falls particularly within the discretion of the trial judge, as it is influenced by factors difficult to capture in the record, such as body language, inflection, and demeanor. *Id.* A potential juror's personal viewpoints do not justify exclusion of that juror as biased unless he or she cannot set aside that viewpoint and render a verdict based on the law and evidence. *Irvin v. Dowd*, 366 U.S. 717, 722–23 (1961).

### b.    Standard for due process rights related to juror bias

A defendant asserting juror bias may show either actual or implied bias. "Actual bias exists when a juror fails to answer a material question accurately because he is biased." *United States v. Thomas*, 627 F.3d 146, 161 (5th Cir. 2010) (quoting *United States v. Bishop,* 264 F.3d 535, 554 (5th Cir. 2001)). Implied juror bias may be found in "extreme circumstances," as in "when the juror is employed by the prosecuting agency, is a close relative of a participant in the trial, or is somehow involved in the transaction that is the subject of the trial." *Id.* (quoting *Bishop*, 264 F.3d at 554).

To obtain a new trial due to a juror's alleged failure to answer questions honestly during voir dire, "the defendant must show that the complained-of juror failed to provide an honest answer to a material question and that a truthful response would have provided a valid basis to challenge the juror for cause." *Buckner v. Davis*, 945 F.3d 906, 910–11 (5th Cir. 2019) (citing *Bishop*, 264 F.3d at 554); *see also McDonough Power Equipment v. Greenwood*, 464

U.S. 548, 556 (1984). To demonstrate actual bias, "admission or factual proof" of bias must be presented. *Buckner*, 945 F.3d at 911; *see also Bishop*, 264 F.3d at 554. If a juror "disclosed the grounds for possible bias but . . . stated that they could be fair," the defendant is "not denied an impartial jury." *Buckner*, 945 F.3d at 911.

### c.    Standard for the right to personal presence at trial

A criminal defendant has a constitutional "right to personal presence at all critical stages of the trial." *Rushen v. Spain*, 464 U.S. 114, 117 (1983); *Faretta v. California*, 422 U.S. 806, 820 n.15 (1975). This right is subject to the harmless-error rule. *Rushen*, 464 U.S. at 118–19. While the final decision on whether any such error is harmless is a matter of federal law, the factual findings made by a state court addressing allegations of improper communication between a trial judge and a juror are entitled to a presumption of correctness even without the application of AEDPA. *Id.* at 120.

### iii.    AEDPA and de novo review

Suniga has failed to carry his burden of establishing that either the state trial judge's implicit or the TCCA's explicit factual finding of no disqualifying bias on the part of Juror P.W. were erroneous. Under AEDPA, this Court must presume the correctness of a state court's factual determination, which the defendant may rebut only by clear and convincing evidence. *See Canfield v. Lumpkin*, 998 F.3d 242, 247 & n.7 (5th Cir. 2021). The deference to state-court factual determinations also extends to implicit credibility findings. *Skilling,* 561 U.S. at 396; *see also Wainwright*, 469 U.S. at 428. "The factual question whether the juror is biased and whether his answers can be believed are questions for the trial court." *Dorsey v. Quarterman*, 494 F.3d 527, 553 (5th Cir. 2007) (citing *Wainwright*, 469 U.S. at 423–24).

Suniga has failed to present specific facts sufficient to show that Juror P.W. answered any voir dire question inaccurately or otherwise concealed any relevant information during her voir dire examination (or on her juror questionnaire answers) that, if disclosed, would have given rise to a legitimate challenge for cause. Likewise, nothing in Juror P.W.'s voir dire examination or the transcript from her May 1 meeting with the trial judge reveals a legitimate basis for a challenge for cause. Suniga's speculative assertions that his trial counsel would have been able to present a meritorious challenge for cause had he been present at the May 1 meeting does not furnish a basis for overcoming the trial court's presumptively reasonable factual finding that Juror P.W. had no disqualifying bias.

Juror P.W.'s voir dire examination reveals a lack of clear and convincing evidence showing she was biased, even given her comments made to the trial judge on May 1. Suniga's trial counsel did not request permission to question Juror P.W. further after he reviewed the transcript of the meeting with the trial judge that had taken place the day before. Nothing in that brief exchange shows that Juror P.W.'s voir dire examination was inaccurate or that she withheld any relevant information about her ability to honor the presumption of innocence or to render a verdict based exclusively on the law and evidence. Suniga has thus failed to show that Juror P.W. had actual bias.

Further, the transcript of the May 1 exchange is not clear and convincing evidence that the trial judge's implicit factual finding of no disqualifying bias was erroneous. Suniga suggests that this Court should infer the existence of disqualifying bias based on Juror P.W.'s expressions of fear when in the presence of detainees in the courthouse basement. But implied bias arises only in "extreme situations" in which "no reasonable person could not be affected in his actions as a juror." *Brooks v. Dretke*, 444 F.3d 328, 331 (5th Cir. 2006).

The Supreme Court has suggested three exemplar circumstances in which implicit bias might arise: when "the juror is an actual employee of the prosecuting agency, . . . the juror is a close relative of one of the participants in the trial or the criminal transaction, or . . . the juror was a witness or somehow involved in the criminal transaction." *Smith v. Phillips*, 455 U.S. 209, 222 (1982) (O'Connor, J., concurring). None of those circumstances are presented here. And Suniga does not show facts showing that any similarly extreme circumstance is present here. Thus, Suniga has failed to show implied bias.

Suniga also complains that the trial court erroneously denied his request for an additional peremptory challenge that he could have used against Juror P.W. But "[b]ecause peremptory challenges 'are not required by the Constitution,' it is 'for the State to determine the number of peremptory challenges allowed and to define their purpose and the manner of their exercise.'" *Tong v. Lumpkin*, 90 F.4th 857, 868 (5th Cir. 2024), *cert. denied*, 145 S. Ct. 211 (2024) (quoting *Ross v. Oklahoma*, 487 U.S. 81, 89 (1988)). Thus, "[a]bsent a showing of juror bias, there is no federal constitutional concern regarding deprivation of peremptory challenges." *Id.* (citation omitted). And a mistaken denial of a peremptory challenge "does not, without more, violate the Federal Constitution." *Id.* at 869. Because Suniga has established no disqualifying bias on the part of Juror P.W., his complaint that the trial court erred by denying his request for an additional peremptory challenge fails.

The trial judge promptly revealed to Suniga's trial counsel that he met with Juror P.W. on May 1 and instructed the court reporter to prepare and deliver to Suniga's trial counsel a transcript of that conversation. The arguments presented by Suniga's trial counsel on May 2 did not identify a legitimate basis for disqualifying Juror P.W. Thus, the TCCA's

conclusion on direct appeal—that any error arising from the trial judge's ex parte communication with Juror P.W. was harmless—was objectively reasonable.

Because the TCCA determined that this claim procedurally defaulted, the Court also undertakes de novo review. Some of the objections that Suniga presented to the TCCA on direct appeal differed from his objections to the state trial judge during voir dire, and Suniga presented yet different complaints to the TCCA during his state habeas case. However, Suniga argues that this claim was properly presented during his state habeas proceeding and did not procedurally default. Dkt. No. 36 at 113.

Regardless, though, this claim also fails under de novo review. Any constitutional error resulting from the trial court's May 1 ex parte meeting was harmless. Whether viewed under the Sixth Amendment, Fifth Amendment, or Fourteenth Amendment, any error arising from that meeting did not have a "substantial and injurious effect" in determining the outcome of Suniga's trial. *Brecht*, 507 U.S. at 623. Suniga's trial counsel never identified any legitimate basis for a challenge for cause to Juror P.W. Suniga's direct-appeal counsel and Suniga's state habeas counsel did not either. Finally, Suniga's federal habeas counsel have identified no error relating to the meeting between Juror P.W. and the trial judge that had a substantial and injurious effect on Suniga's trial. The trial judge timely advised defense counsel of the meeting and furnished a transcript of same. Still, defense counsel did not identify any legitimate rationale for excluding Juror P.W. The same remains true to this day. Finally, Suniga offers no rational factual basis for a claim that his personal presence at the May 1 meeting was necessary to avoid frustrating the fairness of the proceedings.

– 64 –

In sum, the TCCA's denial on the merits of this claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law, nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Suniga's trial and direct appeal. Suniga's third claim in his amended habeas petition does not warrant federal habeas corpus relief under AEDPA. And all of the legal and factual arguments raised by Suniga in support of this claim at each level of review fail to rise above the level of harmless error under *Brecht*. Regardless of which standard of review is applied, Suniga's third claim for federal habeas relief fails.

**F.    The eleventh claim—that the prosecutors engaged in racially discriminatory selective prosecution—does not warrant federal habeas relief.**

In his eleventh claim, Suniga argues that his conviction resulted from racially discriminatory charging practices in the Lubbock County District Attorney's Office over the decades immediately preceding his trial. Suniga begins by noting that of the seven defendants for whom the Lubbock DA's Office has successfully obtained the death penalty since 1998, five were Hispanic and one was African American, even though Lubbock's combined Hispanic and African American population has, in recent years, hovered around 40%. Dkt. No. 36 at 191. Suniga next argues that the Lubbock DA's Office has in fact made representations to support the theory that it discriminates based on race. Suniga first notes that one assistant DA noted that between 1995 and 2005, Lubbock had about 25 cases that were death-penalty eligible, but that the DA's Office sought the death penalty in only five of those cases, after looking at "the defendant himself" and whether they believed the defendant would kill again. *Id.* at 192. Second, Suniga notes that during voir dire in his trial, the prosecutor told venire members that, since joining the Lubbock DA's Office in

1995, there had been around 50 death-eligible murders, but the office sought the death penalty only nine or ten times. *Id.*

### i.    Procedural history

Suniga presented a similar selective-prosecution claim in his initial state habeas application. Dkt. No. 52-29 at 107–14. In response, the State filed an affidavit from the Lubbock DA, Matt Powell, stating that he had "never sought the death penalty due to a person's race" and that he instead looked "at both the circumstances of the crime and whether the defendant is likely to kill again" based on factors such as criminal and social history. Dkt. No. 52-37 at 397. He stated he had thus only sought the death penalty against the "worst of the worst" and described the particular circumstances of each defendant's offense that he believed had especially qualified him for the death penalty. *Id.* As to Suniga, Powell stated that he was among the "worst of the worst" "because Suniga, a confirmed member of the Fort Worth Tangos, shot and killed David Rowser during the course of a robbery and then yelled '[t]hat's what you get' after shooting him." *Id.* at 398.

Powell continued that race had never played a role in deciding to seek the death penalty in any of the cases in which it was sought. He also said that he had chosen not to seek the death penalty, regardless of the defendant's race, when he believes that death is an inappropriate punishment for that particular defendant. Finally, Powell asserted that Suniga's theory of discrimination, if accepted, would mean that the DA's Office would need to seek the death penalty against defendants whose cases do not warrant the death penalty, solely to make the pool of defendants who are sentenced to death representative of Lubbock County's overall population. Powell stated he "refuse[d] to do" that "because seeking the

death penalty solely for that reason would constitute a gross injustice." Dkt. No. 52-37 at 397–99.

During the lengthy evidentiary hearing held in Suniga's initial state habeas proceeding, Powell testified that his reasons for deciding to seek the death penalty in Suniga's case included (1) that Suniga was a confirmed member of the Tango Blast prison gang; (2) the level of brutality and disregard for human life reflected in the crime—Suniga fired three times (each hitting its mark) at David Rowser when David simply stepped out of a bathroom; (3) that just after shooting Rowser, Suniga shouted "[t]hat's what you get"; (4) that there was no doubt in his mind as to Suniga's guilt; and (5) the impact of the crime. Dkt. No. 51-34 at 232–315.[33] He also noted that the DA's Office had a practice of seeking all possible information on a defendant's background before making the final decision on whether to seek the death penalty. *Id.* at 296–97. Powell's state habeas hearing testimony did not include even a scintilla of evidence suggesting that Suniga's race or ethnicity played any role in the DA's Office's decision to seek the death penalty in Suniga's case or that any defendant's race or ethnicity had ever played a role in any decision to seek the death penalty made while Powell was the Lubbock DA. In fact, Suniga's proposed fact findings and legal conclusions submitted to the state habeas trial court relied exclusively on inferences drawn from the statistics cited in his application to support his proposed finding of racial animus and conclusion of selective prosecution. Dkt. No. 52-43 at 245.

---

[33] Powell's testimony also discussed his view that even minor jail infractions during pretrial detention could be a significant factor in determining future dangerousness and the role of Suniga's future dangerousness in seeking the death penalty. *Id.* at 294–96. The parties' agreed order of issues for the hearing did not include Suniga's selective-prosecution claim, *see* Dkt. No. 52-39 at 164–74, but both parties questioned Powell about his thought process and reasoning in seeking the death penalty against Suniga.

The state habeas trial court made findings and conclusions recommending denial of this claim on the merits. First, the court found that Powell's affidavit and testimony were credible. Next, it found that since 1976, nine Anglo defendants, six Hispanic defendants, and four African American defendants have been sent to Texas's death row from Lubbock County. It then found that Powell sought the death penalty against Suniga because Powell believed that Suniga's case qualified Suniga as among "the worst of the worst." Dkt. No. 52-37 at 397. It found that Powell noted the brutality of Suniga's actions and the total disregard for human life, including Suniga's yelling "[t]hat's what you get!" just after shooting David Rowser. *Id.* at 398. The court concluded that, to prevail on a claim that a prosecutor's decision to seek the death penalty violates the Equal Protection Clause, the burden is on the defendant to prove both (1) the existence of purposeful discrimination, and (2) that the purposeful discrimination had a discriminatory effect on the defendant. The court determined that Suniga had failed to prove the existence of purposeful discrimination by the Lubbock DA's Office in the decision to seek the death penalty in Suniga's case. Finally, the court concluded that both the TDCJ death-row statistics and Powell's affidavit and testimony affirmatively refuted Suniga's contention that the Lubbock DA's Office acted with discriminatory intent in Suniga's case.[34]

The TCCA denied Suniga state habeas relief, concluding Suniga had procedurally defaulted his seventh claim. *Ex parte Suniga*, 2022 WL 2064609, *2 ("We will not review the merits of [this claim] because [it was] either raised and rejected on direct appeal or Applicant failed to raise [it].").

---

[34] The relevant portion of the State's proposed findings and conclusions addressing this claim appears at Dkt. No. 52-44 at 33–41. The portion of the state trial court's order issued adopting the State's proposed findings and conclusions on this claim appears at Dkt. No. 52-44 at 64.

### ii.    Standard for selective-prosecution claims

In the ordinary case, "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *United States v. Armstrong*, 517 U.S. 456, 464 (2006) (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978)); *In re United States*, 397 F.3d 274, 284 (5th Cir. 2005). Nonetheless, a prosecutor's discretion is subject to constitutional constraints, including equal-protection principles. *Armstrong*, 517 U.S. at 464; *In re United States*, 397 F.3d at 284. That is, the decision to prosecute may not be based on an unjustifiable standard such as race, religion, or other arbitrary classification. *Armstrong*, 517 U.S. at 464. To dispel the presumption that a prosecutor has not violated equal-protection principles, a defendant must present clear evidence showing that the prosecutor's decisions had both a discriminatory effect and a discriminatory motive or purpose. *Id.* at 465; *In re United States*, 397 F.3d at 284. To establish discriminatory effect when racial discrimination is claimed, a defendant must show that similarly situated individuals of a different race were not prosecuted. *Armstrong*, 517 U.S. at 465.

### iii.    De novo review

Because Suniga seeks discovery on this claim (*see* Dkt. No. 74 at 18–23), this Court will address the merits of this claim. The TCCA rejected the state habeas version of Suniga's selective-prosecution claim as procedurally defaulted, so this Court's review of the merits of this claim is de novo.

Rule 2(c)(2) of the Rules Governing Section 2254 Cases in the United States District Courts requires that the petition "state the facts supporting each ground." This "requires a

more detailed statement" than Federal Rule of Civil Procedure 8. *Mayle v. Felix*, 545 U.S. 644, 649 (2005). Suniga's amended federal habeas petition fails to allege any specific facts showing that his death sentence stemmed from a discriminatory motive or purpose on the part of Lubbock County prosecutors.

As explained above, Powell denied categorically that the race or ethnicity of any offender ever played any role in the decision by him or the Lubbock DA's office during his tenure to seek a death sentence in a particular capital-murder case. The record before this Court (through Powell's extensive testimony during Suniga's state habeas hearing) does establish there were two instances during Lubbock DA Powell's tenure in office in which he chose to offer a plea of life without parole to the person charged (or who could have been charged) with capital murder. Powell testified that, in both instances, the families of the victims strongly urged the Lubbock DA's Office not to seek the death penalty.[35] Powell discussed both cases at length during his state habeas testimony, and there was never any suggestion that the race or ethnicity of the offender played any role in the decision not to seek the death penalty. And Suniga does not allege any specific facts in his amended federal habeas petition establishing that race or ethnicity played any role in the Lubbock DA's Office's decision to seek the death penalty in his case.

Suniga's state habeas counsel had several years during which Suniga's initial state habeas application was pending, and more than AEDPA's one-year statute of limitations, within which to investigate the possibility that race or ethnicity played a role in the DA's

---

[35] In one case, the offender had murdered multiple young women, including one who was pregnant at the time of her death and whose body had never been recovered. The prosecutors were willing to negotiate a plea deal in exchange for the offender providing information on the location of the body. Dkt. No. 51-34 at 237–38. In the other case, the victim's family was adamantly opposed to the imposition of a death sentence. *Id.* at 291–92.

decision to seek the death penalty or any instances of potential capital offenders in Lubbock County who received different treatment from Lubbock DA's Office. Still, Suniga alleges no specific facts showing that his race played any role in the DA's decision to charge Suniga with capital murder or to seek the death penalty.

Additionally, Suniga's reliance on statistics is unpersuasive. Suniga asserts that his death penalty resulted from discriminatory animus. Yet the statistics he cites in his federal pleadings do not support his claim. Suniga cites the number of individuals from Lubbock County who have been sent to Texas's death row in recent years, not from the entire time since *Jurek v. Texas*, 428 U.S. 262 (1976), in which the Supreme Court effectively re-instituted capital punishment in Texas. That, in recent years, a disproportionate (compared to the overall population of Lubbock County) number of Lubbock County capital murderers who have received a death sentence have been Hispanic does not establish even an inference of discriminatory purpose, especially when the state habeas trial court expressly found that trend did not hold over a longer period. Dkt. No. 52-44 at 40–41.

Suniga makes no factual assertions about the ethnicity or race of other Lubbock County offenders who could have been charged with capital murder or against whom the Lubbock DA's Office could have sought a death sentence. Nor does Suniga allege any specific facts showing that any Lubbock County offender of a race or ethnicity different from Suniga's (but who was similarly situated to Suniga) could have been charged with capital murder but was not. And Suniga does not allege any specific facts showing that any such Lubbock County offender was allowed to plead to a sentence of life without parole.

Instead, Powell's uncontroverted testimony currently before this Court shows that the focus of the Lubbock DA's Office's decision to seek a death sentence for Suniga was

based on factors unrelated to Suniga's race or ethnicity.  For instance, Powell testified

extensively about his concerns over Suniga's confirmed gang membership.  Powell's

consideration of the fact Suniga was a confirmed member of a notorious, violent prison

gang when choosing to seek a death sentence for Suniga was race- and ethnicity-neutral.

Moreover, Suniga's membership in the Tango Blast gang was not seriously in dispute at the

time of trial.  The February 22, 2012, Lubbock County grand-jury testimony of Suniga's

wife Megan included her admission that Suniga told her he had joined the Tango Blast gang

when he was in prison.  Dkt. No. 51-24 at 55.

Far from showing any discriminatory animus toward Suniga, the testimony of both

Powell and Suniga's trial counsel during Suniga's state habeas hearing established beyond

any doubt that Powell and the Lubbock DA's Office left open the possibility of a plea

bargain for a life sentence until almost the start of the guilt-innocence phase of trial.  It was

not Powell but Suniga, as he explained to his mother during their videotaped conversation

on the eve of trial, who refused to engage in plea negotiations.

Likewise, Powell's consideration of the particularly brutal and senseless

circumstances of Suniga's offense was race- and ethnicity-neutral.  Powell emphasized

during his state habeas testimony that he was influenced by the senselessness of the offense,

especially the fact that Suniga shot an unarmed restaurant employee who merely stepped

out of a restroom as Suniga and his cousin were fleeing the restaurant with the tip jar.

There was no evidence presented at trial to suggest David Rowser did or said anything

aggressive or threatening toward Suniga or Lopez Jr. before Suniga shouted at Rowser and

fired his gun three times with ruthless efficiency.  From all accounts of the eyewitnesses,

Rowser merely walked out a restroom doorway, Suniga shouted at him (asking Rowser

whether he wanted to be a hero or thought it was a joke), and—without allowing Rowser to respond—shot Rowser three times.  It was also clear from the trial testimony of the surviving restaurant employees and patrons that they were all traumatized by what they witnessed, particularly by watching a profusely bleeding David Rowser die in his younger brother's arms.  To succeed on his selective-prosecution claim, Suniga must overcome the presumption that a prosecutor acts in good faith and within his discretion.  *Broadnax v. Lumpkin*, 987 F.3d 400, 413 (5th Cir. 2021).  Suniga has failed to allege any specific facts sufficient to do so.

Likewise, Suniga's amended federal habeas petition alleges no specific facts showing that Suniga's prosecution for capital murder and death sentence had a discriminatory effect.  Suniga has failed to allege any specific facts identifying a criminal defendant of another race who was genuinely "similarly situated" to Suniga but who was not prosecuted for capital murder in Lubbock County or against whom Lubbock County prosecutors brought a capital-murder prosecution but did not seek the death sentence.  Suniga had a full and fair opportunity to question Powell during the state habeas proceeding about the possible existence of any potential capital-murder cases or any potential capital-murder defendants of another race or ethnicity who were similarly situated to Suniga but who received different treatment from the Lubbock DA's Office.  Suniga chose not to do so.

In sum, to establish a racially discriminatory effect, a defendant must show that similarly situated individuals of a different race were not prosecuted.  *Broadnax*, 987 F.3d at 413.  Suniga fails to allege any specific facts sufficient to meet this burden.  Thus, even when viewed under a de novo standard of review, this claim fails and does not warrant federal habeas relief.  Furthermore, because Suniga has alleged no "specific facts" within the

– 73 –

meaning of Rule 2(c)(2) of the Rules Governing Section 2254 Cases in the United States District Courts sufficient to overcome the presumption of the prosecutor's good faith or to identify a similarly situated individual who was treated differently, this claim is frivolous, and it fails to justify his request for discovery. *Broadnax*, 987 F.3d at 413; *Perillo v. Johnson*, 79 F.3d 441, 444 (5th Cir. 1996).

### G. The eighth claim—that the State failed to comply with its *Brady* obligations—does not warrant federal habeas relief.

In his eighth claim, Suniga argues that his constitutional rights were violated when the prosecution failed to disclose to Suniga's defense counsel several facts about the prosecution witness Rachel Pereida. Suniga asserts that the prosecution failed to disclose that Pereida had abused methamphetamine and tested positive for drugs in the weeks before her testimony at Suniga's trial and that Pereida was living at the time of trial with a known felon in violation of the terms of her probation. Next, Suniga asserts that the State did not disclose that, despite Pereida's many violations of the terms of her probation (including committing many new criminal offenses), probation-revocation proceedings were not initiated against Pereida after she testified before the grand jury in Suniga's case in February 2012. Suniga alleges that the prosecution did not disclose that Pereida had a long history of working as an informant or cooperator for law enforcement or the full extent of Pereida's lengthy history of felony convictions, substance abuse, and cooperation with local law enforcement investigators. Further, Suniga asserts that the prosecution knowingly presented (and failed to correct) false trial testimony by Pereida that her drug-abuse problems were in the past and that Suniga, who she knew through her romantic relationship with Lopez Jr., was the leader of that duo.

Suniga also asserts that the prosecution failed to disclose to Suniga's trial counsel that the Lubbock County Chief Medical Examiner (who testified about David Rowser's cause of death at Suniga's 2014 trial) was later convicted of a felony criminal offense.  Dkt. No. 36 at 160–75.

### i.    Procedural history

In his initial application for state habeas relief, Suniga presented a different series of complaints of alleged prosecutorial misconduct, including (1) a *Brady* claim focusing on the failure of the prosecution to disclose Rachel Pereida's probation violations, cooperation with law enforcement, and telephone conversations with a detective; (2) a *Brady* claim relating to evidence of Suniga's threat against another Lubbock County Detention Center inmate, which gave rise to an administrative finding of Suniga's gang affiliation; (3) a complaint about the failure of prosecutors to correct Pereida's allegedly false testimony that Suniga was the leader between himself and Lopez Jr.; (4) complaints about the allegedly unethical nature of the prosecution's relevance objections at trial to the defense's proffers of mitigating evidence related to Suniga's older brothers and maternal aunt; and (5) complaints about the prosecution's purportedly deceptive representations about the demeanor displayed by Suniga during his videotaped conversation with his mother shortly before trial. However, Suniga's initial state habeas application did not mention the former Lubbock County Chief Medical Examiner, Dr. Natarajan, or contain any claim relating to him.  Dkt. No. 52-29 at 35–36.

The state habeas trial court's extended evidentiary hearing in Suniga's state habeas proceeding included testimony from prosecutors, defense counsel, and many other witnesses addressing Suniga's complaints involving Pereida.  The state habeas trial court issued

findings of fact and conclusions of law that recommended denial of state habeas relief on these claims, in part because Suniga's complaints did not satisfy the materiality prong of *Brady*.[36]  The state habeas trial court found that Assistant DA Long allowed Pereida to plead to a reduced charge in a drug-possession case in July 2012 so that Pereida could enter a drug-treatment facility.  In August 2012, Pereida was arrested on multiple new charges, and her probation officer, Melisa Hernandez, recommended that Pereida remain in jail until she could be placed in a drug-treatment program.  Neither Long nor Hernandez gave Pereida any special treatment based on the fact Pereida was a potential witness against Suniga. Amanda Welty, Pereida's probation supervisor from November 2012 through May 2015, did not give Pereida special treatment because of Pereida's status was a witness against Suniga.  Pereida's computerized criminal history was presented to the defense team in March 2014.  That report contained detailed information on all criminal charges and arrests involving Pereida from July 2012 through March 2014, including each case number. Pereida's trial testimony in May 2014 admitted that she had a long criminal history and a long history of drug problems involving methamphetamine.  In May 2015, Pereida's community supervision was revoked due to methamphetamine use, and she was adjudicated guilty.  Hernandez's and Welty's affidavits stated that they did not give Pereida special treatment because she was a witness against Suniga.  From the defense team, Cowie

---

[36] Dkt. Nos. 52-43 at 428–79 (the State's proposed findings and conclusions); 52-44 at 61–62 (order adopting the State's proposed findings and conclusions).  The state habeas trial court found credible the writ-hearing testimony of Powell (Dkt. No. 51-34 at 232–315), Suniga's lead trial counsel and Chief Public Defender for the Regional Public Defender's Office Edward Ray Keith (Dkt. Nos. 51-36 at 262–311; 51-37 at 13–126), Suniga's co-counsel and mitigation specialist at trial Robert Cowie (*see* Dkt. No. 51-36 at 113–260), and the affidavits of Powell, Keith, Suniga's co-counsel Dennis R. Reeves, former Assistant Lubbock DA Sean Long, Melisa Hernandez, and Amanda Welty.

and Keith testified that the defense was aware of Pereida's long criminal record but chose not to cross-examine her because she could not furnish any testimony on the central issue that the defense wished to litigate—whether Suniga was at the crime scene at the time of the shooting—and because cross-examining Pereida could furnish evidence favorable to the prosecution. Dkt. No. 52-43 at 428–40.

The state habeas trial court concluded that the State did not withhold from Suniga's defense team information showing that Pereida committed violations of her community supervision. The State had no obligation to turn over information in the public record, such as public records related to Pereida's violations of community supervision. It also concluded that Pereida was not given special or favorable treatment because of her status as a witness against Suniga. Because there was no preferential treatment given to Pereida by the Lubbock DA's Office or the probation officers, the details of her community supervision were not favorable to Suniga within the meaning of *Brady*. And Pereida's probation violations in 2012–13 were not material to Suniga's case because the defense already had information with which it could impeach Pereida. And there is no reasonable probability that impeachment of Pereida's trial testimony based on her probation violations would have resulted in a different outcome at trial. *Id.* at 440–48.

The TCCA denied state habeas relief on Suniga's *Brady* claims because Suniga failed to show that the State failed to disclose evidence or that any withheld evidence was favorable or material. *Ex parte Suniga*, 2022 WL 2064609, at *1.

###### ii.    Relevant federal law

###### a.    Standard for *Brady* claims

"'[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (quoting *Brady v. Maryland*, 373 U.S. 83, 87 (1963)).  The prosecution's duty to disclose evidence material to either guilt or punishment applies even when there has been no request by the accused.  *Id.* at 690; *Strickler v. Greene*, 527 U.S. 263, 280 (1999); *United States v. Agurs*, 427 U.S. 97, 107 (1976).  This duty also applies to impeachment evidence.  *Strickler*, 527 U.S. at 280; *United States v. Bagley*, 473 U.S. 667, 676, 685 (1985).  *Brady* encompasses evidence known only to police investigators and not personally known by the prosecutor.  *Strickler*, 527 U.S. at 280–81; *Kyles v. Whitley*, 514 U.S. 419, 438 (1995).  "'[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police.'" *Strickler*, 527 U.S. at 281 (quoting *Kyles*, 514 U.S. at 437).

There are three elements to a *Brady* claim: the evidence must (1) be favorable to the accused, either because it is exculpatory or because it is impeaching; (2) have been suppressed by the State, either willfully or inadvertently; and (3) be "material," meaning that prejudice must have ensued from its non-disclosure.  *Banks*, 540 U.S. at 691; *Strickler*, 527 U.S. at 281–82.  Evidence is "material" under *Brady* where there is a "reasonable probability" that had the evidence been disclosed, the result at trial would have been different.  *Smith v. Cain*, 565 U.S. 73, 75 (2012); *Cone v. Bell*, 556 U.S. 449, 469–70 (2009); *Banks*, 540 U.S. at 698–99.  A reasonable probability does not mean that the defendant

would more likely than not have received a different verdict with the evidence, but that the likelihood of a different result is great enough to undermine confidence in the outcome of the trial. *Smith*, 565 U.S. at 75; *Kyles*, 514 U.S. at 434.

The Supreme Court has emphasized four aspects of the *Brady* materiality inquiry. First, a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted in the defendant's acquittal. *See Bagley*, 473 U.S. at 682. Second, the materiality standard is not a sufficiency-of-the-evidence test. *Kyles*, 514 U.S. at 434–35. Third, once materiality is established, harmless error analysis does not apply. *Id.* at 435–36. Finally, materiality must be assessed collectively, not item-by-item. *Id.* at 436–37.

### b.    Standard for *Giglio/Napue* claims

A state denies a criminal defendant due process when it knowingly uses perjured testimony at trial or allows untrue testimony to go uncorrected. *Giglio v. United States*, 405 U.S. 150, 153–54 (1972); *Napue v. Illinois*, 360 U.S. 264. 269–70 (1959). To show a due-process violation from the use of allegedly perjured testimony, a defendant has the burden of establishing that (1) the witness actually gave false testimony; (2) the falsity was material, meaning that there was a reasonable likelihood that it affected the judgment of the jury; and (3) the prosecution used the testimony knowing that it was false. *Giglio*, 405 U.S. at 153–54.

### iii.    AEDPA review of exhausted *Brady* claim

At the guilt-innocence phase of Suniga's capital-murder trial, the jury heard the uncontroverted testimony of a pair of Lubbock motel employees about their many encounters with Suniga and Lopez Jr. at the motel, including their vivid descriptions of

Suniga's distinctive appearance in his whiteout contact lenses. After that, the prosecution called one of Lopez Jr.'s ex-girlfriends, Rachel Pereida.

Pereida began her brief testimony by admitting that she had been in trouble multiple times for drugs, but her memory problems resulting from her drug use were now in the past. She admitted that she had been convicted of felonies "lots of times" and was currently on a ten-year term of probation. Dkt. No. 49-29 at 39–40. She said that she had not talked with Suniga's prosecution team about any of her own criminal cases and that she had received no promises regarding her testimony against Suniga. *Id.*

She then testified that she had met Lopez Jr. and Suniga through Lopez Jr.'s cousin, Dusty Tijerina. She said that she had dated Lopez Jr. and was able to identify Lopez Jr. and Brian Suniga from the photographs that had been admitted into evidence (State Exhibit Nos. 80–81). She testified that it seemed like Suniga and Lopez Jr. were together and carried firearms "all the time." *Id.* at 42–43. She stated that the tan Tahoe with damage to the front, in which Lopez Jr. and Suniga traveled, belonged to Lopez Jr., who usually drove the car. She also testified that her impression was that Suniga was in charge between the two men, based on the way that Lopez Jr. "jumped" whenever Suniga said "Let's go." *Id.* at 41–44. After a brief recess to consult with Suniga, his defense counsel chose not to cross-examine Pereida. *Id.* at 44–45.

The record fully supports the state habeas court's factual finding that the prosecution advised defense counsel in March 2014 of Pereida's criminal history and that she was on community supervision—specifically, by the writ-hearing testimony of the former Lubbock DA Powell and defense counsel Keith, both of which the state habeas court reasonably found to be credible. The state habeas court's factual finding that Pereida received no

preferential treatment from the Lubbock DA's Office or responsible community supervision officers because of her status as a witness against Suniga is supported by the affidavits of the probation officers presented to the state habeas court as well as the writ-hearing testimony of Powell and Keith, all of which the state habeas trial court reasonably found to be credible.

More importantly, the TCCA's conclusion that Suniga's claim regarding the alleged suppression of Pereida's probation records failed to satisfy the materiality prong of *Brady* is not just reasonable—it is logically unassailable. Contrary to Suniga's repeated assertions throughout his federal habeas pleadings, Rachel Pereida was not a significant witness at Suniga's trial, much less a "star" prosecution witness. Pereida was barely on the stand long enough to explain to the jury that she had a long criminal history with "lots of" felonies and an equally lengthy history of abusing drugs.

All Pereida did during her extremely brief appearance on direct examination at Suniga's capital-murder trial (fewer than five pages in the court reporter's transcript) was corroborate three points. First, Pereida corroborated the identification testimony given by the two motel employees, who testified that they immediately recognized Suniga and Lopez Jr. as the two individuals described in media reports as the gunmen who robbed a restaurant in Lubbock and fatally shot David Rowser. Second, she corroborated the identification testimony of Lubbock Police Detective Mayer that he was able to identify Suniga as the person wearing whiteout contact lenses shown in a convenience-store surveillance video purchasing two cans of beer less than three hours before the murder of David Rowser. Third, Pereida corroborated the testimony of the two motel employees about the color and description of the tan- or champagne-colored Tahoe that Lopez Jr. and Suniga used during

their many visits to the motel in November and December 2011—the same vehicle in which Suniga and Lopez Jr. were arrested on December 27, 2011.

The undisclosed evidence related to Pereida was not material. "Undisclosed evidence that is merely cumulative of other evidence is not material, while the impeached testimony of a witness whose account is strongly corroborated by additional evidence supporting a guilty verdict . . . generally is not found to be material either." *Rocha v. Thaler*, 619 F.3d 387, 396–97 (5th Cir. 2010), *clarified on denial of reconsideration*, 626 F.3d 815 (5th Cir. 2010) (internal quotation marks and citation omitted). In Suniga's trial, Pereida offered no testimony about the shooting of Rowser or any of its circumstances.

Pereida's testimony did not place Suniga at the crime scene. That was accomplished by the testimony of four witnesses. First, Suniga's acquaintance testified about the business card (with the acquaintance's handwriting) that he had given to Suniga, which a restaurant employee and multiple police officers observed near the front door of the restaurant just after the murder. Second, a restaurant patron testified that one of the gunmen slipped and fell while exiting the restaurant after the shooting. Third, a forensic expert testified about the presence of Suniga's DNA on all three business cards found near the front door of the restaurant. And fourth, a restaurant employee testified that he had just mopped the front-door area and that there were not business cards on the floor before the shooting.

Pereida's trial testimony likewise did not identify the gunman wearing the whiteout contact lenses as the shooter. That was done through the testimony of Rowser's younger brother and a restaurant patron. Pereida's trial testimony also did not address the traumatized reaction of the surviving restaurant employees and patrons to the brutal shooting of David Rowser.

Just as significantly, Pereida's trial testimony did not address the eyewitness testimony that one gunman shouted at Rowser when he exited a restroom (asking whether Rowser wanted to be a hero or thought it was a joke) and, before Rowser could respond, fired three shots at Rowser. In fact, two of the restaurant patrons testified that the shooting occurred so swiftly and unexpectedly that it left them traumatized years later. And nothing in Pereida's trial testimony addressed the officers' discovery of a jar lid with a slit cut into it that was found inside the tan Tahoe in which Suniga and Lopez Jr. were arrested on December 27, 2011, which fit the sample tip jar that a detective obtained from the restaurant.

Finally, nothing in Pereida's trial testimony bore any impact on the issues at the punishment phase. Pereida's suggestion that she believed Suniga to be the "leader" of the duo was irrelevant to any issue before the jury at either phase of trial.[37] There is no suggestion, much less any evidence, before this Court that either of the gunmen said or did anything to communicate to the other gunman in the seconds between when David Rowser stepping out of the restaurant restroom and when the gunman with whiteout contact lenses shot David. There was no evidence at trial, Suniga's state habeas proceeding, or before this Court that either of the gunmen attempted to direct, instruct, or lead the gunman who fatally shot David during the brief interval between David's emergence from the restroom and the instant that David was shot. Thus, Pereida's opinion that, based on her dealings

---

[37] At the guilt-innocence phase of Suniga's capital-murder trial, the state trial judge properly instructed the jury on the Texas law of parties: that (1) all persons who are guilty of acting together in the commission of an offense are parties to that offense, and a party is criminally responsible for the offense if the offense is committed by his own conduct, by the conduct of another for whom he is criminally responsible, or both; and (2) a person is criminally responsible for an offense by the conduct of another if, when acting with intent to promote or assist the commission of the offense he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense, but that mere presence alone does not make one a party to an offense. Dkt. No. 51-30 at 291.

with the duo, Suniga appeared to be the leader was immaterial to any issue properly before the jury at either phase of Suniga's capital-murder trial. Impeaching Rachel Pereida's trial testimony would not have diminished in any meaningful manner the prosecution's overwhelming evidence showing Suniga's moral blameworthiness for his fatal shooting of David Rowser.

Suniga's trial counsel could have cross-examined and impeached Pereida. Doing so would not have changed the mountain of compelling circumstantial evidence tying Suniga to the fatal shooting of David Rowser presented during the guilt-innocence phase. Likewise, even if Suniga's trial counsel had been able to successfully impeach Rachel Pereida's brief trial testimony, there is no reasonable probability that doing so would have affected the outcome of either phase of Suniga's capital-murder trial. Pereida's trial testimony did not add anything of substance to the prosecution's evidence showing Suniga's lengthy criminal record (including dealing methamphetamine starting at age fifteen), association with a violent prison gang, history of domestic violence, failure to support financially any of his seven children, or Suniga's admissions to long-term drug abuse.

In sum, the prosecution presented overwhelming evidence at both phases of trial establishing (1) Suniga's guilt for fatally shooting David Rowser during the robbery of the restaurant; (2) Suniga's propensity for future violence; (3) Suniga's actual commission of the fatal shooting; and (4) Suniga's personal moral blameworthiness for his capital offense. "[W]hen the testimony of a witness who might have been impeached is strongly corroborated by additional evidence supporting a guilty verdict, the undisclosed evidence is generally not found to be material." *Spence v. Johnson*, 80 F.3d 989, 995 (5th Cir. 1996)

– 84 –

(quoting *Wilson v. Whitley*, 28 F.3d 433, 439 (5th Cir. 1994)).  As a result, any undisclosed impeachment evidence relating to Pereida's trial testimony was not material under *Brady*.

Moreover, impeachment evidence addressing a matter over which a witness has already been confronted is not material.  *United States v. Cessa*, 872 F.3d 267, 272 (5th Cir. 2017).  Given that Pereida confessed at the outset of her trial testimony that she had a history of drug abuse and "lots of felonies," further impeaching Pereida based on the details of her then-recent probation violations would have been redundant.  *Id.*; *see also Bernard*, 762 F.3d at 480.

For all these reasons, the state habeas court reasonably determined that any evidence contained in Pereida's allegedly withheld probation records that could have been used to impeach Pereida's trial testimony was not material under *Brady* to the outcome of either phase of Suniga's trial.

### iv.    De novo review of unexhausted claims

Suniga brings three more claims concerning undisclosed evidence.  First, Suniga argues that the prosecution violated his *Brady* rights by failing to disclose to the defense that Pereida was allegedly either a cooperating witness for law enforcement or a paid informant working for law enforcement.  Second, Suniga argues that the prosecution violated his rights under *Giglio* and *Napue* by the prosecution's failure to correct Pereida's false testimony that her drug problems were in the past and that Suniga was the leader of the pair of gunmen who robbed the restaurant and fatally shot David Rowser.  Third, Suniga argues that the prosecution violated his *Brady* rights by failing to disclose to the defense that the Lubbock County Medical Examiner was engaged in unlawful activity and was later convicted of a crime.  It is far from clear whether the first two of these arguments were ever fairly presented

to the state court, but the last was not.  But assuming without deciding that de novo review is necessary, the arguments still fail.

### a.    Unexhausted *Brady* claim regarding Pereida

For the reasons detailed in Analysis § 3.G.iii, *supra*, even assuming that (1) Pereida was a long-standing law enforcement asset, confidential informant, or cooperating witness, and (2) the prosecution failed to disclose that fact to Suniga's defense team before trial, this claim fails to satisfy *Brady*'s materiality prong.  Suniga's trial counsel could have vigorously cross-examined and impeached Pereida based on her alleged status as a law-enforcement informant, asset, or cooperating witness.  Suniga's trial counsel also could have impeached Pereida based on her continued drug use, the violations of her probation, or her commission of more criminal offenses in the months before Suniga's trial.

But even if Suniga's trial counsel had so skillfully cross-examined Rachel Pereida as to destroy her credibility or cause her to recant her entire direct-examination testimony, this Court concludes after de novo review that there is no reasonable probability it would have caused a different outcome for either phase of Suniga's trial.  The overwhelming evidence of Suniga's guilt did not depend, in any way, on the veracity of Pereida's short guilt-innocence phase trial testimony.  And there is not a possibility, much less a reasonable probability, that the outcome of the punishment phase would have been impacted by Suniga's trial counsel successfully impeaching Pereida at the end of her brief appearance on the witness stand.

As already noted, Pereida did not purport to identify Suniga as the gunman who fatally shot David Rowser and furnished no testimony about the circumstances of the robbery or the fatal shooting.  Pereida primarily corroborated other identification testimony.  Pereida likewise offered no testimony relating to the discovery of Kenneth Poe's business

card found at the crime scene.  Suniga's own mother admitted that she recognized Suniga as the individual wearing whiteout contact lenses in the convenience-store surveillance video recorded just hours before the murder.  And Pereida did not offer any testimony relating to the tip jar lid discovered inside the tan Tahoe.[38]

After de novo review, Suniga's complaints of allegedly undisclosed evidence of Pereida's then-recent drug use and alleged status as a law enforcement asset, informant, or cooperating witness still do not satisfy the materiality prong of *Brady*.  *Medellin v. Dretke*, 371 F.3d 270, 281 (5th Cir. 2004) (noting that there is no materiality under *Brady* where evidence of guilt was overwhelming).  Given the amount of incriminating evidence beyond Pereida's brief testimony, the allegedly suppressed impeachment evidence is simply too insignificant to undermine confidence in the jury's verdict.  *United States v. Edwards*, 442 F.3d 258, 268 & n.10 (5th Cir. 2006) (rejecting a *Brady* claim where the suppressed evidence was immaterial considering the other testimony and physical evidence that supported the conviction); *Pippin v. Dretke,* 434 F.3d 782, 789 n.7 (5th Cir. 2005) ("A claim that is largely

---

[38] Although the Fifth Circuit has since vacated the opinion, *see Holberg v. Guerrero*, No. 21-70010, 2025 WL 2165936 (5th Cir. July 30, 2025), the Fifth Circuit's prior opinion in *Holberg* is consistent with this conclusion.  The Fifth Circuit previously granted habeas relief there after finding that the State "failed to disclose impeachment evidence that its critical trial witness was a paid informant." *Holberg v. Guerrero*, 130 F.4th 493, 495 (5th Cir. 2025).  The only issue was whether the defendant killed the victim in self-defense or not.  *Id.* at 496–97.  Holberg's trial hinged on the informant's credibility, and without the suppressed evidence, the defense had no impeachment material.  *Id.* at 504–06.  The majority concluded that there was "no sound theory . . . to support the conclusion that [the suppressed evidence] did not reasonably affect Holberg's trial."  *Id.* at 505.

The case here is immediately distinguishable in material respects.  First, Pereida did not claim to have any personal knowledge of a confession to Rowser's murder by either Suniga or Lopez Jr.  Second, Pereida did not place Suniga at the crime scene, and she offered no testimony about the circumstances of Rowser's shooting.  Third, Pereida was not a key witness, as her testimony merely corroborated the testimony of other witnesses.  While the prosecution may have mentioned Pereida during closing argument at the guilt-innocence phase, that did not elevate Pereida's role at Suniga's trial above that of a minor, corroborating witness.  Pereida's testimony does not even approach the substantial and central role that the informant played in *Holberg*.

speculative with respect to the effect of the allegedly exculpatory evidence on the jury's

ultimate determination of guilt or innocence cannot support a *Brady* violation.").

### b.    Unexhausted *Giglio/Napue* claims regarding Pereida

Suniga complains that the prosecution either deliberately elicited false testimony

from Pereida, or knowingly failed to correct Pereida's false testimony, that her drug

problems were in the past and that Suniga was the "leader" of the duo.  For the same

reasons detailed in Analysis §§ 3.G.iii–iv.a, *supra*, there is no reasonable probability that

either impeaching Pereida or having Pereida recant her trial testimony on either or both of

these two points would have resulted in a different outcome for either phase of Suniga's

trial.  The Court finds after de novo review that there is no reasonable probability that, but

for the failure of the prosecution to correct either or both instances of allegedly false

testimony, the outcome of either phase of the trial would have been different.

First, contrary to Suniga's arguments in his federal habeas pleadings, Pereida did not

testify at trial that all her drug-related problems were behind her.  In fact, she never denied

that she was still using illicit narcotics.  Instead, she testified that any problems she had

experienced in the past with her memory due to her long history of drug abuse were no

longer an issue.  Dkt. No. 49-29 at 40–41.

Second, Suniga points to Pereida's testimony that she believed Suniga was the leader

because Lopez Jr. seemed ready whenever Suniga said, "[l]et's go."  *Id.* at 43–44.  This

testimony seems to be more of an expression of Pereida's opinion than an assertion of

historical fact.  But, assuming this aspect of her testimony was factually inaccurate, for the

reasons detailed in Analysis § 3.G.iii, *supra*, there is no reasonable probability that, but for

the prosecution's elicitation of this "false" testimony, the outcome of either phase of Suniga's trial would have been different.

Pereida's assertion of her belief that Suniga was the leader of the duo was not relevant to any issue properly before the jury at either phase of Suniga's trial. As explained above, there was no evidence at trial suggesting the two gunmen consulted, confessed, or otherwise conspired with one another in the few seconds between David Rowser's exit from the restroom and the fatal shooting. Thus, there was no opportunity for either gunman to have done anything to direct, instruct, or lead the other. The eyewitness testimony explained that as soon as Rowser exited the restroom, the gunman in whiteout contacts shouted at Rowser and, without allowing Rowser an opportunity to respond, fired his gun three times. There was no evidence at trial, and there is no allegation currently before this Court, suggesting that Lopez Jr. instructed, directed, or coerced Suniga to shoot three times at David Rowser.

In addition, the eyewitness testimony identified only the gunman wearing whiteout lenses as David Rowser's shooter. Detective Mayer identified without contradiction Suniga as the person wearing whiteout contact lenses as shown on the Lubbock-area convenience store surveillance video recorded just hours before the murder. All of the eyewitnesses at the restaurant who saw the faces of the gunmen testified about the distinct appearance of the gunman wearing whiteout lenses. Additionally, the two motel employees who interacted with Suniga repeatedly in the months before the murder had no difficulty recognizing Suniga as the person described in media accounts of the robbery and murder. And Suniga has offered no explanation, much less any evidence, showing how the business card that Kenneth Poe gave him appeared near the front door of the restaurant just after the robbery

and murder. There is no suggestion, much less any evidence, currently before this Court establishing that Suniga fired the fatal shots into David Rowser while acting under the direction or under the influence of Lopez Jr. That Suniga fired three times with ruthless efficacy and efficiency (two shots to the chest and one to the head area) likewise belies any contention the murder was not intentional.

Finally, it was undisputed that both gunmen pointed their guns at restaurant employees and demanded money and that both men moved together toward the front door after one of them grabbed the tip jar. The state trial court properly charged the jury under the Texas law of parties that a person is "criminally responsible for an offense committed by the conduct of another if, acting with the intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." Dkt. No. 51-30 at 291. Thus—whether Suniga or Lopez Jr. was the "leader"—under Texas law, the fact that only one of the gunmen fatally shot David Rowser did not provide a defense to capital murder to either gunman.

The Supreme Court's recent grant of habeas relief on direct appeal does not require a different result. *Glossip v. Oklahoma*, 145 S. Ct. 612 (2025). In *Glossip*, the State withheld eight boxes of evidence showing that its primary witness suffered from bipolar disorder, for which he was prescribed lithium, and that the witness recanted or changed his testimony on multiple occasions. *Id.* at 621–23. The State then failed to correct the witness's false trial testimony that he had never seen a psychiatrist and had been inadvertently given lithium instead of cold medicine. *Id.* Because the witness's testimony was the only direct evidence of Glossip's guilt, the jury's assessment of his credibility was "necessarily determinative"— "no other witness and no physical evidence established" Glossip's guilt. *Id.* at 628.

Moreover, the undisclosed evidence directly undermined other components of the State's case, including its repeated theory that the witness was harmless on his own and only participated in the killing at Glossip's direction. *Id.* Indeed, the Oklahoma Attorney General also agreed that prosecutors violated Glossip's rights and requested a new trial. *Id.* at 618.

Here, Pereida did not claim to have any personal knowledge of the capital offense with which Suniga was charged. She did not give any testimony directly establishing Suniga's presence at the restaurant the night of the robbery and murder. Far from offering the only direct evidence of Suniga's guilt, Pereida's testimony did little more than corroborate the unchallenged identification testimony of other eyewitnesses. After de novo review, and careful consideration of *Glossip*, there is still no reasonable probability that, but for the prosecution's failure to correct the allegedly false aspects of Pereida's trial testimony, the outcome of either phase of Suniga's trial would have been any different.

### c.    Unexhausted *Brady* claim regarding Dr. Natarajan

To the extent that Suniga alleges that the prosecution withheld unidentified information relating to criminal misbehavior by the former Lubbock County Chief Medical Examiner, his claim fails because it lacks the factual specificity mandated by Rule 2(c)(2) of the Rules Governing Section 2254 Cases in the United States District Courts. That rule mandates that a petitioner "state the facts supporting each ground." *Mayle*, 545 U.S. at 655 (citation omitted). Federal habeas petitions must "specify all the grounds for relief available to the petitioner" and "state the facts supporting each ground." *Id.*

Likewise, conclusory or speculative allegations relating to a *Brady* claim do not warrant discovery under Rule 6 of the Rules Governing Section 2254 Cases in the United

States District Courts.  *Murphy v. Johnson*, 205 F.3d 809, 814 (5th Cir. 2000) (holding that a petitioner's factual allegations must be specific, not speculative or conclusory, to justify discovery under Rule 6); *West v. Johnson*, 92 F.3d 1385, 1400 (5th Cir. 1996) ("Rule 6, which permits the district court to order discovery on good cause shown, does not authorize fishing expeditions.") (citation omitted).

Dr. Natarajan testified during Suniga's trial that he did not perform David Rowser's autopsy but that he did supervise the autopsy and sign the autopsy report written by the medical examiner who performed the autopsy.  Dkt. No. 49-30 at 99–102.  Dr. Natarajan then testified about the results of Rowser's autopsy, explaining the three gunshot wounds and corresponding bullet tracks through Rowser's body that the medical examiner found during the autopsy, along with the physical damage those bullets inflicted internally.  *Id.* at 110–29.  Suniga does not allege any specific facts showing there was anything factually inaccurate about the information that Dr. Natarajan conveyed to Suniga's jury about David Rowser's injuries or cause of death.  Suniga also does not allege any specific facts suggesting that there was anything misleading in Dr. Natarajan's trial testimony.  Finally, Suniga does not allege any specific facts showing a reasonable probability that cross-examination or impeachment of Dr. Natarajan's trial testimony would have resulted in a different outcome to either phase of Suniga's trial.

Given the lack of any specific facts suggesting that Dr. Natarajan's testimony was inaccurate or misleading or that disclosure of the information related to Dr. Natarajan's unrelated criminal conduct would have resulted in a different outcome, any alleged error related to the disclosure of Dr. Natarajan's criminal conduct fails to satisfy the materiality requirement under *Brady*.  Suniga's conclusory and speculative allegations about Dr.

Natarajan lack any specific facts showing that Lubbock County prosecutors or law enforcement personnel were aware at the time of Suniga's 2014 trial that Dr. Natarajan had ever engaged in any criminal misconduct. This unexhausted claim is too non-specific to avoid summary dismissal under Rule 2(c). After de novo review, this Court concludes Suniga's unexhausted complaint of allegedly withheld information about Dr. Natarajan does not warrant federal habeas relief.

*          *          *

In sum, the TCCA's rejection on the merits of Suniga's exhausted *Brady* claims relating to Pereida was neither contrary to, nor involved an unreasonable application of, clearly established federal law, nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Suniga's trial, direct appeal, and state habeas proceedings. Likewise, all of the unexhausted *Brady* and *Giglio/Napue* claims in his amended federal habeas petition fail under a de novo standard of review. Thus, Suniga's eighth claim in his amended federal habeas petition does not warrant federal habeas relief.

### H.    The first, fourth, sixth, seventh, and ninth claims—all regarding ineffective assistance of counsel—do not warrant federal habeas relief.

In his first, fourth, sixth, seventh, and ninth claims in his amended federal habeas petition, Suniga argues that his trial counsel rendered ineffective assistance, thereby violating Suniga's Sixth and Fourteenth Amendment rights. In the first claim, Suniga complains that his counsel failed to adequately investigate Suniga's background and present all available mitigating evidence. Dkt. No. 36 at 22–92. In the fourth claim, Suniga complains that his counsel did not object to the prosecution's use of peremptory strikes against minority venire members. *Id.* at 116–27. In the sixth claim, Suniga complains that

his counsel did not develop a relationship with Suniga and present a defense or meaningfully counter the prosecution's case. *Id.* at 134–54. In his unexhausted seventh claim, Suniga complains that his counsel failed to impeach Pereida. *Id.* at 155–60. In his ninth claim, Suniga complains that his counsel failed to counter the prosecution's evidence of future dangerousness. *Id.* at 175–83. Each claim falls short and does not justify habeas relief.

### i.    Procedural history

Suniga's seventh claim was not fairly presented to the state courts in either Suniga's appellate brief or initial state habeas application, as Suniga's federal habeas petition admits. *See id.* at 158 (noting that Suniga's prior counsel did not "assert trial counsel's ineffectiveness [in failing to impeach Pereida] in the state habeas petition"). The rest of the ineffective-assistance complaints were fairly presented to the state habeas court, although some of the specific theories of ineffective assistance presented by Suniga in these claims were not fairly presented to the state courts. *See infra* Analysis § 3.H.vii.e.

### ii.    Relevant federal law

At the outset, the Court notes that Suniga's ineffective-assistance claims reference or depend on his trial counsel's alleged failure to comply with the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases. But those guidelines for the performance of trial counsel do not set forth the operative standard of judicial review for the performance of trial counsel. *Bobby v. Van Hook*, 558 U.S. 4, 8 (2009) (holding that the ABA Guidelines are "only guides" to what reasonableness means, not its definition). Because the "[b]est practices urged by the ABA do not necessarily track the contours of the Sixth Amendment," those "guidelines do not function as 'inexorable

commands' with which all capital defense counsel 'must fully comply.'" *Druery v. Thaler*, 647 F.3d 535, 541 n.2 (5th Cir. 2011) (quoting *Bobby*, 558 U.S. at 8).

 The constitutional standard for determining whether a criminal defendant has been denied the effective assistance of trial counsel, as guaranteed by the Sixth Amendment, has two elements. "First, the defendant must show that counsel's performance was deficient." *Strickland*, 466 U.S. at 687. This means that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* A defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *Williams v. Taylor*, 529 U.S. 362, 390–91 (2000). In so doing, the defendant has the burden of proof and must overcome a strong presumption that the conduct of his trial counsel "falls within [a] wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Bobby*, 558 U.S. at 7 (quoting *Strickland*, 466 U.S. at 688–89). There is a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *See Wiggins*, 539 U.S. at 523; *Bell v. Cone*, 535 U.S. 685, 698 (2002); *Strickland*, 466 U.S. at 690.

 "Second, the defendant must show that the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687. This means that "counsel's errors were so serious as to deprive the defendant of a fair trial." *Id.* The defendant must establish a reasonable probability that, but for the objectively unreasonable misconduct of his counsel, the result of the proceeding would have been different. *Wiggins*, 539 U.S. at 534 (quoting *Strickland*, 466

U.S. at 694). A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. *Thornell v. Jones*, 602 U.S. 154, 163 (2024). This "requires a substantial, not just conceivable, likelihood of a different result." *Jones*, 602 U.S. at 163 (citation omitted).

Under AEDPA's deferential standard of review, claims of ineffective assistance adjudicated on the merits by a state court are entitled to a doubly deferential form of federal habeas review. AEDPA "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Burt v. Titlow,* 571 U.S. 12, 19 (2013). Under 28 U.S.C. § 2254(d)(1), "'a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *White v. Wheeler,* 577 U.S. 73, 77 (2015) (quoting *White v. Woodall,* 572 U.S. 415, 419–20 (2014)); *Harrington v. Richter,* 562 U.S. 86, 103 (2011). When the state court failed to adjudicate one of the *Strickland* prongs, the Court reviews the non-adjudicated prong de novo. *See Porter v. McCollum*, 558 U.S. 30, 39 (2009) (citing *Rompilla v. Beard*, 545 U.S. 374, 390 (2005)).

      iii.    **The unexhausted seventh claim—regarding the failure to impeach Pereida—fails de novo review and does not warrant federal habeas relief.**

In his seventh claim in his amended federal habeas petition, Suniga complains that his trial counsel rendered ineffective assistance by failing to (1) cross-examine Pereida; (2) interview a known accomplice of Pereida, Jonathan Shadden; and (3) use Shadden as a witness at trial to impeach Pereida. Dkt. No. 36 at 155–60. This ineffective-assistance claim was never fairly presented to any state court, either on direct appeal or in Suniga's

initial state habeas application. *Id.* at 159. The Court thus reviews this claim de novo. *See Porter*, 558 U.S. at 39 (citing *Rompilla*, 545 U.S. at 390); *Wiggins*, 539 U.S. at 534.

For the reasons detailed in Analysis § 3.G.iii, iv.a–b, *supra*, Suniga's seventh claim for federal habeas relief fails to satisfy the prejudice prong of *Strickland*. The Court also concludes that the record reveals that there were objectively reasonable reasons why Suniga's trial counsel could, and reasonably did, choose not to cross-examine or impeach Pereida after consulting at trial with Suniga after Pereida's direct testimony.

First, as already explained, Pereida's trial testimony merely corroborated the undisputed identification testimony of the two motel employees and Detective Mayer. Second, Pereida's brief trial testimony did not implicate Suniga in the robbery and murder. Third, Pereida admitted during her testimony on direct examination that she had a history of drug abuse that, at one time, had affected her memory and that she had committed "lots of [felonies]." Dkt. No. 49-29 at 40. Thus, any attempt to impeach Pereida further by using the testimony of Shadden, another confessed drug addict and felon, to identify Pereida as a purported confidential informant or cooperating witness would likely have had diminishing returns. Fourth, evidence showing that a prosecution witness at one trial had been a prosecution witness, confidential informant, or cooperating witness in a prior criminal investigation or proceeding is by its nature double-edged: while it could be considered by some jurors as suggestive that the witness is an agent of the prosecution, other jurors could consider such evidence as bolstering the witness' credibility because prosecutors and law-enforcement agents trusted the veracity of the witness enough to use the witness as an informant or witness. Thus, evidence that Pereida had worked for law enforcement in other

cases as a confidential informant or cooperating witness was not necessarily impeaching in nature.

Finally, and most tellingly, during her grand jury testimony in February 2012, Pereida testified that Suniga was the more violent of the duo and seemed to lead more than he followed and that Suniga and Lopez Jr. were always together. She also testified that Lopez Jr.'s star facial tattoo related to the Tango Blast gang and that Lopez Jr. had no real job and instead dealt drugs. She testified that Lopez Jr.'s cousin, Dusty Tijerina, told her that Suniga and Lopez Jr. committed the robbery and murder at the restaurant to earn points with the Tango Blast gang. She also stated that Suniga had lots of firearms, that it seemed that Suniga had a different weapon every time she saw him, and that Suniga and Lopez Jr. each always had a gun with them. Dkt. No. 51-24 at 34–42.

Thus, there is ample information in the state court record establishing that Suniga's trial counsel had legitimate, objectively reasonable, reasons for choosing not to attempt to cross-examine or impeach Pereida at trial. It was a reasonable choice to let Pereida's limited corroboration testimony stand rather than opening the door to other issues through cross-examination or impeachment. After de novo review, Suniga's seventh claim in his amended federal habeas petition fails to satisfy either prong of *Strickland*. Suniga's seventh claim does not warrant federal habeas relief.

> ### iv. The sixth claim—that his attorney failed to establish a client relationship and failed to present a defense or counter the State's evidence—does not warrant federal habeas relief.

Suniga's sixth claim is effectively an omnibus complaint of ineffective assistance at the guilt-innocence phase. In his sixth claim, Suniga complains that his trial counsel rendered ineffective assistance by failing to (1) develop a relationship with Suniga;

(2) develop a theory of the case or cross-examine witnesses; or (3) impeach Pereida's credibility.  Dkt. No. 36 at 134–54.

For failure to develop a relationship, Suniga argues that his counsel failed to comply with ABA guidelines mandating that defense counsel "establish a relationship of trust with the client." *Id.* at 135.  He also argues that his counsel failed to understand the nature of his relationship with Lopez Jr. and failed to pursue a plea deal in which Suniga would receive life without parole if Lopez Jr. received 15 years. *Id.* at 135–36.  Suniga asserts that this allowed the prosecution to pit him against his cousin, which his counsel failed to prevent. *Id.* at 135.  Suniga also complains that his counsel did not visit him between December 4, 2013, and December 25, 2013, and did not meet with Suniga often enough during January 2014. *Id.* at 136.

Next, Suniga argues that his trial counsel did not advance any theory of defense. *Id.* at 138.  He also asserts that his counsel failed to cross-examine witnesses that connected Suniga and Lopez Jr. to the crime and that his counsel failed to present evidence showing that Suniga was not at the crime scene during the commission of the crime. *Id.* at 138–39.  Suniga notes that the defense did not capitalize on the opportunity to argue that Suniga was not the shooter based on the eyewitness testimony of Lauren Krachala that the person in whiteout contacts had a buzz cut, which Suniga did not have at the time of the shooting. *Id.* at 139.  Suniga also asserts that his counsel failed to elicit evidence that Suniga was always polite at the motel during cross-examination of the motel employees. *Id.* at 140.

Finally, Suniga again argues that his counsel was deficient by failing to impeach Pereida.  He asserts that his counsel did not cross-examine and impeach Pereida with (1) her original statements to law enforcement personnel; (2) her grand jury testimony; (3) her

statements to the defense team on November 27, 2012; (4) the recording of her December 27, 2011, tip-line call; (5) the fact Pereida was then on probation; (6) her testimony at a suppression hearing for a different defendant; and (7) the contents of Pereida's probation records showing she had multiple positive drug tests and arrests for new criminal charges following her grand jury testimony. *Id.* at 141–43. Suniga also asserts that the defense failed to present impeachment evidence showing that Pereida was prone to lying under oath. *Id.* at 147. Suniga also claims that effective examination of Pereida would have revealed testimony showing that Lopez Jr. told others that he was the shooter. *Id.* at 143.

### a.    Procedural history

In his initial state habeas application, Suniga presented a similar ineffective-assistance claim. *See* Dkt. Nos. 52-28 at 315–500; 52-29 at 3–34. In that application, Suniga complained that his trial counsel did not engage intelligently in Defense Initiated Victim Outreach and did not secure and maintain Suniga's trust. He also asserted that his trial counsel did not formulate a defensive theory of the case or use the additional time granted by continuances. Suniga asserted that at trial, his counsel remained passive and complicit during the prosecution's case and failed to attach and rebut the prosecution's evidence of future dangerousness. He also asserted that his trial counsel failed to present expert testimony at the guilt-innocence phase or obtain helpful evidence through cross-examination, particularly of Pereida.

Suniga also argued that his trial counsel failed to challenge the State's reliance on improper future-dangerousness evidence and injected harmful evidence on the dangerousness of prisons. He asserted that his trial counsel did not investigate and present evidence rebutting the State's evidence of Suniga's gang membership. He claimed that his

trial counsel did not impeach prosecution witnesses about Suniga's jail disciplinary infractions or properly educate the court on the proper scope of mitigating evidence. Suniga asserts that his trial counsel failed to investigate and present evidence detailing Suniga's social history, such as drug and alcohol abuse in his family and cartel-backed drug distribution in Suniga's home growing up.

In addition, Suniga argued that his trial counsel failed to develop mitigation themes through appropriate experts, such as to explain the history of alcohol, substance, and sexual abuse in Suniga's family. Suniga claimed that his trial counsel relied on flawed testing when choosing not to present expert mental-health testimony. Suniga also asserted that his trial counsel failed to follow the advice of a defense expert to present evidence of Suniga's intellectual, visual, and verbal abilities, which suggested a serious language disorder possibly triggered by severe developmental trauma. He claimed that his trial counsel failed to use testimony from experts explaining the "unusual sexual habits" of Suniga's family and Suniga's own attachment issues, severe addiction, and PTSD symptoms. Suniga also argued that his trial counsel failed to attack the State's implicit accusation that David Rowser's shooting was gang-related and failed to subpoena and attack the credibility of David Luna, a gang member who identified Suniga as a Tango Blast member.

Suniga also claimed that his trial counsel failed to present mitigating evidence showing that Suniga was the product of severe family dysfunction resulting from various factors, such as (1) multi-generational race discrimination and violence; (2) that Suniga's family members were generally bad role models and that he lacked a father figure and parental supervision; (3) he and his brothers' association with drug dealers growing up; (4) sexual abuse in his family; and (5) the arrests of Michael Suniga, Lopez Sr., and others

close to Suniga, contributing to Suniga's abuse of methamphetamine.  Suniga also asserted

that his trial counsel failed to call expert witnesses to present testimony explaining factors

such as (1) Suniga's social and personal history of trauma and its effect on his development;

(2) the history of discrimination against Mexican Americans in West Texas and its impact

on economic opportunities; and (3) socio-economic issues relating to border politics,

policing, and the illicit drug trade and how those factors exploit individuals who become

involved in the drug trade.  Suniga also complained about his trial counsel's failure to call a

trauma expert who could provide a unifying framework for Suniga's mitigation case and

explain the impact of trauma on Suniga's development, the neuro-biological impacts of

childhood neglect and violence, the interaction of trauma and substance abuse, trauma's

impact on identity formation, and the emotional responses and personal relationships of

trauma victims.  Suniga also asserted that his trial counsel failed to call a qualified

psychologist and socio-cultural expert to testify about the social, historical, economic, and

psychological barriers facing Mexican Americans.  He also argued that his trial counsel

failed to call a qualified historian to explain the nature of the drug trade between Texas and

Mexico and its economic incentives and risks and presented no expert testimony on

Suniga's psycho-social history.

    During the extended evidentiary hearing held in Suniga's state habeas proceeding,

the state habeas trial court heard extensive testimony from Suniga's attorneys Edward Ray

Keith[39] and Dennis Reeves.[40]   The court also heard testimony from the prosecutors who

---

[39] Dkt. Nos. 51-36 at 262–311; 51-37 at 13–126.  Edward Ray Keith also submitted an affidavit.
  Dkt. No. 52-20 at 372–79.

[40] Dkt. No. 51-37 at 128–201.  Reeves also submitted an affidavit addressing Suniga's
  ineffective-assistance, *Brady*, *Giglio/Napue*, *Batson*, and selective-prosecution claims.  Dkt. No.
  52-20 at 363–71.

tried Suniga's case,[41] Suniga's mitigation specialist Rob Cowie,[42] Suniga's defense investigator Albert Miraval,[43] and an attorney Suniga called to testify as an expert on capital litigation practices and standards, Richard Burr.[44]  The court also heard testimony from all three of the experts identified in Suniga's first claim for state habeas relief and from several fact witnesses.  *See generally* Dkt. No. 51-33 at 3–5 (index of witnesses).  The state habeas trial court found that the affidavits and testimony of Suniga's defense attorneys Keith and Reeves, mitigation specialist Cowie, and investigator Miraval were credible.  But the court disagreed with the conclusions of Suniga's capital-litigation expert, Richard Burr.  The court adopted the State's proposed findings and conclusions, concluding that Suniga's ineffective-assistance claims failed to satisfy the prejudice requirement and recommending denial of the claim on the merits.  Dkt. No. 52-44 at 57–61.

The TCCA denied Suniga's first claim for state habeas relief on the merits.  *Ex parte Suniga*, 2022 WL 2064609, at *1 ("We deny relief on these [first and fifth] claims because [Suniga] has . . . failed to show a reasonable probability that, but for his trial counsel's alleged deficient performance, the result of his trial would have been different.").

---

[41] Lead prosecutor Powell's state writ-hearing testimony appears at Dkt. No. 51-34 at 232–315.  The state writ testimony of the prosecution second chair, Sunshine Stanek, appears at Dkt. No. 51-34 at 138–228.  Powell also submitted an affidavit that addressed the ineffective-assistance, *Brady*, *Giglio/Napue*, *Batson*, and selective-prosecution claims.  Dkt. No. 52-37 at 391–99.

[42] Dkt. No. 51-36 at 113–260.

[43] Dkt. No. 51-37 at 203–26.

[44] Dkt. Nos. 51-36 at 14–111; 51-37 at 228–58; 51-38 at 13–112.  Attorney Burr testified that his entire legal practice since 1981 has been representing people on death row who are seeking to challenge their convictions.  Dkt. No. 51-36 at 14–15.  He was offered to the state habeas trial court and accepted without objection as an expert on "prevailing professional norms" for death penalty cases.  *Id.* at 26.

### b.    AEDPA review

For the reasons detailed in Analysis §§ 3.G.iii–iv, H.iii, *supra*, as well as below, the TCCA's rejection on the merits of this claim, based on an absence of prejudice under *Strickland*, was reasonable.

Conclusory assertions of ineffective assistance do not furnish a basis for federal habeas relief. *Harper v. Lumpkin*, 64 F.4th 684, 691 (5th Cir. 2023) (quoting *Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000)).  This is particularly the case when a petitioner assails the performance of his trial counsel without a specific showing of how the alleged deficiencies in the performance of his trial counsel prejudiced the petitioner's right to a fair trial. *Barnard v. Collins*, 958 F.2d 634, 642 n.11 (5th Cir. 1992).  As explained below, these standards doom Suniga's complaints about his trial counsel's failures to investigate and develop a defensive strategy at the guilt-innocence phase.

While Suniga complains in conclusory fashion that his trial counsel failed to adequately develop rapport with Suniga and failed to adequately investigate and develop a defensive theory during the guilt-innocence phase, Suniga alleges no specific facts showing that any rational defensive strategy was available to his trial counsel other than the one they chose: holding the prosecution to its burden of proof and emphasizing the circumstantial nature of the prosecution's identification testimony.  Suniga's trial counsel did just that, arguing at the closing of the guilt-innocence phase that there had been no eyewitness

testimony by anyone at the crime scene identifying Suniga as the shooter.[45]  More significantly, Suniga fails to allege any specific facts showing there was any evidence available at the time of trial to show that Suniga was not there or to establish that Suniga had an alibi for where he was at the time and place of David Rowser's murder.

Suniga also complains that his trial counsel failed to cross-examine the prosecution's identification witnesses, but he fails to allege any specific facts showing a reasonable probability that cross-examination or impeachment of any of those witnesses would have resulted in a different outcome at either phase of his capital-murder trial.  The decision of whether or how to cross-examine a witness are quintessentially matters of trial strategy that rarely support an ineffective-assistance claim.  *Bernard*, 762 F.3d at 472.

Suniga does not allege that there was any evidence available at the time of trial to impeach or otherwise cast doubt on the testimony of multiple identification witnesses: (1) Detective Mayer, who identified Suniga as the individual wearing whiteout contact lenses in the surveillance video recorded just hours before the murder; (2) either of the motel employees, who testified that once they heard and saw media accounts of the fatal shooting, they had no difficulty identifying Suniga and Lopez Jr. as matching media descriptions; (3) Suniga's acquaintance Kenneth Poe, who testified that he gave Suniga one of the

---

[45] Dkt. No. 49-31 at 31 ("No witness came in this courtroom and said '[t]here he is.  He did it.  He shot David Rowser.'").  Suniga's complaint that his trial counsel should have argued that Krachala's testimony—that the gunman with "Halloween contacts" had a buzz cut, *see* Dkt. No. 49-28 at 137—was exculpatory is refuted by the record.  Suniga's trial counsel argued at the guilt-innocence closing that "[t]hey have to prove that it's Brian Suniga that did this.  Not that somebody with a buzz cut, or long hair, white hat, or black hat, or red shirt."  Dkt. No. 49-31 at 31.  There is no reasonable probability that a rational jury would have ignored the prosecution's mountain of circumstantial evidence and acquitted Suniga based on this one inconsistent detail in the many eyewitnesses' testimony.  Moreover, Krachala's buzz cut testimony was elicited by Suniga's defense counsel on cross-examination, further undercutting this aspect of Suniga's ineffective-assistance claim.  Dkt. No. 49-28 at 137.

business cards found at the crime scene after the murder; or (4) the forensic expert, who testified that Suniga's DNA was a match for DNA found on one of the business cards found at the crime scene and that Suniga could not be ruled out as a contributor to the DNA mixture found on the other two cards. And for the reasons explained in Analysis §§ 3.G.iii–iv, H.iii, *supra*, Suniga's complaints that his trial counsel should have attempted to cross-examine and impeach Pereida fail to satisfy either prong of *Strickland*, regardless of the many impeachment theories that Suniga proffers. As explained above, Pereida was not a key or star witness for the prosecution. She merely corroborated the identification testimony of the two motel employees and Detective Mayer. Impeaching Pereida would not have diminished the compelling circumstantial evidence that put Suniga and Lopez Jr. at the restaurant crime scene at the time of the murder.

Additionally, Suniga alleges no specific facts showing there was any evidence available at the time of trial to address the highly inculpatory discovery of the jar lid—which had a slit cut in it and that fit a sample tip jar from the restaurant—recovered on December 27, 2011, from inside Lopez Jr.'s vehicle.

Moreover, Suniga's conclusory complaint that his trial counsel failed to establish rapport with Suniga does not establish prejudice within the meaning of *Strickland*. The Sixth Amendment right to counsel does not guarantee an accused a "meaningful attorney-client relationship." *Morris*, 461 U.S. at 14. Suniga's complaints that his trial counsel informed him of the prosecution's strong case against him and the possibility that the prosecution might seek to induce Lopez Jr. to testify against him by offering Lopez Jr. a plea bargain do not furnish a basis for a finding of either deficient performance or prejudice. Defense counsel owes "duties to consult with the defendant on important decisions and to keep the

defendant informed of important developments in the course of the prosecution." *Strickland*, 466 U.S. at 688.  Suniga's complaints that the foregoing comments damaged his working relationship with his counsel may be understandable within the context of the writ-hearing testimony that Suniga lacks emotional maturity,[46] but they do not satisfy the prejudice requirement.

Likewise, Suniga's conclusory complaint that his trial counsel failed to develop a comprehensive and coherent defense strategy for the guilt-innocence phase also fails to satisfy the prejudice requirement.  Defense counsel need not develop a defense where none exists under applicable law.  *United States v. Cronic,* 466 U.S. 648, 656 n.19 (1984).  Suniga's conclusory complaint that his trial counsel failed to meet sufficiently with Suniga in December 2013 and January 2014 also does not establish prejudice.  Brevity of consultation does not establish ineffective assistance unless the defendant can show what benefit would have resulted from the additional consultation.  *Bernard*, 762 F.3d at 478 (citing *Schwander v. Blackburn*, 750 F.2d 494, 499 (5th Cir. 1985)).  Suniga has failed to allege specific facts identifying any non-speculative benefit that would have resulted from additional consultations between himself and his defense team during this time frame.

The state habeas trial court expressly found after hearing testimony from Suniga's trial counsel, mitigation specialist, and investigator that Suniga repeatedly insisted to his defense team that he and Lopez Jr. were not at the restaurant on the night of the murder.[47]

---

[46] Rob Cowie testified during the writ hearing that many of Suniga's family members believed that Suniga operated emotionally at the maturity level of a fifteen-year-old.  Dkt. No. 51-36 at 128.

[47] Dkt. No. 52-43 at 287–89.  This factual finding was fully supported by the evidence before the state habeas court.  Lead defense counsel Keith testified without contradiction at Suniga's state writ hearing that Suniga consistently insisted that he and Lopez Jr. had not been at the restaurant on the evening of the murder.  Dkt. No. 51-37 at 25–26.

But both attorney Keith and defense investigator Miraval testified without contradiction at Suniga's state writ hearing that the defense was never able to identify any potential alibi witness. Dkt. No. 51-37 at 25–26 (Keith), 223 (Miraval). This left Suniga's lead defense counsel with what he felt was a single rational guilt-innocence trial strategy: to challenge the eyewitness testimony offered by those at the crime scene. *Id.* at 23–24.

Similarly, Suniga's conclusory complaints about his trial counsel's failure to negotiate a favorable plea bargain on Suniga's behalf are also insufficient to satisfy *Strickland*'s prejudice prong. Lead defense counsel Keith testified without contradiction during Suniga's state writ hearing that Suniga never authorized him to seek a plea bargain that would involve Suniga accepting a term of imprisonment for life without parole. *Id.* at 16. Keith also testified that he considered it unlikely the prosecution would ever have accepted a plea deal for both co-defendants that included a sentence of only fifteen years for Lopez Jr. *Id.* at 16–17. More importantly, Suniga cites no testimony during his state writ hearing indicating Lubbock DA Powell would have been willing to agree to a joint plea bargain that would result in Lopez Jr. serving only a fifteen-year term of imprisonment. Lopez Jr. eventually pled to a term of life imprisonment without the possibility of parole. Under such circumstances, Suniga's conclusory assertion that his trial counsel rendered ineffective assistance during plea negotiations fails to establish prejudice within the meaning of *Strickland*.

Finally, Suniga's reliance on the ABA Guidelines as setting the standard for objectively reasonable attorney conduct is misplaced. As explained above, the ABA Guidelines are guidelines only to professional norms, not the definition of effective assistance under the Sixth Amendment. *Bobby*, 558 U.S. at 8; *Bernard*, 762 F.3d at 478.

### c.     Alternative de novo review of the claim

A comparison of the complaints of ineffective assistance that Suniga includes in his sixth claim for federal habeas relief in this Court and the more extensive ineffective-assistance claim he included as his first claim in his initial state habeas application shows some, but not complete, overlap. Thus, a court could conclude that there are aspects of Suniga's sixth claim for federal habeas relief that have not yet been fairly presented to the state courts.

Assuming without deciding that de novo review is required for the sixth claim, the claim still fails. The identity of the gunman who fatally shot David Rowser was not primarily determined by the eyewitness testimony of those at the restaurant during the robbery and murder, although two eyewitnesses at the crime scene did testify that the gunman with whiteout contact lenses shot David Rowser. Rather, the identity of the shooter was established mainly through circumstantial evidence—the uncontroverted testimony of two motel employees who instantly recognized Suniga and Lopez Jr. from their dealings with the duo for two months before the crime, and Detective Mayer's testimony identifying Suniga as the person seen in surveillance video buying beer, which was recorded just hours before the fatal shooting. In addition, Suniga's presence at the crime scene at the time of the murder was established through evidence showing that the three found business cards bore either Suniga's DNA or a mixture of DNA in which Suniga was a possible contributor. Finally, Suniga and Lopez Jr.'s identity as the gunmen was fully supported by the discovery inside Lopez Jr.'s vehicle, the day after the murder, of a tip-jar lid that Detective Mayer testified and demonstrated to the jury fit the sample tip jar that he obtained from the restaurant.

Thus, Suniga's role in the murder was established through compelling circumstantial evidence and the eyewitness testimony of a restaurant employee and a patron that the gunman with whiteout contact lenses shot David Rowser.  To date, Suniga has identified no exculpatory evidence, no alibi evidence, and no other evidence of any type that suggests that someone else played this role in the murder.  Under these circumstances, Suniga's defense counsel did the best they could with Suniga's insistence that he and Lopez Jr were not at the restaurant the night of the murder.  Suniga may not have enjoyed hearing it, but his trial counsel had a professional and ethical duty to inform Suniga before trial of (1) the overwhelming nature of the prosecution's circumstantial evidence, and (2) the possibility that the prosecution might offer Suniga's co-defendant a plea bargain in exchange for Lopez Jr.'s testimony against Suniga.  There was nothing that Suniga's trial counsel lawfully or ethically could have done to prevent the prosecution from offering Lopez Jr. a deal.  It was Suniga's refusal to understand the situation that led to the tension between Suniga and his counsel—as Cowie and others described during Suniga's state writ hearing—not any ineffective assistance of the part of his defense attorneys.  It would have been the height of professional irresponsibility for Suniga's trial counsel not to have informed Suniga of the possibility that prosecutors might try to turn Lopez Jr. against Suniga.

For the reasons detailed in Analysis §§ 3.G.iii–iv, H.iii–iv.b, *supra*, after de novo review, the Court concludes that all of the complaints of ineffective assistance contained in Suniga's sixth claim for federal habeas review fail both prongs of *Strickland*.  Suniga's sixth claim does not warrant federal habeas relief under de novo review.

*     *     *

– 110 –

In sum, the TCCA's rejection on the merits of Suniga's first claim in his initial state habeas application was neither contrary to, nor involved an unreasonable application of, clearly established federal law, nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Suniga's trial, direct appeal, and state habeas proceedings.  Likewise, all of the unexhausted complaints of ineffective assistance contained in Suniga's sixth fail, even under de novo review.  Suniga's sixth claim in his amended federal habeas petition does not warrant federal habeas relief.

## v.  The fourth claim—ineffective assistance based on the failure to raise a *Batson* objection—does not warrant federal habeas relief.

In his fourth claim in his amended federal habeas corpus petition, Suniga argues that his trial counsel rendered ineffective assistance by failing to make an objection based on *Batson v. Kentucky*, 476 U.S. 79 (1986), to the prosecution's use of a peremptory strike against a male Latino member of the jury venire.  Dkt. No. 36 at 116–27.

### a.  Procedural history

In his initial state habeas application, Suniga complained that his state trial counsel rendered ineffective assistance by not raising a *Batson* objection to the State's use of a peremptory strike against venire member S.P., a Latino male.  Dkt. No. 52-29 at 80–97.  In response, Suniga's lead trial counsel and co-counsel each furnished affidavits addressing this claim, as did former Lubbock DA Powell.[48]  The state habeas trial court found that the affidavits were credible and that every Catholic member of the jury venire who displayed any hesitancy with regard to an ability to vote to impose the death penalty was either excused by agreement, struck for cause, or subjected to a peremptory strike by the

---

[48] Dkt. Nos. 52-37 at 395–97 (Powell affidavit); 52-20 at 370–71 (Reeves affidavit), 379 (Keith affidavit).  The Reeves and Keith affidavits both stated the defense did not want S.P. on the jury.

prosecution. The court concluded that striking a venire member peremptorily based on the individual's religious views on the death penalty does not violate the holding in *Batson*. It also found that Powell believed, based on venire member S.P.'s voir dire answers, which included hesitation in answering death-penalty-related questions, that S.P. could not vote to impose the death penalty because of his strong religious views and his Catholic faith and that Powell exercised a peremptory strike against S.P. The state habeas trial court found that Suniga's trial counsel did not want S.P. to serve on Suniga's jury and thus chose not to object to the prosecution's use of a peremptory strike against S.P. Finally, the court concluded that this claim for state habeas relief failed to satisfy both prongs of *Strickland*. Dkt. No. 52-44 at 11–26.

The TCCA denied this claim for state habeas relief on the merits. *Ex parte Suniga*, 2022 WL 2064609, at *1 ("We deny relief on [this] claim[] because [Suniga] has . . . failed to show a reasonable probability that, but for his trial counsel's alleged deficient performance, the result of his trial would have been different.").

### b.    AEDPA and de novo review

The TCCA's denial of this ineffective-assistance claim on the merits was objectively reasonable based on the evidence before it. Both of Suniga's trial counsel furnished affidavits stating that the defense chose not to raise a *Batson* objection when the prosecution exercised a peremptory strike against S.P. because the defense team did not want S.P. to serve on Suniga's jury. Suniga has alleged no specific facts showing that strategic decision was objectively unreasonable. As many courts have noted, selecting a jury is strategic and more art than science. *See Romero v. Lynaugh*, 884 F.2d 871, 878 (5th Cir. 1989); *Teague v. Scott*, 60 F.3d 1167, 1172 (5th Cir. 1995).

Trial counsel is entitled to considerable deference and a presumption of reasonableness when selecting a jury, especially with regard to the conduct of voir dire and the impressions and inferences to be drawn from venire members' demeanor, tone of voice, and many other factors that are not readily discernable from the written record. Indeed, "*Strickland* encompasses the prohibition against second-guessing counsel's trial strategy on *voir dire*," and differences in strategy or questioning, with the benefit of hindsight, "will not support a finding of ineffective assistance." *Thomas v. Lumpkin*, 995 F.3d 432, 447 (5th Cir. 2021).

Trial counsel are entitled to considerable deference in terms of how they choose to craft their voir dire examinations, given that generic questions may not expose biases, but pointed questions may also fail to expose bias while exacerbating prejudice on the jury. *Pena-Rodriguez v. Colorado*, 580 U.S. 206, 224–25 (2017). Similar deference is owed to the inferences and conclusions trial lawyers draw from a venire member's answers, hesitation, facial expressions, and tone of voice during voir dire examination.

Suniga has alleged no specific facts showing that his trial counsel's voir dire examination of S.P. was inadequate or that the apparently negative impressions and inferences that his counsel drew from S.P.'s answers and impression were objectively unreasonable. Suniga has failed to allege specific facts sufficient to establish that the strategic decision by his trial counsel not to object to the prosecution's use of a peremptory strike against S.P. was objectively unreasonable.

Moreover, given that Suniga's trial counsel made an objectively reasonable strategic decision that they did not want S.P. on Suniga's jury, the failure to raise a *Batson* objection when the prosecution peremptorily struck S.P. could not, by definition, have prejudiced

Suniga under *Strickland*. Had Suniga's trial counsel made a timely *Batson* objection that the state trial court sustained, then the defense would have been required to use one of its own peremptory challenges to strike S.P. Thus, the TCCA reasonably concluded that Suniga's fifth claim for state habeas relief did not satisfy the prejudice prong of *Strickland*.

Additionally, there was no reasonable probability that a timely *Batson* challenge premised on refusal to follow the law or the court's instructions based on a religious objection to the death penalty would have prevailed. The prosecution proffered race-neutral reasons for striking S.P. when required to do so in the state habeas trial court. The state habeas trial court found that Powell exercised a peremptory strike against S.P. (as well as other jurors who expressed hesitation at imposing the death penalty) because of his religious hesitation about the death penalty. The state habeas trial court found the prosecution did so consistently throughout Suniga's jury selection. Neither the Supreme Court nor the Fifth Circuit has ever held that striking a juror based on his or her refusal to follow the law or the court's instructions based on a religious objection to the death penalty is forbidden under *Batson*. *See Guidry v. Lumpkin*, 2 F.4th 472, 485 n.1 (5th Cir. 2021) ("[The Supreme Court to date has not extended *Batson* protections to religious affiliation."); *Fisher v. Texas*, 169 F.3d 295, 305–06 (5th Cir. 1999). "An attorney's failure to raise a meritless argument . . . cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue." *Nelson v. Davis*, 952 F.3d 651, 679 (5th Cir. 2020); *see also United States v. Slape*, 44 F.4th 356, 359–60 (5th Cir. 2022). Suniga's trial counsel did not render ineffective assistance by failing to raise a meritless *Batson* objection.

To the extent that Suniga implicitly argues that his trial counsel should have urged a *Batson* objection akin to the one Suniga now brings in his federal habeas pleadings—that *Batson* should be extended to include religious objections to the death penalty as well as race—that argument is unpersuasive. The Sixth Amendment's reasonableness standard does not require counsel to guess correctly on questions of first impression. *Slape*, 44 F.4th at 360. Both parties at Suniga's trial were amenable to excusing, challenging for cause, or peremptorily striking Catholic venire members who expressed reluctance or hesitation when it came to imposing the death penalty. This is hardly surprising. As of the date of Suniga's trial in 2014, neither the United States Supreme Court, the Fifth Circuit, nor the Texas Court of Criminal Appeals had extended the holding in *Batson* to a refusal to follow the law or the court's instructions based on a religious objection to the death penalty.

A strong presumption of reasonableness must be afforded to the strategic decisions of trial counsel. *Dunn v. Reeves*, 594 U.S. 731, 739 (2021); *Richter*, 562 U.S. at 104. Defense lawyers have limited time and resources and so must choose from among countless strategic options. *Dunn*, 594 U.S. at 739. Such decisions are particularly difficult because certain tactics carry the risk of harming the defense by undermining credibility with the jury or distracting from more important issues. *Id.*

The burden of rebutting this presumption rests on the defendant, and the absence of evidence cannot overcome it. *Id.* In fact, even if counsel's conduct were far from exemplary, a court still may not grant relief unless the record reveals that counsel took an approach that no competent lawyer would have chosen. *Id.* Suniga has failed to allege any specific facts sufficient to overcome the presumption that his trial counsel's strategic

decision not to object to the prosecution's peremptory strike of S.P. fell within the broad range of objectively reasonable professional assistance.

Even were this Court to undertake an alternative de novo review of the ineffective-assistance assertions contained in Suniga's fourth claim here, the claim still fails. Suniga alleges no specific facts showing that his trial counsel's strategic decision not to raise a *Batson* objection to the prosecution's peremptory strike of S.P. was objectively unreasonable or that Suniga was thus prejudiced under *Strickland*. Thus, for the reasons discussed above, this Court concludes after de novo review that this claim fails both prongs of *Strickland*.

The TCCA's rejection on the merits of Suniga's fifth claim in his initial state habeas application was neither contrary to, nor involved an unreasonable application of, clearly established federal law, nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Suniga's trial, direct appeal, and state habeas proceedings. In addition, the ineffective-assistance claim contained in Suniga's fourth claim fails even under de novo review. Suniga's fourth claim in his amended federal habeas petition does not warrant federal habeas relief.

> **vi.    The ninth claim—ineffective assistance based on the failure to challenge the State's evidence of future dangerousness—does not warrant federal habeas relief.**

In his ninth claim in his amended federal habeas petition, Suniga argues that his trial counsel rendered ineffective assistance by failing to (1) seek a continuance to investigate last-minute disclosures identifying Suniga as a gang member; (2) challenge the gang membership evidence once it was admitted; (3) obtain impeachment evidence for use against a jail-guard witness who testified about Suniga's disrespectful behavior in jail while

awaiting trial; (4) investigate other jail guards who presented evidence at the punishment phase; (5) counter the State's narrative that Suniga was dangerous; (6) call David Luna (a gang member) to testify and impeach Luna; and (7) present Linda Bazan as a witness, who could testify that Suniga had never admitted to being a gang member. Dkt. No. 36 at 175–83.

### a. Procedural history

As explained in Analysis § 3.H.iv, *supra*, Suniga's initial state habeas application included many assertions of ineffective assistance, including most (but not all) of those contained in this ninth claim. The state habeas trial court received affidavits from Suniga's trial counsel (Keith and Reeves), Suniga's mitigation specialist and investigator, and former Lubbock DA Powell, all of which the state habeas court found to be credible. Several of the same individuals also testified at the evidentiary hearing held in Suniga's initial state habeas proceeding, and the state habeas trial court found their testimony to be credible. Suniga also presented witnesses whom Suniga argued could furnish either (1) new mitigating evidence, or (2) evidence that would have controverted or impeached the prosecution witnesses who testified at the punishment phase about Suniga's gang membership, history of domestic violence, and violations of jail rules during his pretrial detention. Dkt. No. 52-43 at 257–58, 318–40, 428.

The state habeas trial court made lengthy factual findings and conclusions of law. Dkt. No. 52-43 at 318–40. The court concluded that the decision of Suniga's trial counsel not to use the jail guard David White's personnel file to impeach White's trial testimony was objectively reasonable because counsel did not believe that the information contained in the file would have been admissible under the evidentiary rules. The court also concluded

that a report of a 2012 reprimand in White's file could not have been admitted to impeach White because that evidence was inadmissible under Texas Rule of Evidence 608(b). Next, the court found that the incident report and reprimand in White's personnel file were not probative of White's credibility. In addition, the court found that Suniga laughed in open court when White testified at trial and described Suniga's disrespectful and profane language during that incident. The court also concluded that it was objectively reasonable for Suniga's defense counsel to choose not to cross-examine law-enforcement officers who testified at trial about Suniga's gang membership and not to call lay witnesses to counter the prosecution's gang experts, because the defense team's own pretrial investigation of Suniga's prior TDCJ custody revealed that Suniga was affiliated with the Tango Blast gang. Dkt. No. 52-43 at 331–32, 338–40.

The court found that Suniga's friend, Linda Bazan, met with Suniga on April 30, 2014, at LCDC, which was video-recorded, and during that meeting Suniga made multiple comments related to gangs and his gang membership, including that others at LCDC referred to Suniga as "Foros" and used other gang-specific terminology to refer to Suniga. The court found that Bazan did not purport to possess any expertise on gangs or gang slang and that multiple prosecution gang experts testified at the punishment phase that "Foros" is slang for Fort Worth members of the Tango Blast gang. The court thus concluded that it was objectively reasonable for Suniga's defense counsel to choose not to call Suniga's friend, Linda Bazan, to testify at the punishment phase about Suniga's gang affiliation because Bazan's testimony at the state writ hearing—that Suniga had never told her that he was in a gang—was not credible, and presenting the testimony would have opened the door to additional future dangerousness evidence from the prosecution. *Id.* at 323, 328–29, 331–32.

Additionally, the court concluded that it was objectively reasonable for Suniga's trial counsel not to call David Luna to testify about his report to LCDC officers that Suniga and another known Tango Blast member had threatened Luna because Luna's recantation of that report during his testimony at the state writ hearing was not credible and presenting the testimony would have opened the door to additional future dangerousness evidence from the prosecution. *Id.* at 330–32. It also concluded that it was objectively reasonable for Suniga's trial counsel not to present evidence challenging the prosecution's evidence of Suniga's gang membership because his attorneys testified at the state writ hearing that the defense team found no witness or gang expert who could furnish any testimony to challenge the State's evidence, and because the defense team's pretrial investigation revealed that Suniga was affiliated with the Tango Blast gang. Finally, the court concluded that it was objectively reasonable for Suniga's defense counsel not to cross-examine LCDC and Fort Worth County Jail employees concerning episodes of Suniga's misconduct during detention because doing so could, in the mind of Suniga's defense counsel, open the door to additional harmful evidence. *Id.* at 327–28, 331–32.

The TCCA denied these complaints of ineffective assistance on the merits when it denied (based on a lack of prejudice under *Strickland*) Suniga's first claim for state habeas relief in his initial state habeas application. *Ex parte Suniga*, 2022 WL 2064609, at *1.

### b.    AEDPA and de novo review

This Court concludes the state habeas trial court's findings and conclusions were all fully supported by the evidence presented during Suniga's trial and state habeas proceedings. And the TCCA's conclusion that all of the ineffective-assistance complaints contained in this claim failed to satisfy *Strickland*'s prejudice prong is unassailable.

Complaints about a trial counsel's failure to investigate the defendant's background and to present available mitigating evidence are common. In the context of punishment-phase mitigation in capital cases, it is unreasonable not to investigate further when counsel has information available to him that suggests additional mitigating evidence—such as mental illness or a history of childhood abuse—may be available. *See, e.g.*, *Porter*, 558 U.S. at 39–40; *Wiggins v. Smith*, 539 U.S. 510, 524–26 (2003); *Williams*, 529 U.S. at 395–96.

A jury in Texas "cannot recommend a death sentence without unanimously finding that a defendant presents a future danger to society," after which finding the jury may consider mitigating evidence. *Andrus v. Texas*, 590 U.S. 806, 821 (2020). A Texas capital-sentencing jury can answer the future-dangerousness special issue in favor of the prosecution only if it determines the prosecution has carried its burden of proving future dangerousness beyond a reasonable doubt. But individual jurors need not agree on whether any particular mitigation evidence presented at the punishment phase of trial warrants an affirmative answer to the mitigation special issue, on which there is no burden of proof. The trial court correctly instructed Suniga's jury on all these matters.

The state habeas court's conclusion that the 2012 reprimand contained in David White's personnel file was not admissible under applicable state evidentiary rules to impeach White is binding on this Court. *See Garza v. Stephens*, 738 F.3d 669, 677 (5th Cir. 2013) (holding that a Texas habeas court's interpretation of evidentiary rules was binding in the federal habeas case); *see also Bradshaw v. Richey*, 546 U.S. 74, 76 (2005). Thus, the failure of Suniga's trial counsel to obtain White's personnel file did not prejudice Suniga because they could not have used the information in it to impeach White's trial testimony.

Suniga's conclusory complaints that his trial counsel failed to discover and present unspecified evidence controverting the prosecution's evidence of Suniga's history of domestic violence and violations of jail rules during his pretrial detention also fail to satisfy the prejudice prong of *Strickland*. During his state habeas hearing, Suniga argued that there was a nondescript relationship between the victim's mother and some of the staff at the LCDC—premised in part on the fact that, at the time of Suniga's trial, Jonathan Rowser was working as an LCDC detention officer—and that this relationship was the reason LCDC personnel had manufactured disciplinary cases against Suniga during his pretrial detention. The state habeas court heard the testimony of the relevant parties, reviewed affidavits that it found to be credible, and reasonably determined that there was no merit to the contention of an illicit conspiracy among LCDC personnel to cite Suniga for unjustified disciplinary infractions.

The TCCA also reasonably concluded that Suniga's conclusory complaints that his trial counsel acted unreasonably by choosing not to cross-examine LCDC personnel about Suniga's prison disciplinary incidents lacked merit. Keith testified during Suniga's state writ hearing that he believed little value would be gained by the defense cross-examining the jail guards and gang experts who testified about Suniga's disciplinary infractions and conversation with Linda Bazan because doing so could open the door to additional testimony from those witnesses on re-direct about Suniga's gang affiliation and jailhouse misconduct. The state habeas court reasonably concluded that Keith did not render deficient performance in failing to cross-examine those witnesses. The state habeas court also reasonably concluded that the contrary opinion of Suniga's legal expert was not persuasive. Despite attorney Burr's impressive credentials, his actual experience in terms of

– 121 –

trying capital-murder cases in Texas pales in comparison to that of Keith, especially with regard to capital-murder trials in Texas.[49]

The state habeas court also reasonably concluded Suniga's defense team did not render deficient performance by not calling David Luna to testify at Suniga's trial.  David Luna is a confirmed member of the Texas Syndicate prison gang.  When Suniga called Luna to testify during the state writ hearing and Luna recanted his accusation that Suniga and another Tango Blast member had threatened Luna in 2014, the state habeas court reasonably found Luna's recantation not to be credible.  Recanting affidavits and testimony is highly disfavored.  *See Summers v. Dretke*, 431 F.3d 861, 872 (5th Cir. 2005); *see also Spence*, 80 F.3d at 1003.  The state habeas court reasonably concluded that the failure of Suniga's trial counsel to call Luna to testify at Suniga's trial (in an attempt to refute the prosecution's evidence of Suniga's gang membership) did not prejudice Suniga, given the other evidence of Suniga's gang membership.  Dkt. No. 52-43 at 468–69; *see also supra* n.11.

The state habeas court also reasonably concluded that the strategic decision by Suniga's trial counsel not to challenge the prosecution's evidence of Suniga's affiliation with the Tango Blast gang did not prejudice Suniga within the meaning of *Strickland*.  As that court noted, Suniga's defense team did a pretrial investigation into Suniga's term of incarceration within the TDCJ, which led the defense team to conclude that Suniga was, in fact, affiliated with the Tango Blast gang.  In addition, defense investigator Miraval testified

---

[49] Burr testified at Suniga's state habeas proceeding that his entire legal practice since the early 1980s has been in death-row defense and specifically doing post-conviction review on the adequacy of the trial counsel's representation. Dkt. No. 51-36 at 14–15. Burr did not testify that he had ever represented an individual charged with a criminal offense prior to receiving a conviction. In contrast, Keith testified that he had tried civil and criminal cases in Texarkana as well as two capital-murder cases—one a full trial and the other a re-trial as to punishment. *Id.* at 263–65.

during the state writ hearing that the defense team could not locate any witness or gang expert who could refute the prosecution's evidence of Suniga's gang affiliation. Dkt. Nos. 52-43 at 331–32; 51-37 at 192–93. Furthermore, attorney Keith testified during the state writ hearing about the risks associated with cross-examining Pereida because of her knowledge that Lopez Jr. participated in a series of robberies before the robbery and murder of David Rowser and her belief that Suniga and Lopez Jr. were always together. Dkt. No. 51-36 at 289–91.

Moreover, as explained in Factual Background § 1.A.iii, *supra*, the prosecution's evidence at the punishment phase included far more than isolated instances of jail disciplinary violations, oblique indications of Suniga's gang affiliation, and Suniga's repeated acts of domestic violence. Suniga's capital-sentencing jurors also had before them the undisputed testimony of multiple eyewitnesses (and graphic crime scene photographs) detailing the brutal and senseless shooting of David Rowser, who by all accounts had done and said absolutely nothing aggressive toward Suniga or Lopez Jr. before being shot three times. The jury also heard the undisputed testimony of multiple eyewitnesses that the gunman with whiteout contact lenses shouted at David Rowser as he exited the restroom and, before David could respond, shot David three times and shouted, "[t]hat's what you get." Dkt. No. 52-37 at 398. The jury heard testimony from a pair of law-enforcement gang experts that Suniga's use of the term "Foros" in his video-recorded conversation with Linda Bazan reflected Suniga's knowledge of, if not membership in, the Fort Worth branch of the Tango Blast gang, a notoriously aggressive and violent gang that was rapidly growing in size and influence within and outside the TDCJ. The jury also saw Suniga's lengthy criminal record, which included convictions and arrests for assault, carrying a weapon, and drug-

related offenses.  Finally, the jury saw jail, probation, parole, and prison records showing that Suniga had admitted to drug use and involvement in drug trafficking since age fifteen.

Under these circumstances there is no reasonable probability that, but for the failure of Suniga's trial counsel to challenge the prosecution's evidence of Suniga's gang affiliation, jail disciplinary violations, and acts of domestic violence, the outcome of Suniga's punishment phase would have been any different.  The brutal and senseless nature of Suniga's capital offense, as well as Suniga's long history of criminal misbehavior and drug abuse, combined to compel an affirmative answer to the future-dangerousness special issue.  Without evidence showing that Suniga had accepted responsibility for his brutal murder, the evidence at the punishment phase showing Suniga's demonstrated propensity for future violence was overwhelming.  The state habeas court's findings and conclusions on the ineffective-assistance complaints contained in this claim were all fully supported by the evidence before the state habeas court.

However, even if the Court were to conduct de novo review, the claim would still fail.  The respondent notes that, while Suniga did present the state habeas court with many of the same ineffective-assistance complaints included in his ninth claim here, Suniga did not complain during his state habeas proceeding about the failure of his trial counsel to seek a continuance to investigate LCDC's designation of Suniga as a "confirmed" Tango Blast member.  Dkt. No. 44 at 196–98.  Assuming that this claim is unexhausted and requires de novo review, it fails.

The failure of Suniga's trial counsel to request a continuance on the eve of trial to investigate "new" allegations of Suniga's gang membership was neither "deficient performance" nor "prejudicial" within the meaning of *Strickland*.  Suniga's defense team

investigated Suniga's gang affiliation before trial and, based on that investigation, concluded that Suniga was affiliated with the Tango Blast gang.  Likewise, Suniga's defense team could not locate any witness or gang expert before trial to refute the prosecution's evidence establishing Suniga's Tango Blast affiliation.

Finally, Suniga's wife Megan testified during her February 2012 grand-jury testimony that Suniga told her that he had joined the Tango Blast gang when he was in the TDCJ.  Dkt. No. 51-24 at 55–56.  If Suniga's trial counsel had decided to push back aggressively at the punishment phase on the prosecution's evidence establishing Suniga's gang affiliation, the prosecution could have called Suniga's own wife to offer Suniga's confession of gang affiliation.  Under such circumstances, it was objectively reasonable for Suniga's defense team to choose not to controvert the prosecution's evidence of Suniga's gang affiliation.  And again, Suniga's trial counsel's choice not to seek a last-minute continuance to investigate prosecution evidence of Suniga's gang affiliation, which the defense team believed to be factually accurate, did not prejudice Suniga within the meaning of *Strickland*.  An attempt to challenge the prosecution's evidence of gang affiliation would most likely have been met with a devastating response from the prosecution through the testimony of Suniga's wife.

For all these reasons, after de novo review, this Court concludes that Suniga's unexhausted complaint that his trial counsel failed to request a continuance on the eve of trial to investigate new evidence of Suniga's gang membership satisfies neither prong of *Strickland*.

The TCCA's rejection on the merits of this claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law, nor did it result in a

decision that was based on an unreasonable determination of the facts in light of the evidence presented in Suniga's trial, direct appeal, and state habeas proceedings. Likewise, the unexhausted ineffective-assistance claim contained in this claim is refuted by the record currently before this Court and fails even under de novo review. Suniga's ninth claim in his amended federal habeas petition does not warrant federal habeas relief.

> ### vii. The first claim of ineffective assistance based on the failure to investigate and present available mitigating evidence does not warrant federal habeas relief.

In his first claim in his amended federal habeas petition, Suniga argues that his trial counsel rendered ineffective assistance by failing to adequately investigate Suniga's background and present all available mitigating evidence. Dkt. No. 36 at 22–92. Suniga complains that his trial counsel failed to (1) educate the trial court on the proper scope of admissible mitigating evidence, *see id.* at 26–31, 78–82; (2) fully investigate Suniga's background and present a case in mitigation emphasizing Suniga's traumatic childhood, dysfunctional family, possible sexual abuse as a child, personal history of drug and alcohol abuse, lack of positive male role models, exposure to bad male role models, and his role as a dedicated, loving, and caring father, *id.* at 31–35, 37–65, 82–86; and (3) effectively use experts to present Suniga's life story in a compelling manner, *id.* at 36–43, 65–76, 86–90.

As explained in Analysis § 3.H.iv, *supra*, Suniga's first claim in his initial state habeas application included several assertions of ineffective assistance, including most (but not all) of those contained in his first claim in his amended federal habeas petition. During the extended evidentiary hearing held in Suniga's state habeas proceeding, the state habeas trial court heard extensive testimony from Suniga's defense team, the prosecutors, Suniga's legal expert Burr, and friends and relatives of Suniga and then issued extensive findings and

conclusions.  The state habeas trial court's findings and conclusions determined that Suniga's ineffective-assistance claims related to the conduct of his trial counsel at the punishment phase were either refuted by the record before the state habeas court or insufficient to establish prejudice under *Strickland*.  Dkt. No. 52-44 at 55–61.[50]  The TCCA, as explained above, rejected these complaints on the merits, concluding Suniga had failed to satisfy the prejudice prong of *Strickland*.  *Ex parte Suniga*, 2022 WL 2064609, at *1.

In all three parts of his first claim in his amended federal habeas petition, Suniga presents this Court with complaints about his trial counsel's failure to call expert witnesses. Because prejudice under *Strickland* must be evaluated cumulatively in the context of the punishment phase of a capital-murder trial, this Court will address the prejudice prong of *Strickland* only after reviewing the state habeas court's findings and conclusions in all three parts of his first claim in his amended federal habeas petition.

### a.    Failure to educate the trial court on the "proper" scope of mitigating evidence

Suniga first argues that his trial counsel failed to (1) review the video of Suniga's jailhouse meeting with his mother, in which Suniga made comments about being surprised when he learned that his brother Michael had been sexually assaulted as a child and joked about wanting to have ten children so that he could evade child support obligations; (2) use that video to impeach Michael's trial testimony about when Michael first told Suniga about having been molested; (3) call a trauma expert like Dr. Matthew Mendel to testify at the punishment phase on the widespread sexual, drug, and alcohol abuse within Suniga's

---

[50] The State's proposed findings and conclusions relating to Suniga's first claim in his initial state habeas application, which the state habeas trial court largely adopted, appear at Dkt. Nos. 52-43 at 344–500; 52-44 at 3–53.

family, how dysfunction in Suniga's extended family damaged Suniga (including possibly involving the sexual abuse of Suniga himself), and the effect of the cultural socialization of males within Suniga's family leading to the need to be "tough, stoic, and self-sufficient"; and (4) failing to move to exclude the cross-examination of defense expert Frank Aubuchon on bad acts by third parties within TDCJ.[51]  Dkt. No. 36 at 36–41.

The state habeas court found that the defense's pretrial investigation revealed that when Suniga learned in 2008 that his older brother Michael had been sexually abused as a child by their Uncle Larry, Suniga pistol-whipped Larry.  It found that during voir dire, Suniga's trial counsel emphasized to the venire members that mitigating evidence was not required to have a nexus to a capital offense.  It then found that when Suniga's trial counsel tried to elicit testimony from Michael about his sexual abuse as a child, the prosecution successfully objected on relevance grounds.  When trial counsel tried to elicit testimony from Suniga's mother about Eric's alcoholism and having relationship and employment issues, the prosecution objected on relevance grounds.  When trial counsel tried to elicit testimony from Suniga's Aunt Delores about the sexual abuse of another maternal aunt by Suniga's grandfather, the prosecution objected on relevance grounds.  The state habeas trial court found that the trial court sustained all three relevance objections, and the TCCA on direct appeal ruled that those relevance rulings were correct under state evidentiary rules.  It also found that, as the trial judge has tried multiple capital-murder cases as a prosecutor, the judge was familiar with the scope of mitigating evidence.

---

[51] The decision not to call Dr. Mendel to testify at trial and the failure to file a motion to exclude Aubuchon's cross-examination are discussed below in connection with the manner in which Suniga's trial counsel chose to utilize their experts.  *See infra* Analysis § 3.H.vii.c.

The court found that Suniga's attorney Reeves testified during the state writ hearing that the defense was circumspect at trial with regard to the events surrounding Suniga's discovery of Michael's child sexual abuse because Suniga had beaten Larry when Suniga learned about the abuse, and at the time of trial, Larry was living with Suniga's wife and children. It also found that the defense team reasonably believed that evidence about the timing of when Suniga discovered the abuse could be harmful because it might reveal that Suniga had beaten Larry afterward. The court found that the defense had no evidence that Suniga had been sexually abused as a child, which Suniga also denied.

The state habeas trial court concluded that under *Tennard v. Dretke*, 542 U.S. 274, 284 (2004), the rules of relevance for mitigating evidence at the punishment phase of a capital-murder trial are the same as those that apply at trial. It also concluded that the failure of Suniga's defense to "educate" the trial judge on the scope and nature of mitigating evidence was neither deficient performance nor prejudicial within the meaning of *Strickland* because the TCCA ruled on direct appeal that the trial court's exclusion of the additional proffered mitigating evidence was correct under evidentiary rules. Dkt. No. 52-43 at 344–52.[52]

The TCCA's rejection on the merits of this portion of Suniga's first claim in his amended federal habeas petition was objectively reasonable in light of the evidence before the state habeas court and the applicable standard for proving deficient performance. *Clark v. Thaler*, 673 F.3d 410, 429 (5th Cir. 2012) (failure to raise a meritless objection cannot be

---

[52] The state habeas court's findings and conclusions on Suniga's claims of ineffective assistance in connection with defense expert Aubuchon's trial testimony (*see* Dkt. No. 52-43 at 309–18) are discussed below in connection with Suniga's complaints about his defense team's utilization of expert witnesses. *See infra* Analysis § 3.H.vii.c.

the basis for a finding of deficient performance); *see also Paredes*, 574 F.3d at 291. Suniga alleges no specific facts showing how his trial counsel could have used the video of Suniga and his mother's conversation in LCDC to impeach Michael's trial testimony about exactly when Michael first told Suniga that Michael had been sexually abused as a child by their Uncle Larry. Suniga informed his mother during their recorded conversation that he was shocked when he learned Michael had been sexually abused as a child. At the state writ hearing, Michael testified that he believed he had done so about eight years before then. There was no evidence before the state habeas court suggesting that Suniga had observed or knew of the abuse at the time it occurred, when Suniga was still quite young. There was no evidence before the state habeas court to suggest the date that Suniga first learned about Michael's abuse was any earlier than Michael suggested at the state writ hearing, which would have placed the timing of that revelation around 2008, as identified by the state habeas trial court. By 2008, Suniga was in his late twenties.[53] Thus, no evidence suggested that Suniga learned of the abuse during his development or that it affected him directly until he was an adult.

---

[53] The TDCJ's death-row website lists Suniga's date of birth as December 27, 1979, which his mother testified at trial was accurate. Dkt. No. 49-33 at 136. Suniga was thus hours shy of his 32nd birthday when he shot David Rowser. The state habeas trial court heard testimony from Michael, Suniga's mother, and many other members of Suniga's family and found that Suniga was told Michael's history of child sexual abuse around 2008, when Suniga was about 29. Assuming that Michael's trial testimony was accurate, then (1) Michael was sexually abused by his uncle around the time his biological parents divorced, (2) Suniga was unaware of that at the time it happened, (3) Michael informed Suniga of what happened to him several times, (4) the last time was about eight years before then, and (5) he had no idea why Suniga expressed surprise over learning about Michael's child sexual abuse when Suniga and his mother discussed the matter in their recorded conversation on the eve of Suniga's trial. Dkt. No. 49-34 at 107–09. Assuming that Michael informed Suniga at least eight years prior to Suniga's capital-murder trial, the latest such revelation took place around 2003, when Suniga was about 24. In any case, it is clear that Suniga did not learn about his brother Michael's history of child sexual abuse until Suniga was an adult.

The proffered testimony of Suniga's mother about Eric's alleged alcoholism was already before the jury. Their mother identified Eric as an alcoholic during her punishment-phase trial testimony. Her proffered testimony that Eric had experienced problems maintaining relationships and employment because of his drinking added little to the mitigating evidence before the jury. Eric testified that after he graduated from high school, he left home for college, served two tours in the Navy, returned to Texas, graduated from college, and found work as a stockbroker, all without financial support from his family. By all accounts, Eric had virtually no interaction with Suniga once Eric left home for college when Suniga was still a child. There was also no suggestion that Suniga was aware during his developmental period of Eric's battles with alcohol as an adult.

The proffered testimony of Suniga's Aunt Delores about an incident of child molestation that took place between Suniga's grandfather and another of Suniga's maternal aunts when she was a child, standing alone, bore no relevance to Suniga's development since it was unaccompanied by any expert testimony showing how it had impacted Suniga a generation later. There was no suggestion at trial or during Suniga's state habeas hearing that Suniga ever had any knowledge of this conduct until shortly before the trial.

More significantly, the TCCA's ruling on direct appeal—that the state trial court correctly applied state relevance rules when it excluded the proffered testimony in question—is binding on this Court. *Bradshaw*, 546 U.S. at 76; *Garza*, 738 F.3d at 677; *Paredes*, 574 F.3d at 291. Suniga's trial counsel tried to elicit the testimony Suniga now complains should have been admitted at trial. The TCCA held the trial court properly excluded this proffered testimony under state evidentiary rules. For the reasons detailed in Analysis § 3.B, *supra*, there was no constitutional error resulting from the TCCA's ruling.

While mitigating evidence need not relate directly to a capital offense, *see Tennard*, 542 U.S. at 284, it still must relate to the defendant's character and moral blameworthiness, *see Lockett*, 438 U.S. at 604 n.12 ("Nothing in this opinion limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense.").[54]

Suniga's trial counsel cannot reasonably be faulted for failing to present the proffered evidence in question. They attempted to do so. The state trial court excluded it under state evidentiary rules. The TCCA definitively held that ruling was a correct construction of state evidentiary rules. No constitutional error resulted. Suniga's trial counsel cannot reasonably be faulted for failing to accomplish what was not legally possible. *Paredes*, 574 F.3d at 291; *Turner v. Quarterman*, 481 F.3d 292, 297–98 (5th Cir. 2007).

Suniga's conclusory complaint that his trial counsel failed to review before trial the video of Suniga's jailhouse visit with his mother includes no fact-specific allegations showing how that failure prejudiced Suniga. He does not allege any facts showing how the conversation between himself and his mother on the eve of trial could have been used to impeach Michael's trial testimony in a manner beneficial to the defense when Michael was not a party to that recorded conversation. As explained above, Suniga's trial counsel

---

[54] Capital-murder defendants often present extensive evidence about sexual abuse or family dysfunction during their developmental period as mitigating evidence at the punishment phase. This is often done through the testimony of mental health experts (psychologists, psychiatrists, and trained counselors), sociologists, and child-development experts who have evaluated the defendant and interviewed the defendant's family. Those experts are allowed to express opinions that are based in substantial part on either hearsay or other types of evidence not otherwise admissible. The evidentiary bases for those experts' opinions are often explored in great detail on cross-examination. In the process, capital-sentencing juries are often informed of information about a defendant's background that would not otherwise be admissible. Suniga's trial counsel chose not to call any such experts at the punishment phase. The objective reasonableness of that decision is discussed below in connection with the second and third parts of Suniga's first claim in his amended federal habeas petition. *See infra* Analysis § 3.H.vii.c.

reasonably feared that exploring the timing of when Suniga learned about Michael's child sexual abuse could result in the admission of evidence showing Suniga's violent reaction to learning about the same.

As explained in Factual Background § 1.A.iii, *supra*, Suniga's trial counsel put on a substantial case in mitigation, introducing evidence showing Suniga's childhood was characterized by many influences, such as his biological parents' divorce at a young age, his mother's remarriage after the family moved to Massachusetts, and the hands-off approach to parenting employed by his stepfather, Trevino. The mitigation case also included evidence of additional family separation that resulted in the move to Copperas Cove, Texas, and the loss of contact with Eric after Eric graduated from high school. There was evidence of the absence of positive role models for Suniga after the move to Texas and how Michael became a de facto father-figure for Suniga as a teenager. The mitigation case showed Michael's struggles as a teen with violence, drugs, and misogynistic behavior toward young women, as well as how Suniga's mother liked to party when she was not working and often left Michael and Suniga unsupervised. The defense showed how Suniga's maternal uncles and one aunt engaged in criminal misbehavior and were incarcerated.

The mitigation case also showed that Lopez Sr., a known drug-trafficker, became a role model for Suniga and that Suniga dropped out of school after ninth grade to work for Lopez Sr. in the drug trade. The defense also showed that Suniga loved his seven children, although he did not support any of them financially. It also showed Suniga's lengthy history of alcohol and methamphetamine abuse, beginning at age fifteen, the widespread abuse of alcohol within his maternal family for generations (including the fact both Michael and Eric had problems with alcohol as adults), and his biological father's death from

alcohol-related issues.  The mitigation case also included the horrifically violent incident in which Michael and Suniga survived a violent assault upon their mother's home that included dozens of bullets fired into the house and the front of the home being set on fire, all apparently in retaliation for violence in which the perpetrators believed Michael had been involved.  Thus, even without expert testimony to contextualize it for them, Suniga's jurors knew that Suniga endured substantial family dysfunction and significant trauma as a child and had been exposed to multiple pernicious influences during his developmental period.

Moreover, the additional proffered testimony of Suniga's brother Michael, mother, and maternal aunt Delores would have been largely cumulative to the substantial case in mitigation presented by Suniga's trial counsel.  Counsel is not ineffective for failing to present additional evidence that is cumulative to the mitigating evidence already in the record.  *See, e.g.*, *Sheppard v. Davis*, 967 F.3d 458, 468–69 (5th Cir. 2020); *Norman v. Stephens*, 817 F.3d 226, 233 (5th Cir. 2016).

Under such circumstances, the state habeas court reasonably concluded that Suniga's complaints about his trial counsel's failures to (1) present additional evidence showing dysfunction within Suniga's family, and (2) "educate" the trial court on the proper scope of mitigating evidence, did not constitute deficient performance under *Strickland.*

### b.    Failure to present a compelling social and life history.

Suniga next argues that his trial counsel rendered ineffective assistance in connection with the punishment phase by failing to present a compelling life story.  Suniga asserts that his counsel did not try to get Suniga's friends and family to convince Suniga to accept a plea deal and failed to adequately prepare defense witnesses to testify.  He argues that counsel failed to show the rampant abuse of alcohol and drugs in Suniga's family and failed to

obtain VA medical records showing that Suniga's biological father was an alcoholic and that Suniga had cared for his father toward the end of his life.  He also asserts that the defense failed to present evidence showing that Eric was an alcoholic with relationship and employment issues, failed to show Suniga's mother's drinking problems, and failed to present evidence showing that Suniga was a dedicated and loving father who had good visits with his daughters while he was in prison and was emotionally attached to his children.

He also asserts that his trial counsel rendered ineffective assistance by soliciting testimony from Suniga's mother that Suniga did not financially support his children.  He also asserts that his counsel relied on a flawed neuropsychological evaluation of Suniga performed by Dr. Elizabeth Kasper and ignored Suniga's dyslexia and a profound disparity between Suniga's visual and verbal reasoning abilities.  Suniga argues that his counsel did not recognize the need for further psychological testing arising from those disparities and failed to present expert testimony addressing the "unusual sex habits" of Suniga's family and Suniga's attachment issues.  Suniga asserts that counsel failed to mitigate evidence of Suniga's gang affiliation and failed to present evidence showing Suniga's family dysfunction and lack of positive male role models.  Dkt. No. 36 at 31–64.[55]

The state habeas court made extensive factual findings and conclusions of law, including finding that Cowie, the mitigation specialist, spent over two-thousand hours searching for mitigating evidence, including through meetings with Suniga.  *See* Dkt. No.

---

[55] The respondent correctly points out that pages 46–64 of Suniga's amended federal habeas petition are bereft of any record citations except for vague references to hundreds of pages of records attached as exhibits to Suniga's initial state habeas petition and Suniga's pleadings in this Court. This omission in Suniga's federal habeas pleadings is material.  *See Green v. Johnson*, 160 F.3d 1029, 1036 n.2 (5th Cir. 1998).  A footnote in the respondent's answer identifies the locations in the state court record of many of the documents to which Suniga refers in his amended petition.  Dkt. No. 44 at 53 n.21.

52-43 at 352–89.  The court found that the defense interviewed many members of Suniga's family and put on witnesses who told a multigenerational history of Suniga's family, including family members' substance abuse and drug trafficking.  The court found that the defense team did not obtain the VA medical records of Suniga's biological father Augustine. It found that those records showed that Augustine had a long history of alcohol abuse and related medical problems, including diabetes and alcoholic cirrhosis, as well as showing that between August 1999 and April 2001 (when he died of pneumonia with several secondary diagnoses such as cancer, alcohol abuse disorder, pancreatitis, and malnutrition), he was seen many times at the Dallas VA and had several stays there.  The VA records also showed that in March 2011, he reported that he had three sons but that none of them could be counted on to assist with his medical problems.  *Id.* at 352–57.

The court found that several witnesses testified during the state writ hearing about Augustine's battle with alcoholism, and that Suniga's mother and brother Michael both testified that after moving to Massachusetts, the family had little or no contact with Augustine.  The court found that Rebecca Garcia testified that Michael and Suniga took care of Augustine toward the end of his life because Augustine could not care for himself. *Id.* at 357–58.

The court also found that the jury heard testimony from Suniga's mother about Eric's alcoholism but that, during Suniga's state habeas proceeding, Suniga failed to present evidence showing that a record existed at the time of Suniga's trial that showed that Eric had been diagnosed with an alcohol-related condition.  The court found that the jury heard testimony from several witnesses about Suniga's mother's alcoholism and partying and that multiple trial witnesses testified to Suniga's extensive history of alcohol and drug abuse

beginning in his mid-teens.  The court found that Suniga's jury heard testimony from multiple witnesses that Lopez Sr. ran a large-scale drug trafficking operation from Suniga's mother's (and Suniga's) home in Fort Worth, in which Suniga participated.  It found that Suniga's counsel at trial testified that Albert Trevino (Suniga's mother's second husband) refused to testify at trial that Rosalinda's drinking problems contributed to their divorce.  *Id.* at 358–65.

The court also found that the defense made a strategic decision not to call Megan Suniga to testify at trial because she could have revealed that Suniga committed aggravated sexual assault on her when she was fifteen or sixteen.  It found that the defense could not confirm that Suniga had ever been sexually assaulted, which Suniga also denied.  It found that lead defense counsel testified during the state writ hearing that the defense chose not to question Eric about his alcoholism because Eric was unstable, and the defense feared what he might say if challenged.  It also found that Keith testified that he did not believe it would have been beneficial for the jury to hear that Suniga's drug trafficking was backed by the cartel.  *Id.* at 366–67, 376–77.

The court found that Michael Suniga's wife, Kresha, gave an affidavit and testimony during the writ hearing that were consistent with other witnesses' testimony about the prevalence of drug and alcohol abuse in Suniga's family, including Suniga's methamphetamine abuse starting in his mid-teens.  The affidavit and testimony were also consistent with testimony about Lopez Sr.'s drug trafficking activities and Michael's testimony about his child sexual abuse.  It found that Rosalinda's affidavit and testimony at the writ hearing were largely consistent with her trial testimony but offered more information.  But the court found that Rosalinda's affidavit and testimony were not credible

as they pertained to her assertions (1) that attorney Keith instructed her to answer questions "yes" or "no," because Keith's writ-hearing testimony contradicted this and the trial record demonstrated that she went beyond yes and no answers; (2) that she was unprepared for questions about Suniga's parenting skills and violence toward Megan Suniga and Kristi Bretz (the mother of Suniga's eldest child), because attorney Reeves testified during the writ hearing that he went over both topics with Rosalinda before trial; (3) that Megan and Kristi had been the aggressors in both incidents of assault, because of Suniga's demonstrated history of domestic violence demonstrated during the punishment phase; (4) that Rosalinda was ignorant of Lopez Sr.'s drug trafficking, because several witnesses testified at trial and the writ hearing about how the trafficking was common knowledge in the family; and (5) concerning Eric's alcohol-related medical problems, because Eric's medical records showed that those problems took place in 2015–16, not prior to Suniga's 2014 trial. *Id.* at 369–74.

The court found that Michael's state writ-hearing testimony and affidavit largely aligned with his trial testimony but were not credible to the extent that Michael claimed that his trial testimony had been cut short because the trial record undermined that. It found that the defense chose not to call Megan at trial because her problematic history of mental issues and substance abuse and present substance abuse. It found that the defense chose not to call Leslie Erwin (Megan's mother) at trial because she was a witness to the domestic violence between Suniga and Megan, and she was aware of Suniga's Tango Blast affiliation. It found that the defense chose not to call Kristi Bretz to testify because the defense could not obtain a pretrial interview with her and because she was the listed victim for Suniga's domestic-violence conviction. The court found that Albert Trevino's state writ affidavit was

not credible as it related to the assertion that Suniga's mother's alcoholism was a reason for their divorce and that he had been prevented at trial from testifying about her drinking, because the trial record refuted those contentions, and Rosalinda and Michael both denied that Rosalinda's drinking was a cause of her second divorce. *Id.* at 374–80.

Ultimately, the court concluded that:

- The defense conducted a reasonable investigation for mitigating evidence and presented a coherent mitigation case.

- The defense had not unreasonably failed to obtain Augustine's VA records because other evidence was presented to the jury that established Augustine's alcoholism and related medical issues.

- Suniga was not prejudiced by the failure to obtain those records because they contained no information related to Suniga's own health and also contained harmful information about Suniga's ability to give his father medical assistance during the end of Augustine's life.

- Suniga's defense team was not ineffective by failing to secure and present more evidence of Eric's alcoholism and related medical issues because many of those records did not exist at the time of Suniga's 2014 murder trial.

- The defense team was not deficient by failing to present more evidence of Suniga's mother's drinking because the jury was informed of her drinking and partying after work and there was no credible evidence that her drinking in Massachusetts led to her divorce from Trevino.

- Suniga's trial counsel were not deficient by failing to introduce more evidence of substance abuse in Suniga's family going back several generations and that the defense effectively presented evidence of Lopez Sr.'s drug trafficking from inside Suniga's home in Fort Worth.

- The defense reasonably chose not to present evidence showing that the trafficking was cartel-backed.

- The defense effectively investigated and presented evidence of Suniga's social history.

- The defense effectively investigated and presented Delores Garcia's trial testimony on substance abuse and criminal misconduct within Suniga's family, Suniga's lack of supervision while living in Texas, and Lopez Sr.'s drug trafficking, and reasonably chose not to present more evidence of the same.

- The defense reasonably chose not to call Kresha Suniga to testify at trial because most of the testimony she could have furnished at trial (about Suniga's methamphetamine abuse and the alcoholism of Eric and Michael) was already before the jury, and her testimony about Michael's child sexual abuse was properly excluded at trial.

- Suniga's defense team was effective in presenting Suniga's mother's and Michael's testimony at trial.

- Suniga's defense team reasonably chose not to call Megan Suniga, Kristi Bretz, and Leslie Erwin as trial witnesses because they could have given harmful testimony about Suniga's aggravated sexual assault on Megan when she was underage and domestic violence towards Megan, Suniga's affiliation with the Tango Blast gang, and Suniga's act of domestic violence on Kristi, of which he was convicted.

*Id.* at 381–89.

The record before the state habeas court fully supported each of the foregoing factual findings and conclusions. The state habeas trial court reasonably concluded each of the foregoing complaints of ineffective assistance failed to satisfy the deficient performance prong of *Strickland*.

### c.     Failure to effectively use expert witnesses

All three parts of Suniga's first claim include arguments that Suniga's trial counsel rendered ineffective assistance by failing to present available mitigating evidence through expert witnesses or otherwise failed to effectively use the testimony of defense experts.

As to the punishment phase, Suniga asserts that his counsel failed to call a qualified neuropsychologist (such as Dr. Joan Mayfield) who could have testified about Suniga's limited brain functioning, diagnosis of hypothyroidism, and profound differences in visual and verbal abilities. Dkt. No. 36 at 65. He also asserts that counsel failed to call a qualified trauma expert (such as Dr. Victoria Reynolds) who could have provided perspectives on Suniga's history of life-long trauma and its impact on Suniga's development, the life-long negative outcomes from such trauma, the effect of trauma and substance abuse on Suniga's

development, the effects of modeling violence on identity formation, the effects of traumatic bonding, the emotional responses of trauma victims, and the interpersonal expectations of trauma victims. *Id.* at 66–67. Finally, Suniga claims that his counsel failed to call a qualified clinical psychologist (such as Dr. Ricardo Ainsle) to testify on the social, historical, economic, and psychological barriers facing Mexican Americans. *Id.* at 76–77.

In addition, in the first part of this claim (*see* Analysis § 3.H.vii.a, *supra*), Suniga argued that his trial counsel failed to use a trauma expert to educate the trial judge about how sexual indecency had multigenerational effects. He also asserts that counsel failed to explain that the children of sexual abuse victims have higher rates of substance abuse, delinquency, and other rampant dysfunction and explain how impaired caregivers can harm a child's development with long-term consequences. Dkt. No. 36 at 30.

Finally, in the second portion of this claim (*see* Analysis § 3.H.vii.b, *supra*), Suniga argues that his trial counsel provided ineffective assistance by relying on Dr. Kasper's flawed neuropsychological evaluation of Suniga and ignoring Suniga's dyslexia and a disparity between Suniga's visual and verbal reasoning abilities. He also argues that his counsel failed to recognize the need for further psychological testing arising from that disparity and failed to present expert testimony addressing the "unusual sex habits" of Suniga's family and Suniga's attachment issues. Suniga also asserts that trial counsel failed to call retained defense expert Dr. Mendel to testify about (1) the dysfunction in Suniga's family, including widespread sexual abuse and criminal misconduct, as well as frequent use of alcohol and drugs; (2) the destabilizing and damaging impact of that dysfunction on Suniga; and (3) the cultural socialization of the males within Suniga's family to be tough, stoic, and self-sufficient. *Id.* at 39–42. Finally, Suniga asserts that trial counsel failed to

move to exclude the cross-examination testimony of defense expert Frank Aubuchon about the bad acts of third parties within the TDCJ's facilities. *Id.* at 42–43.

The state habeas trial court issued extensive factual findings and legal conclusions addressing this portion of the ineffective-assistance claims. Dkt. No. 53-42 at 389–427. That court found that the defense team obtained as many of Suniga's education records as possible and consulted with Dr. Cecil Reynolds, a neuroscientist who reviewed the test results of defense neuropsychologist Dr. Kasper after she evaluated Suniga and did not identify any issues with Dr. Kasper's test results. The court found that Dr. Kasper conducted neuropsychological testing on Suniga and reported that Suniga's IQ was only slightly below average. It also found that the defense did not call Dr. Kasper at trial because her test results did not show a pattern or depth of deficits that would have been mitigating. *Id.* at 389–91.

The court found that Suniga's defense team did not consult with Dr. Mayfield—a neuropsychologist who furnished an affidavit to the state habeas court questioning Dr. Kasper's file on Suniga (including some minor scoring errors and missing answer sheets), finding anomalies in Dr. Kasper's raw data, and concluding that one of Dr. Kasper's three symptom-validity tests was invalid. The court found that Dr. Mayfield administered her own tests to Suniga over a two-day period and determined Suniga has profound differences between his visual and verbal abilities as well as substantial deficiencies in reading, spelling, and math. *Id.* at 391–93.

The court found that, at Dr. Cecil Reynolds's suggestion, the defense conferred with Dr. Mendel, a clinical psychologist specializing in the impact of child sexual abuse in adult males. Dr. Mendel interviewed Suniga in February 2014 along with Suniga's mother,

brothers, wife, and other family members and reviewed Suniga's academic, medical, and criminal records. The court found that, after an exchange of emails between Dr. Mendel and mitigation specialist Cowie in April 2014, Dr. Mendel reported in a phone call that he did not believe there was a strong mitigation story to present to the jury. The court found that, after that conversation, the defense team decided not to call Dr. Mendel as a trial witness because the defense team feared that Dr. Mendel could furnish harmful information on cross-examination. *Id.* at 394–96.

The court found that the defense team did not consult a cultural expert (such as Professors Ricardo Ainsle or Chad Alvarez) as part of the mitigation investigation. The court found that Dr. Ainsle provided an affidavit and testimony to the state habeas court on the social, historical, economic, and psychological barriers experienced by Mexican Americans in West Texas in the early 1900s and how those experiences are expressed in cultural coping mechanisms, substance abuse, and gender roles informed by expressions of machismo. The court found that Professor Alvarez provided an affidavit and testimony to the state habeas court explaining the U.S.–Mexico drug trade between 1980 and 2001, the economic and sociological forces that explain Mexican American involvement in the drug trade, and the risks that individuals directly involved in the illegal trade and distribution of narcotics faced at that time. *Id.* at 396–97.

The court found that the defense team did not call Dr. Kasper at trial because doing so would have opened the door to Suniga's evaluation by a prosecution mental-health expert, which counsel believed would harm the defense. The court found that the defense team did not call Dr. Mendel at trial because, while the defense did observe some behaviors suggesting that Suniga was the victim of child sexual abuse, neither the defense team nor

Dr. Mendel were able to verify that such abuse took place, and Suniga denied that it had. The court also found that Dr. Mendel reported to the defense team that, after evaluating Suniga and his family, Dr. Mendel did not believe that the defense had a strong story or the PTSD diagnosis that the defense had suspected.  As a result, the court found, the defense decided not to call Dr. Mendel.  The court also found that the defense team had no reason to believe that Dr. Kasper's neuropsychological evaluation of Suniga was flawed and was unaware of any scoring errors in Dr. Kasper's testing.  *Id.* at 397–99.

The court found that there was a history of intimate-partner swapping among female members of Suniga's mother's family.  It found that at trial, the jury heard evidence showing the relocations of Suniga's family during his childhood, Suniga's loss of father figures through divorce or incarceration, that Suniga's biological parents divorced, and his father died from chronic alcoholism.  It also found that the jury heard evidence that Suniga received the least amount of structure at home among his brothers, that Lopez Sr. trafficked drugs and involved Michael and Suniga in that criminal activity, and that Suniga cared for his biological father while he was dying.  *Id.* at 400–01.

The court found that the defense team did not consult a trauma expert such as Dr. Victoria Reynolds, who had furnished expert testimony on the trauma Suniga had experienced during his life and the impact of same on his development and subsequent behavior.  But the trial court also found that much of the information on which Dr. Victoria Reynolds based her conclusions came from sources that the state habeas court deemed not to be credible.  It also found that at least one other court had determined that Dr. Victoria Reynolds was not credible based on her reliance on unreliable sources and selective review of documents and other evidence.  The court also found that she could not determine

whether Suniga had been sexually abused as child.  It also found that, at the writ hearing,

Dr. Victoria Reynolds was extremely hostile towards the State on cross-examination.  *Id.* at

401–03.

The court found that Dr. Victoria Reynolds reviewed the declarations of Dr. Mendel

(which the court found not credible) and Dr. Mayfield.  The court found that Dr. Mendel's

affidavit was not credible because, despite Suniga's strong denials during a video-recorded

conversation with Rosalinda, and despite Dr. Mendel's inability after an extensive interview

with Suniga to determine whether Suniga had been sexually abused, Dr. Mendel's affidavit

nevertheless expressed a belief that Suniga may have been sexually abused as a child.  In

addition, Dr. Mendel's affidavit stated that he could not conduct further follow-up

interviews.  The court found that Dr. Mendel's emails with mitigation specialist Cowie did

not suggest any desire to conduct further interviews, but his affidavit stated that he was

prepared to testify on Suniga's significant life trauma and its effect on Suniga's development

and to explain the intergenerational trauma in Suniga's family relevant to Suniga's

development.  The court also found that Dr. Mendel's affidavit did not address his phone

calls with Suniga's defense team in April 2014 and that attorneys Keith and Reeves and

mitigation specialist Cowie refuted Dr. Mendel's affidavit during testimony at the state

habeas proceeding when they testified that Dr. Mendel told them over the phone that he did

not believe there was a strong case for PTSD or mitigation.  *Id.* at 403–06.

The court concluded that Suniga's defense team did not render deficient performance

by failing to adequately meet with defense experts before trial because the defense team met

extensively with Dr. Kasper, Dr. Mendel, and Dr. Cecil Reynolds before deciding whether

to call experts as trial witnesses, and the failure of Suniga's defense team to retain and call a

trauma trial expert did not prejudice Suniga under *Strickland*. The court concluded that, despite Dr. Mayfield's opinions, the defense team reasonably chose for Dr. Kasper not to testify at trial, and there was no reasonable probability that the outcome of Suniga's trial would have been any different if the defense had called experts such as Dr. Ainsle or Dr. Alvarez to testify. The court concluded that Suniga's defense team's decision not to call Dr. Mendel at trial was objectively reasonable, in part because the jury heard extensive testimony at trial about instances of trauma Suniga experienced growing up. The Court concluded that Suniga's complaints of ineffective assistance neither individually nor collectively satisfied the prejudice prong of *Strickland*. Dkt. Nos. 53-42 at 406–10; 52-44 at 60–61.

As to the defense expert Frank Aubuchon, the state habeas court found that Suniga's defense team called Aubuchon to testify generally on TDCJ's ability to control any threat of violence that Suniga posed at TDCJ through prison policies and to assure the jury that Suniga would not pose a risk of future dangerousness if imprisoned for life without the possibility of parole. The court found that Aubuchon's direct examination testimony at trial establishes that TDCJ uses a variety of inmate-classification policies and procedures to minimize the risk of violence posed by inmates. It found that Aubuchon testified at trial that, if Suniga received a sentence of life without parole, Suniga would be classified as a G-3 inmate upon his arrival in a maximum security TDCJ facility and Suniga would not be allowed to freely move around within his housing unit or to have any work assignments that allowed him to work outside his building. It found that, on cross-examination, Aubuchon admitted that acts of violence do occur within TDCJ units, that the previous year (in 2013) there were almost 1,200 serious assaults on TDCJ inmates, nearly 100 serious assaults on

staff, almost 6,000 disciplinary infractions recorded for assaults on staff, over 12,000 disciplinary citations for assaults on inmates, almost 300 alleged sexual assaults, and four homicides.  Aubuchon also testified that in 2013, seven TDCJ inmates had escaped from the maximum security Connally Unit, and they later killed a law enforcement officer before they were apprehended.  Dkt. No. 53-42 at 309–12.

The court found that Aubuchon's affidavit submitted to the state habeas court was not credible because Aubuchon's criticism of LCDC personnel for failing to interview Suniga after his incident with David Luna was unjustified given the credible testimony before the state habeas court showing that LCDC personnel did not interview Suniga because they believed they could not interview Suniga and remain in compliance with the trial court's pretrial gag order.  The court also found the affidavit not credible because Aubuchon's complaint that Suniga's trial counsel should have asked Aubuchon to testify about Suniga's identification as a Tango Blast affiliate was undermined by the credible testimony of attorney Keith before the state habeas court that questioning Aubuchon may have opened the door to additional testimony of bad behavior by Suniga.  The trial court also found that Aubuchon argued he should have been asked by Suniga's defense team to respond to testimony showing that Suniga had used the term "Foros" because he could have refuted that this meant Suniga was a Tango Blast member, yet attorney Keith and the defense team had repeatedly instructed Suniga to refrain from using that term.  Finally, the court found that Aubuchon's complaint that Suniga's trial counsel should have objected to questions about TDCJ violence statistics failed because Aubuchon's direct testimony about TDCJ classification systems opened the door to questions about the actual level of violence within TDCJ.  *Id.* at 313–15.

The court concluded that Suniga's defense team was not ineffective for calling Aubuchon to testify at trial about the TDCJ classification system. It also concluded that Suniga could not show prejudice arising from the failure of Suniga's trial counsel to move to exclude Aubuchon's testimony about extraneous bad acts inside TDCJ facilities or the Connally Seven escape, as Judge Darnell could have correctly overruled a motion to exclude that testimony because, under applicable evidentiary rules, Aubuchon's testimony on direct opened the door to those subjects. Finally, the court concluded that Suniga's trial counsel reasonably could have believed that Aubuchon's direct testimony was valuable to the defense even if it opened the door to that testimony about extraneous bad acts inside TDCJ. *Id.* at 315–18.

### d.    Collective prejudice analysis

In determining prejudice under *Strickland* in the context of capital sentencing, federal habeas courts examine all of the mitigating evidence introduced at trial and all new mitigating evidence presented in the habeas proceeding and then re-weigh that mitigating evidence against the aggravating evidence. *Andrus*, 590 U.S. at 821–22; *Sears v. Upton*, 561 U.S. 945, 956 (2010); *Wiggins*, 539 U.S. at 534. *Strickland* does not require the State to "rule out" or negate a sentence of life in prison to prevail; rather, it places the burden on the defendant to show a "reasonable probability" that the result of the punishment phase of a trial would have been different. *Wong v. Belmontes*, 558 U.S. 15, 27 (2009). "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112 (citing *Strickland*, 466 U.S. at 693).

"When a defendant challenges a death sentence . . . the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to

the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Sandoval Mendoza v. Lumpkin*, 81 F.4th 461, 481 (5th Cir. 2023) (quoting *Strickland*, 466 U.S. at 695). Because a Texas death sentence required a unanimous jury recommendation, "prejudice here requires only 'a reasonable probability that at least one juror would have struck a different balance' regarding [his] 'moral culpability.'" *Id.* (quoting *Andrus*, 590 U.S. at 822). "In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Id.* (quoting *Strickland*, 466 U.S. at 695). "Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 696.

AEDPA's deferential standard of review means that claims of ineffective assistance adjudicated on the merits by a state court are entitled to a doubly deferential form of federal habeas review. Under 28 U.S.C. § 2254(d)(1), "'a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *White,* 577 U.S. at 77 (2015).

In cases in which the Supreme Court has found prejudice, the trial counsel failed to put on, develop, and present a comprehensive mitigation case. For example, in *Wiggins*, trial counsel failed to discover and present evidence showing severe abuse by an alcoholic mother, repeated rape in foster care, and other neglect and violence. 539 U.S. at 235. In *Porter*, trial counsel failed to discover and present evidence that the defendant routinely witnessed his father severely beat his mother, as well as evidence of the father's regular beatings of the defendant, the defendant's possible mental disability, his injuries from Army

service, trauma from military service, and alcoholism.  558 U.S. at 33–36.  And in *Williams*, trial counsel failed to discover and present evidence showing that the defendant, whose parents were imprisoned for criminal neglect, experienced a nightmarish childhood and was severely beaten by his father, had a mental disability, was unlikely among inmates to act in a violent or dangerous manner, and thrived in a regimented environment.  529 U.S. at 395– 96.

Here, in contrast, Suniga's trial counsel investigated and put on an extensive case in mitigation, as summarized in Factual Background § 1.A.iii, *supra*.  Suniga did not present the state habeas court with any new mitigating evidence that transformed the mitigation case actually presented at trial.  As explained below, there was an objectively reasonable justification for the decision by Suniga's trial counsel not to present testimony from an evaluating mental health expert at the punishment phase: doing so would have required Suniga to submit to an evaluation by a prosecution or independent mental health expert—a course that Suniga's trial counsel reasonably feared would result in testimony highly detrimental to the defense.

**The Reasonable Scope of Suniga's Defense Team's Investigation.**  Suniga's defense team was not obligated to engage in a wide-ranging exploration for every conceivable source of information potentially beneficial to the defense.  *See Thomas*, 995 F.3d at 456.  Counsel in capital cases have a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  *Andrus*, 590 U.S. at 814; *Bobby*, 558 U.S. at 11–12.  "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."  *Andrus*, 590 U.S. at 814 (quoting *Wiggins*, 539 U.S. at

521–22). The objective reasonableness of strategic decisions is directly related to the objective reasonableness of the investigation undertaken before making those decisions.

The state habeas court reasonably concluded that Suniga's defense conducted an objectively reasonable investigation into Suniga's background searching for mitigating evidence. This objective reasonableness determination is fully supported by the evidence that was before the state habeas court, particularly the testimony at Suniga's state writ hearing given by his trial counsel (attorneys Keith and Reeves), his mitigation specialist (Cowie), and the defense investigator (Miraval).

As found by the state habeas court, mitigation specialist Cowie testified without contradiction during the state habeas hearing that he spent more than two thousand hours meeting with Suniga, consulting with experts, and investigating possible mitigating aspects of Suniga's life. The impressive case in mitigation presented by Suniga's defense team belies any assertion the scope of their investigation was objectively unreasonable.

As detailed in Factual Background § 1.A.iii, *supra*, and Analysis § 3.H.vii.a–b, *supra*, Suniga's trial counsel told Suniga's life history while highlighting the many negative influences Suniga experienced during his developmental years. Suniga's trial counsel did so while also trying to minimize the potentially problematic evidence that they uncovered during their pretrial investigation. Counsel discovered that Suniga first became involved romantically with his wife when she was fifteen or sixteen and told both his wife and her mother that he was a Tango Blast member. The defense team also independently confirmed that Suniga was a Tango Blast member. Suniga pistol-whipped his Uncle Larry after learning that his brother Michael had been sexually abused as a child by their uncle.

Suniga had seven children with five women, at least two of whom Suniga had domestically abused.  Suniga had not supported any of his children financially, which his defense counsel apparently tried to neutralize by having Suniga's mother and another family member pre-emptively admit during their direct testimony.  And the drug-trafficking operation run by Lopez Sr. in which Michael and Suniga participated was linked to a Mexican drug cartel.

The mental health experts with whom the defense team consulted before trial concluded that Suniga's IQ was only slightly below average, and Suniga's neuropsychological evaluation before trial revealed no significant mental disorder.  The defense team could not confirm that Suniga had been sexually abused as a child, and Suniga vigorously denied the same.  The child sexual abuse expert, Dr. Mendel, also could not diagnose Suniga with PTSD.  Defense counsel reasonably feared that a mental-health examination by a prosecution expert could result in trial testimony from such expert that would harm the defense.

**The Reasonable Choice to Present Aubuchon's Testimony.**  The TCCA reasonably concluded that Suniga's trial counsel reasonably chose to present the expert testimony of former TDCJ administrator Frank Aubuchon at the punishment phase of Suniga's trial despite knowing that Aubuchon would be subject to cross-examination about violence within TDCJ facilities.  Aubuchon testified about the TDCJ's classification policies and how they would impact Suniga if he received a sentence of life imprisonment without the possibility of parole.  *See supra* Factual Background § 1.A.iii.  The goal of this testimony, as reasonably found by the state habeas court, was to attempt to convince the jury that any

– 152 –

propensity for violence in Suniga could be adequately controlled by TDCJ policies and practices.

On cross-examination, Aubuchon was forced to admit that despite TDCJ policies and practices, (1) there was still considerable violence within TDCJ facilities (as reported in TDCJ's own statistics for 2013), and (2) within recent memory, a group of seven inmates escaped from the maximum-security John B. Connally Unit and committed capital murder in the Dallas-Fort Worth area before being apprehended. Suniga now argues that his trial counsel should have moved to exclude Aubuchon's testimony on cross-examination. The state habeas court concluded that, under state evidentiary rules, Aubuchon's cross-examination was admissible due to the scope of his direct examination. This interpretation and this application of state evidentiary rules are binding on this Court. *Bradshaw*, 546 U.S. at 76; *Garza*, 738 F.3d at 677; *Paredes*, 574 F.3d at 291.

The state habeas court also reasonably concluded that any motion to exclude the substance of Aubuchon's cross-examination would have lacked merit. Trial counsel's failure to make a meritless objection or motion satisfies neither prong of *Strickland*. *Turner*, 481 F.3d at 297–98 ("[C]ounsel cannot have rendered ineffective assistance of counsel by failing to make an objection that would have been meritless."); *see also Clark*, 673 F.3d at 429. The TCCA reasonably concluded that none of Suniga's ineffective-assistance complaints related to Aubuchon's trial testimony satisfied the prejudice prong of *Strickland*.

In addition, the state habeas court also reasonably concluded that Aubuchon's complaints about Suniga's trial counsel in Aubuchon's declaration filed in the state habeas court lacked merit. This Court agrees that Aubuchon's complaint that he was not allowed by Suniga's trial counsel to challenge the prosecution's evidence of Suniga's gang affiliation

is meritless.  As explained, Suniga's trial counsel discovered ample evidence during their pretrial investigation (including information furnished in the grand jury testimony of Megan Suniga and a pretrial interview with her mother) that Suniga was, in fact, affiliated with the Tango Blast gang.  That information was corroborated by the defense team's independent investigation into Suniga's years of incarceration within the TDCJ.  Suniga was not prejudiced by the failure of his trial counsel to use Aubuchon to disprove a fact that the defense team knew to be true.  Likewise, as explained above, Aubuchon's complaint that Suniga's trial counsel failed to object to his cross-examination based on TDCJ violence statistics is meritless given the scope of his direct testimony.

   ***The Reasonable Choice Not to Elicit Additional Testimony from Family Members.***  The TCCA reasonably concluded that Suniga was not prejudiced within the meaning of *Strickland* by his trial counsel's failure to present additional testimony detailing bad acts and misconduct by his family members proffered in affidavits and testimony by Suniga's mother, brothers Michael and Eric, former stepfather Albert Trevino, and maternal aunt Delores during the state habeas proceeding.  The state habeas court reasonably found there was very little "new" in the state writ-hearing testimony presented by these witnesses.  Suniga's trial counsel presented a substantial case in mitigation that detailed Suniga's life history and highlighted the many negative influences he encountered growing up.  *See supra* Factual Background § 1.A.iii and Analysis § 3.H.vii.  The additional details furnished by these family members during their state writ-hearing testimony and in their affidavits submitted to the state habeas court were largely cumulative of the extensive case in mitigation actually presented at the punishment phase.  The TCCA reasonably concluded that the failure of Suniga's trial counsel to present additional testimony addressing the subjects about which

these witnesses testified during the state writ hearing did not prejudice Suniga. *See Sheppard*, 967 F.3d at 468 (holding that the state habeas court reasonably concluded that the defendant was not prejudiced by failure to present additional mitigating evidence that was similar to the substantial mitigation case at trial); *Norman*, 817 F.3d at 233.

Suniga's new evidence purporting to show him as a "dedicated and loving" father could easily be rebutted by the admissions of his family members that Suniga's love and dedication had no monetary support attached. Suniga's mother, brother Eric, and other family members testified at trial that Suniga had not supported his children financially. Nothing in Suniga's new evidence about his role as a father refuted that telling fact.

Furthermore, as found by the state habeas court, most of this purportedly new mitigation evidence—for example, Augustine's VA medical records and Eric's medical history—bore little relationship to Suniga or the issues before the jury at the time of Suniga's trial. *See Williams*, 761 F.3d at 570.

**The Lack of Prejudice from Uncalled Lay Witnesses.** "[C]omplaints of uncalled witnesses are not favored in federal habeas corpus review because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have stated are largely speculative." *Nelson*, 952 F.3d at 669 (citation omitted); *see also Coble v. Quarterman*, 496 F.3d 430, 436 (5th Cir. 2007). "To prevail . . . the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense." *Nelson*, 952 F.3d at 669 (citation omitted).

Even assuming that Suniga's complaints about uncalled lay witnesses in his amended federal habeas petition can meet most of those requirements, the TCCA reasonably determined that Suniga could not establish prejudice for his ineffective-assistance complaints based on the failure of Suniga's trial counsel to call his wife Megan, her mother Leslie Erwin, the mother of Suniga's eldest child (Kristi Bretz), Linda Bazan, and Michael's wife Kresha to testify at trial. Suniga's trial counsel had ample reasonable strategic reasons for deciding not to call any of these witnesses at the punishment phase.

The state habeas court reasonably determined that Kresha could offer little evidence that was "new," save for more details about Michael's sexual abuse as a child, which the TCCA held on direct appeal had been properly excluded under state evidentiary rules. It reasonably concluded that the decision by Suniga's trial counsel not to call Kresha to testify did not prejudice Suniga, because the decision not to present cumulative testimony does not constitute ineffective assistance. *Coble*, 496 F.3d at 436.

Suniga's trial counsel likewise had objectively reasonable reasons for not calling Linda Bazan to testify at trial about Suniga's use of the term "Foros" and other matters. Bazan's testimony about her interpretation of the meaning of the term "Foros" was largely irrelevant to the goals of Suniga's defense team at the punishment phase. In their pretrial investigation, Suniga's defense team obtained substantial information from Suniga's wife and her mother, as well as their own investigation of Suniga's time in TDCJ, leading to the conclusion that Suniga was part of the Tango Blast gang. Suniga's trial counsel reasonably believed that attempting to elicit testimony from Suniga's mother-in-law or Bazan that "explained" that Suniga joined the Tango Blast gang only to avoid getting beaten up in prison was a risky proposition, because they believed that both witnesses possessed personal

knowledge of more acts of violence by Suniga and because Bazan had proven uncooperative with the defense team.

As the state habeas court explained in its lengthy factual findings and conclusions summarized above, calling each of these witnesses to testify at Suniga's trial would have been problematic for the defense. On cross-examination, Megan and Leslie could have corroborated Suniga's gang affiliation and furnished harmful evidence that Suniga became romantically involved with Megan—and committed aggravated sexual assault on her—when she was underage. Both Megan and Leslie could have furnished evidence about Suniga's domestic violence against Megan. The defense team considered Megan to be emotionally erratic and unstable, a conclusion shared by Leslie. Kristi could have been questioned on cross-examination about Suniga's conviction for domestically assaulting her. Thus, there were clearly apparent and objectively reasonable strategic reasons why Suniga's defense counsel chose not to call these four witnesses to testify at trial. These findings and conclusions of the state habeas court were supported by the state writ-hearing testimony of Suniga's trial counsel, mitigation specialist, and investigator.

*The Reasonable Decisions Not to Call Various Experts.* When evaluating an ineffective-assistance claim, the Court "will not question a counsel's reasonable strategic decisions." *Sandoval Mendoza*, 81 F.4th at 479 (citation omitted); *see also Strickland*, 466 U.S. at 691. "Moreover, we have consistently found counsel's decisions regarding examination and presentation of witnesses and testimony to fall within this category of trial strategy which enjoys a strong presumption of effectiveness." *Sandoval Mendoza*, 81 F.4th at 479 (citation omitted). Defense counsel have considerable discretion when determining whether

to introduce expert testimony in mitigation at the punishment phase of a capital-murder trial. *Id.* at 476–81.

Suniga complains that his trial counsel rendered ineffective assistance by failing to call a panoply of expert witnesses. He asserts that his trial counsel should have called an expert or experts such as Professor Ainsle to discuss sociological, historical, economic, and psychological forces harming Americans of Mexican descent in West Texas. He also complains that his trial counsel should have called a qualified historian such as Dr. Alvarez to explain the nature of the drug trade between Texas and Mexico and its economic incentives and extreme risk. Suniga argues that such experts could have explained the forces that lead Mexican Americans to become involved in the illicit drug trade and substance abuse.

The state habeas court accurately noted in its findings and conclusions that such testimony had very little relevance to Suniga. This finding was reasonable. The evidence at trial showed Suniga was born in Austin and moved to Massachusetts as a toddler, where he lived with his mother and stepfather (who, by all accounts, was a positive role model). Suniga returned to Texas with his older brothers when his mother and stepfather separated. Suniga spent several years there, growing up outside Fort Hood, where his mother worked. After Eric graduated from high school and left for college, Suniga had very little supervision save for that of his badly behaved older brother Michael. Eventually, the family relocated to Fort Worth, where Michael graduated from high school and left home for the Army, only to return less than a year later after being discharged for dereliction and fraternization. Suniga dropped out of high school and spent the final years of his development engaged in drug-trafficking and substance abuse in the Fort Worth area.

While Suniga's mother grew up in West Texas, Suniga's only connection to West Texas (the focus of Dr. Ainsle's expertise) formed when Suniga began working in an oil field just a few months before committing his capital offense. Without testimony by a mental health or sociological expert, Suniga's jury would have had no rational basis to connect the historical trends among Mexican Americans in West Texas to Suniga's developmental period. To the extent that Suniga asserts that such testimony should have been offered, Suniga's defense team testified extensively during Suniga's state writ hearing that they wished to conceal, if possible, the link between Lopez Sr. and Mexican drug cartels. The defense was aware of information from members of Suniga's family suggesting that Suniga's home in Fort Worth had been purchased with funds furnished by a Mexican drug cartel. Suniga's defense team reasonably wished to minimize any evidence that suggested a direct link between Suniga and drug cartels. The testimony proffered by Dr. Alvarez during the state writ hearing would have accomplished the opposite result.

Suniga complains that his trial counsel consulted with but failed to call Dr. Kasper to testify after her neuropsychological evaluation of Suniga found no significantly below-average intellectual functioning and no significant brain abnormalities or disorders. Suniga's defense team testified that they relied on Dr. Kasper's evaluation of Suniga, as well as on their consulting expert Dr. Cecil Reynolds, who reviewed Dr. Kasper's testing and identified nothing that required additional testing or evaluation. Significantly, Dr. Cecil Reynolds did not alert the defense team to any errors or omissions in Dr. Kasper's evaluation. After consulting with Dr. Kasper, Suniga's defense team determined that she had little mitigating evidence to offer and chose not to call her as a witness.

Suniga now faults his defense team for relying on the results of Dr. Kasper's neuropsychological testing of Suniga. In support, he points to the state writ-hearing testimony of his expert, Dr. Mayfield, who identified various errors in Dr. Kasper's testing methodology, record-keeping, and scoring of Suniga's evaluation and conducted her own evaluation of Suniga. Dr. Mayfield, like Dr. Victoria Reynolds, identified a significant difference between Suniga's visual and verbal reasoning, which they both stated indicates serious brain dysfunction. But, as the state habeas court that heard the state writ-hearing testimony of Dr. Mayfield and Dr. Victoria Reynolds determined, Suniga's defense team had no reason to believe there was anything deficient in Dr. Kasper's original testing of Suniga.

Trial counsel is "entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Cruz-Garcia v. Guerrero*, 128 F.4th 665, 676 (5th Cir. 2025) (quoting *Evans v. Davis*, 875 F.3d 210, 218 (5th Cir. 2017)). "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* (quoting *United States v. Shepherd*, 880 F.3d 734, 741 (5th Cir. 2018)). "Counsel should be permitted to rely upon the objectively reasonable evaluations and opinions of expert witnesses without worrying that a reviewing court will substitute its own judgment, with the inevitable hindsight that a bad outcome creates, and rule that his performance was substandard for doing so." *Segundo v. Davis*, 831 F.3d 345, 352 (5th Cir. 2016).

Under federal and Texas law, testimony by an examining mental-health expert on behalf of a criminal defendant effectively grants the prosecution the right to have the defendant evaluated by a prosecution mental health expert. *See Kansas v. Cheever*, 571 U.S.

87, 94 (2013); *LaGrone v. State*, 942 S.W.2d 602, 610–11 (Tex. Crim. App. 1997). Dr.
Mendel and Dr. Kasper both evaluated Suniga before trial, but Suniga's defense team chose
not to present testimony from either of them at trial because neither of them had identified
any significant mitigating aspects in Suniga's mental health through their evaluations that
warranted opening the door to a mental-health evaluation by a prosecution or
court-appointed mental health expert. Defense counsel's concern that such an independent
or prosecutorial evaluation could result in expert testimony harmful to the defense was
objectively reasonable.

Given Suniga's personal history, it was reasonable for Suniga's defense team to fear
that an independent mental health evaluation of Suniga could result in a diagnosis of
antisocial personality disorder (ASPD).[56] Suniga committed a violent murder during a
robbery that likely netted less than $20. The victim was shot three times in rapid succession,
twice in the chest and once in the head area. Suniga was a confirmed member (per the
defense team's pretrial investigation) of a fast-expanding prison gang. Despite the
prosecution's overwhelming circumstantial evidence, Suniga refused to admit to his defense
team that he and Lopez Jr. were at the crime scene the night of the murder. Suniga had a
lengthy criminal record beginning when he was a teenager that included a conviction for

---

[56] The Fifth Edition of the American Psychiatric Association's Diagnostic and Statistical Manual of
Mental Disorders ("DSM-5") describes antisocial personality disorder as "a pervasive pattern of
disregard for, and violation of, the rights of others that begins in childhood or early adolescence
and continues into adulthood." *DSM-5*, at p. 659. Deceit and manipulation are central features of
antisocial personality disorder. *Id.* The DSM-5 defines antisocial personality disorder through four
primary requirements: (1) a pervasive pattern of disregard for and violation of the rights of others,
occurring since age 15 years, as indicated by three or more of seven listed behaviors; (2) the
individual is at least 18 years old; (3) there is evidence of conduct disorder with onset before 15
years old; and (4) the occurrence of antisocial behavior is not exclusively during the course of
schizophrenia or bipolar disorder. DSM-5 at 659. The DSM-5 was published May 13, 2013,
which made it the latest version available at the time of Suniga's May 2014 trial.

domestic violence and a conviction for carrying a weapon.  Suniga candidly admitted to his

defense team and others that he had begun using and dealing drugs in his mid-teens.  Suniga

dropped out of high school in the ninth grade and had seven children with five women, two

of whom he had assaulted.  The assertion of some of Suniga's friends and family that he was

addicted to methamphetamine is at least partly refuted by the record from Suniga's time on

parole, during which Suniga consistently tested negative for alcohol and drugs.  And most

telling, the trial record revealed no evidence showing that Suniga had ever expressed

remorse for his fatal shooting of David Rowser.

      Suniga's trial counsel acted reasonably in choosing not to present testimony from a

mental health expert who had evaluated Suniga because doing so could have opened the

door to evidence of Suniga's ASPD or an equally chilling mental health diagnosis from a

prosecution or court-appointed mental health expert.  *See Smith v. Davis*, 927 F.3d 313, 337

(5th Cir. 2019) (trial counsel acted reasonably in choosing not to present mental-health

testimony that would have opened the door to evidence the defendant had confessed to

other offenses and could be diagnosed with ASPD).

      Dr. Cecil Reynolds recommended that the defense team consult with a child sexual

abuse trauma expert.  Suniga's defense did so, retaining Dr. Matthew Mendel, who

evaluated Suniga.  The state habeas court found that Dr. Mendel reported in two telephone

conversations with the defense team in April 2014 that he did not believe there was a very

strong case in mitigation to be made through his testimony because (1) although he still

suspected it may have happened, he could not definitively establish that Suniga had been

sexually abused as a child; (2) Suniga denied it vehemently; and (3) he could not make a

diagnosis of post-traumatic stress disorder.

The state habeas court considered a declaration from Dr. Mendel stating that he was prepared to testify about myriad traumatic episodes Suniga had experienced during his developmental period and their negative impacts on Suniga's development.  However, the state habeas court found that those assertions were not credible because they were refuted by the testimony of Suniga's defense team, who characterized their telephone conversations with Dr. Mendel in a very different light.  It was reasonable for the state habeas court to make a credibility finding based on the consistent testimony of three members of Suniga's defense team, as opposed to the bare declaration of Dr. Mendel.  In addition, Dr. Mendel's declaration appeared to the state habeas court to contradict Dr. Mendel's email exchanges with mitigation specialist Cowie and by Cowie's highly fact-specific testimony during Suniga's state writ hearing.

 Under such circumstances, it was objectively reasonable for the state habeas court to conclude that Suniga's defense team acted in an objectively reasonable manner when they chose not to call Dr. Mendel, Dr. Kasper, or another mental health professional who had evaluated Suniga (such as Dr. Mayfield or Dr. Victoria Reynolds) to testify at Suniga's trial. Calling any mental health expert who had evaluated Suniga to testify at trial would have been an endeavor fraught with potential peril for the defense.  In all reasonable likelihood, it would have resulted in expert testimony very harmful to the defense at the punishment phase of Suniga's trial.

Thus, the state habeas court reasonably found there were objectively reasonable justifications for not calling each of the mental health experts identified by Suniga in his initial state habeas application.  The TCCA reasonably concluded the failure of Suniga's

trial counsel to call an evaluating mental health expert did not prejudice Suniga within the meaning of *Strickland*.

   ***The Lack of Prejudice from Failure to Educate Trial Court on Mitigating Evidence.*** As explained in detail in Analysis § 3.H.vii.a, *supra*, the TCCA reasonably concluded that Suniga was not prejudiced within the meaning of *Strickland* by the alleged failure of his trial counsel to "educate" the trial judge on the scope of proper mitigation evidence. The state habeas court found Judge Darnell had considerable experience trying capital cases, both as a prosecutor and a trial judge. Moreover, the TCCA ruled on direct appeal that the state trial court properly excluded the additional purportedly mitigating testimony of Suniga's mother, brother Michael, and maternal aunt. This ruling on a state-law evidentiary matter is binding on a federal habeas court. Likewise, as explained in detail above, Suniga's argument that he was constitutionally entitled to present the proffered additional testimony of his relatives fails.

   ***The State Habeas Court's Appropriate Consideration of Burr's Testimony.*** In his federal habeas pleadings, Suniga complains that the state habeas court failed to make express credibility findings about the testimony of Suniga's capital litigation expert, attorney Richard Burr. What Suniga fails to acknowledge is that attorney Burr provided opinion testimony. Burr did not claim to possess any personal knowledge of Suniga's offense or the circumstances of Suniga's trial beyond what he gleaned from his review of the trial record and his review of the documents and testimony presented during Suniga's state habeas proceeding. Thus, Burr was a quintessential expert witness. Burr's credibility was not the primary issue before the state habeas court—instead, the state habeas court needed to consider the weight to give his opinions. As such, Burr's expert testimony, like the ABA

Guidelines, constituted some evidence of what constituted ineffective assistance within the meaning of *Strickland*.

The dual prongs of *Strickland* form mixed questions of law and fact.  *United States v. Owens*, 94 F.4th 481, 486 (5th Cir. 2024).  Thus, Burr's opinions on the ultimate question before the state habeas court did not require the state habeas court to issue discreet factual findings addressing Burr's "credibility."  Suniga complains that the state habeas court apparently gave more weight to the explanations given by Suniga's defense team during their state writ-hearing testimony for their strategic decision-making in Suniga's case than to Burr's contrary opinions about the wisdom or efficacy of those strategic decisions.  This was objectively reasonable considering the vast divergence in experience possessed by Suniga's trial counsel in selecting juries and trying criminal cases in Texas courts—where voir dire is conducted mainly by trial counsel—versus Burr's largely federal, post-conviction practice. Suniga's trial counsel were in a vastly superior position because of their extensive state trial experience to understand what a West Texas jury would likely find "mitigating."  The state habeas court's implicit recognition of this fact did not violate Suniga's constitutional rights or render any of the state habeas court's ultimate conclusions objectively unreasonable.

### e.    Alternative de novo review of the claim

Suniga presented the state habeas court with many of the same ineffective-assistance complaints that he includes in his federal habeas petition, but Suniga has also injected new factual and legal theories to support his contention that his trial counsel rendered ineffective assistance in connection with their investigation into Suniga's background, their marshalling of potentially mitigating evidence, and their presentation of available mitigating evidence at the punishment phase.  This may render Suniga's first claim in his amended federal habeas

petition unexhausted. *See Henry v. Cockrell*, 327 F.3d 429, 432 (5th Cir. 2003) ("Indeed, where petitioner advances in federal court an argument based on a legal theory distinct from that relied upon in the state court, he fails to satisfy the exhaustion requirement.") (citation omitted).

Assuming that the new theories in Suniga's federal habeas claim require de novo review, the Court concludes that all of the claims of ineffective assistance contained in Suniga's first claim in his amended federal habeas petition fail to satisfy either prong of *Strickland*. *Paredes*, 574 F.3d at 291 (failure to make meritless objections or requests satisfies neither prong of *Strickland*). As explained above, Suniga's trial counsel presented an extensive case in mitigation which informed the jury of Suniga's life history and identified myriad negative influence he experienced during his developmental period. Because Suniga was not a West Texan and because his trial counsel wished to actively avoid presenting evidence linking Suniga or his family to Mexican drug cartels, it was objectively reasonable for his trial counsel to choose not to present evidence similar to the state writ-hearing testimony of Dr. Ainsle and Dr. Alvarez.

Similarly, the decision of Suniga's defense team not to present expert mental-health testimony was objectively reasonable. Doing so would likely have resulted in a mental expert testifying for the State that Suniga demonstrated ASPD or another, equally negative, personality disorder. This strategic decision was objectively reasonable and did not prejudice Suniga within the meaning of *Strickland*. It fell well within the broad range of strategic decision-making to which trial counsel is entitled when constructing and presenting a case in mitigation at the punishment phase of a capital-murder trial. *Sandoval Mendoza*, 81

F.4th at 476–81 (discussing the broad deference that must be given to trial counsel when choosing whether to call experts, and which type, to testify).

Likewise, Suniga's trial counsel had objectively reasonable bases for their decisions not to call Suniga's wife, her mother, the mother of another one of Suniga's children (whom Suniga had been convicted of assaulting), Linda Bazan, or Michael Suniga's wife to testify at the punishment phase. Each of these witnesses could have presented testimony that was only minimally relevant to Suniga's case in mitigation but they all could have been cross-examined to elicit harmful testimony. The failure of Suniga's trial counsel to present additional testimony from Suniga's family and friends about the many negative aspects of Suniga's life story was also objectively reasonable and non-prejudicial. At some point, Suniga's jury could have become so overwhelmed by the sheer volume of testimony showing the negative aspects of Suniga's life story that it concluded Suniga was the product of a family so riddled with dysfunction that he was beyond the capacity of society to heal him.

And the failure of Suniga's trial counsel to seek a continuance to investigate the designation by LCDC officials of Suniga as a "confirmed" Tango Blast member was neither deficient performance nor prejudicial within the meaning of *Strickland* in light of trial counsel's independent determination that Suniga was a Tango Blast member.

In sum, after de novo review, all of Suniga's assertions of ineffective assistance in his first claim in his amended federal habeas petition fail to satisfy both prongs of *Strickland*, even considering the new or additional evidence Suniga has attached to his federal pleadings but that he failed fairly to present to the state habeas court.

\*           \*           \*

For the many reasons detailed above, the TCCA's rejection on the merits of Suniga's first claim in his initial state habeas application was neither contrary to, nor involved an unreasonable application of, clearly established federal law, nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Suniga's trial, direct appeal, and state habeas proceedings. And even assuming that Suniga's first claim was unexhausted and required de novo review, the claim fails to satisfy both prongs of *Strickland*. Whether viewed de novo or under AEDPA, Suniga's first claim in his amended federal habeas petition fails to satisfy the prejudice prong of *Strickland*. Suniga's first claim in his amended federal habeas petition fails and does not warrant federal habeas relief.

I.    **The thirteenth claim of cumulative prejudicial error at the guilt and penalty phases of trial does not warrant federal habeas relief.**

In his thirteenth claim in his amended federal habeas petition, Suniga argues he is entitled to federal habeas relief under cumulative error principles. Dkt. No. 36 at 201.

i.    **Procedural history**

Suniga did not include a cumulative error claim in his initial state habeas application. Suniga did include a cumulative error point of error in his brief on direct appeal, but that argument asserted cumulative error only for the points of error he presented on direct appeal, which did not include any of his claims for state habeas relief. Thus, Suniga's cumulative error claim in his amended federal habeas petition is unexhausted.

ii.    **Relevant federal and Fifth Circuit law**

The Supreme Court has never expressly recognized a "cumulative error" doctrine sufficient to grant federal habeas relief absent a conclusion that some identifiable federal constitutional right has been violated. *See Derden v. McNeel*, 978 F.2d 1453, 1456 (5th Cir.

1992).  Nonetheless, the Fifth Circuit has recognized a type of cumulative error doctrine.

That doctrine requires a showing that constitutional error occurred during the defendant's

state-court trial.  *See Young v. Stephens*, 795 F.3d 484, 494 (5th Cir. 2015); *Coble*, 496 F.3d at

440; *Miller*, 200 F.3d at 286 n.6.

### iii.    De novo review

Applying de novo review, for the reasons discussed in Analysis § 3.H, *supra*, all of

Suniga's complaints about the performance of his trial counsel fail to satisfy the prejudice

prong of *Strickland*.  For the reasons detailed in Analysis §§ 3.A–G, *supra*, all of Suniga's

other substantive constitutional claims fail as well.  Thus, under the cumulative error

doctrine recognized in this Circuit, there is nothing for this Court to cumulate.  Suniga's

conclusory cumulative error claim has no merit.  His final claim for federal habeas relief

does not warrant federal habeas relief even under de novo review.

## 4.    The Court denies the request for an evidentiary hearing.

Suniga requests an evidentiary hearing to resolve alleged disputed questions of fact.

Dkt. No. 36 at 21.  To the extent that Suniga's claims in his amended federal habeas corpus

petition were disposed of on the merits during his direct appeal or initial state habeas corpus

proceedings, he is not entitled to an evidentiary hearing to develop new evidence attacking

the state appellate or state habeas court's resolution of his claims unless he can satisfy 28

U.S.C. § 2254(e)(2).  *Shinn v. Ramirez*, 596 U.S. 366, 371 (2022).  Likewise, a federal habeas

petitioner is not entitled to an evidentiary hearing to show that his failure to develop facts in

state court resulted from the ineffective assistance of his state habeas counsel.  *Id.* at 382–91.

Under AEDPA, the proper place for development of the facts supporting a federal

habeas claim is the state court.  *See Richter*, 562 U.S. at 103; *Hernandez v. Johnson*, 108 F.3d

554, 558 n.4 (5th Cir. 1997).  When a petitioner's claims have been rejected on the merits,

further factual development in federal court is effectively precluded because federal habeas

review under Section 2254(d)(1) is "limited to the record . . . before the state court." *Cullen*,

563 U.S. at 181–82.

Thus, Suniga is not entitled to an evidentiary hearing on any of his claims that were

rejected on the merits by the state courts, either on direct appeal or during his initial state

habeas corpus proceeding.  *Halprin v. Davis*, 911 F.3d 247, 255 (5th Cir. 2018) ("If a claim

has been adjudicated on the merits by a state court, a federal habeas petitioner must

overcome the limitation of § 2254(d)(1) on the record that was before that state court.");

*Shinn*, 596 U.S. at 371.  Furthermore, factual development of a claim in federal court is

permissible only when the federal habeas court first determines that any new evidence to be

developed could properly be considered in light of the restrictions on evidentiary

development imposed under AEDPA.  *Shoop v. Twyford*, 596 U.S. 811, 819–20 (2022).

Suniga was represented by capable counsel throughout both his state direct appeal and his

state habeas proceeding.  He was afforded a lengthy, nine-day evidentiary hearing during his

state habeas proceeding and allowed to develop facts supporting his claims, including some

claims that the state habeas trial did not designate for factual development in its relevant

order.  Suniga had a full and fair opportunity to develop the facts supporting the claims that

he fairly presented to the state courts, either on direct appeal or in his initial state habeas

proceeding.

This Court is entitled to rely on the facts alleged by Suniga in his amended federal

habeas corpus petition.  *See* Rule 2(c)(2) of the Rules Governing Section 2254 Cases in the

United States District Courts requires that the petition "state the facts supporting each

ground." *See also Mayle v. Felix*, 545 U.S. 644, 649 (2005). Conclusory allegations cannot support claims for federal habeas relief and will not entitle a petitioner to discovery or a hearing. *See, e.g.*, *Fahle v. Cornyn*, 231 F.3d 193, 196–97 (5th Cir. 2000); *Little v. Johnson*, 162 F.3d 855, 862 (5th Cir. 1998). This Court has relied on the facts contained in Suniga's amended federal habeas petition when disposing of the unexhausted portions of some of Suniga's claims. Suniga has failed to allege specific facts sufficient to satisfy Section 2254(e)(2) showing that he is entitled to a second evidentiary hearing in this Court.

**5.    The Court Denies the Request for a Certificate of Appealability.**

Under AEDPA, before a petitioner may appeal the denial of a habeas corpus petition filed under § 2254, the petitioner must obtain a Certificate of Appealability (COA). *Miller-El v. Cockrell*, 537 U.S. 322, 335–36 (2003); 28 U.S.C. § 2253(c)(2). Likewise, under AEDPA, appellate review of a habeas petition is limited to the issues on which a COA is granted. *See Crutcher v. Cockrell*, 301 F.3d 656, 658 n.10 (5th Cir. 2002). In other words, a COA is granted or denied on an issue-by-issue basis, thereby limiting appellate review to those specific issues. *Id.*; 28 U.S.C. § 2253(c)(3).

A COA will be granted only if a petitioner makes a substantial showing of the denial of a constitutional right. *Tennard*, 542 U.S. at 282; *Miller-El*, 537 U.S. at 336. To make such a showing, the petitioner need not show he will prevail on the merits, but he must demonstrate that reasonable jurists could debate whether the petition should have been resolved in a different manner or that the issues presented are adequate to deserve proceeding further. *Tennard*, 542 U.S. at 282; *Miller-El*, 537 U.S. at 336. This Court is required to issue or deny a COA when it enters a final order, such as this one, adverse to a

federal habeas petitioner.  Rules Governing Section 2254 Cases in the United States District Courts 11(a).

The showing necessary to obtain a COA on a particular claim is dependent upon how the district court has disposed of a claim.  "[W]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller-El*, 537 U.S. at 338 (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).  In a case in which the petitioner wishes to challenge on appeal this Court's dismissal of a claim on a non-constitutional ground, such as procedural default, limitations, or lack of exhaustion, the petitioner must show that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and whether this Court was correct in its procedural ruling.  *See Slack*, 529 U.S. at 484.  This Court did not dispose of any of Suniga's claims on procedural grounds, but addressed the merits of all claims, including unexhausted claims.

Reasonable minds could not disagree with this Court's conclusions that: (1)  whether reviewed under AEDPA or de novo, all of Suniga's complaints of ineffective assistance by his trial counsel fail to satisfy the prejudice prong of *Strickland*; (2) the state trial court did not violate Suniga's constitutional rights by denying his motions for a change of venue; (3) any error arising from the trial judge's brief ex parte meeting before trial with a juror who worked in the courthouse did not rise above harmless error; (4) Suniga's trial counsel did not operate under an actual or presumed conflict of interest arising from Suniga's subjective dissatisfaction with his counsel for furnishing him with legally accurate advice and rational

admonitions; (5) Suniga's complaint about the failure of prosecutors to disclose alleged impeachment evidence relating to prosecution witness Rachel Pereida fails to satisfy the materiality standard of *Brady*; (6) Suniga's complaints about the trial court's exclusion of additional testimony from Suniga's family members during the punishment phase fails to satisfy *Strickland*; (7) Suniga's conclusory selective-prosecution claim is meritless; (8) Suniga's constitutional challenge to the Texas capital-sentencing special issues is foreclosed by settled Fifth Circuit precedent; and (9) Suniga's unexhausted cumulative-error claim fails.  Suniga is not entitled to a COA from this Court.

**6.    The Court Denies the Renewed Motion for Discovery.**

Suniga has filed a renewed motion for discovery (Dkt. No. 74), requesting discovery on (1) his *Brady and Giglio/Napue* claims arising from the failure of prosecutors to disclose impeachment evidence relevant to prosecution witness Rachel Pereida and the alleged failure to correct false or misleading testimony by Pereida (his eighth claim here), and (2) his selective-prosecution claim (his eleventh claim here).

For the reasons set forth in Analysis §§ 3.G–H, *supra*, Suniga's claims involving Pereida fail.  Contrary to Suniga's contentions, Pereida was not a star or key prosecution witness.  Her trial testimony on direct examination filled all of five pages.  Her testimony merely corroborated the identification testimony of three other prosecution witnesses. Pereida did not claim to have any personal knowledge of the crime or Suniga's involvement in it.  In fact, she admitted she had never seen Suniga wearing the distinctive whiteout contact lenses that the two motel employees who did identify Suniga at trial used to do so. Impeaching Pereida's abbreviated trial testimony ran a substantial risk that she could furnish harmful testimony—for example, that she knew that Suniga's accomplice had been

engaged in a series of robberies before the fatal shooting of David Rowser. Thus, at trial, Suniga's trial counsel chose not to cross-examine Pereida after consulting with Suniga. Under those circumstances, Suniga's claims cannot satisfy the materiality prongs of *Brady* or *Giglio/Napue.* Suniga is not entitled to discovery on a meritless claim.

Similarly, for the reasons detailed in Analysis § 3.F, *supra*, Suniga is not entitled to discovery on his conclusory selective-prosecution claim. Conclusory claims, unsupported by specific facts, do not permit discovery. *Perillo*, 79 F.3d at 444. Suniga's renewed motion for discovery is denied.

### 7.    The Court denies the motion for a stay and abeyance.

Suniga also filed a motion requesting a stay and abeyance (Dkt. No. 63), pursuant to the Supreme Court's holding in *Rhines*, to permit him to return to state court and exhaust available state habeas remedies with regard to the unexhausted portions of his eighth claim in his amended federal habeas petition (his *Brady* and *Giglio/Napue* claims involving Rachel Pereida) and his unexhausted seventh claim (his claim that his trial counsel rendered ineffective assistance by failing to impeach prosecution witness Pereida).

A stay and abeyance to permit exhaustion of state court remedies on unexhausted claims for relief is appropriate in the context of a pending federal habeas proceeding only when a district court determines that (1) there is good cause for a petitioner's failure to exhaust his claims in state court; (2) the unexhausted claims are not plainly meritless; and (3) the petitioner has not engaged in abusive litigation tactics or intentional delay. *Rhines v. Weber*, 544 U.S. 269, 277–78 (2005); *Haynes v. Quarterman*, 526 F.3d 189, 196 (5th Cir. 2008). For the reasons detailed in Analysis §§ 3.G, 3.H.iii, *supra*, all of the unexhausted portions in Suniga's seventh and eighth claims in his amended federal habeas petition fail

even when examined under a de novo standard of review and thus do not support the issuance of a stay and abeyance under *Rhines*. Suniga's motion for stay and abeyance is denied.

**8.    Conclusion**

The Court denies all relief requested in Suniga's amended federal habeas petition (Dkt. No. 36). The Court denies Suniga's renewed motion for discovery (Dkt. No. 74), his motion for a stay and abeyance (Dkt. No. 63), his request for an evidentiary hearing (Dkt. No. 36 at 21). The Court denies Suniga's request for a Certificate of Appealability on all claims in the amended federal habeas petition. The Court will enter judgment accordingly.

So ordered on September 2, 2025.

JAMES WESLEY HENDRIX
UNITED STATES DISTRICT JUDGE