IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

|   |   |
|---|---|
| BRIAN CLIFF SUNIGA, | : |
| Petitioner, | : |
| | : CIVIL ACTION NO. 5:22-CV-124-H |
| v. | : |
| | : **CAPITAL HABEAS CORPUS** |
| BOBBY LUMPKIN, | : |
| Director, | : |
| Criminal Institutions Division, Texas Department | : |
| of Criminal Justice, Correctional Institutions | : |
| Division | : |
| Respondent. | : |

**PETITIONER'S MOTION TO ALTER OR AMEND JUDGMENT
PURSUANT TO FED. R. CIV. P. 59(e)
AND FOR CERTIFICATE OF APPEALABILITY**

ANNE FISHER
PA Bar No. 94180
Federal Community Defender for the
Eastern District of Pennsylvania
Suite 545 West, The Curtis Center
601 Walnut Street
Philadelphia, PA 19106
(215) 928-0520
Annie_Fisher@fd.org

Dated: September 30, 2025

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................................ii

STANDARD GOVERNING RULE 59(e) ............................................................................................3

STANDARD GOVERNING CERTIFICATE OF APPEALABILITY .............................................3

I.     This Court Should Reconsider Its Denial of Habeas Relief and a Certificate of Appealability on Mr. Suniga's Claim that His Rights Under the Fifth, Sixth, Eighth, and Fourteenth Amendments Were Violated When He Was Tried in a Venue that Was Subjected to Pervasive and Prejudicial Pretrial Publicity Which Denied Him a Fair Trial (Federal Habeas Claim II). ..................................................................................................4

     A.     This Court erred in its analysis of presumptive prejudice. ..............................6

     B.     This Court erroneously failed to consider whether Mr. Suniga is entitled to relief based on the record as a whole. ............................................................9

     C.     Mr. Suniga is entitled to relief, or at least a COA, on this claim. ................14

CONCLUSION .....................................................................................................................................15

# TABLE OF AUTHORITIES

**Cases**

*Andrew v. White*, 145 S. Ct. 75 (2025) ..................................................................................... 9
*Banister v. Davis*, 590 U.S. 504 (2020) ..................................................................................... 3
*Barefoot v. Estelle*, 463 U.S. 880 (1983) ................................................................................... 4
*Brecht v. Abrahamson*, 507 U.S. 619 (1993) ........................................................................ 5, 14
*Buck v. Davis*, 580 U.S. 100 (2017) .......................................................................................... 4
*In re Transtexas Gas Corp.*, 303 F.3d 571 (5th Cir. 2002) ........................................................ 3
*Irvin v. Dowd*, 366 U.S. 717 (1961) ......................................................................................... 14
*Lavespere v. Niagra Mach. & Tool Works*, 910 F.2d 167 (5th Cir. 1990) ................................. 3
*Lockyer v. Andrade*, 538 U.S. 63 (2003) ................................................................................... 9
*Miller–El v. Cockrell*, 537 U.S. 322 (2003) ......................................................................... 4, 15
*Mu'Min v. Virginia*, 500 U.S. 415 (1991) .............................................................................. 6–7
*Murphy v. Florida*, 421 U.S. 794 (1975) ...................................................................... 5, 11, 14
*Patterson v. Colorado ex rel. Attorney General of Colo.*, 205 U.S. 454 (1907) ........................ 5
*Patton v. Yount*, 467 U.S. 1025 (1984) ................................................................................ 8, 13
*Rideau v. Louisiana*, 373 U.S. 723 (1963) .......................................................................... 5–7, 9
*Skilling v. United States,* 561 U.S. 358 (2010) ................................................................. passim
*United States ex rel. Darcy v. Handy*, 351 U.S. 454 (1956) .................................................... 14
*White v. New N.H. Dep't of Emp't Sec.*, 455 U.S. 445 (1982) ................................................... 3
*Whitehead v. Johnson*, 157 F.3d 384 (5th Cir. 1998) ................................................................ 4

**Statute**
28 U.S.C. § 2253 ..................................................................................................................... 3–4

**Rule**
Fed. R. Civ. P. 59 ....................................................................................................................... 3

On September 2, 2025, this Court issued a Memorandum Opinion and Order denying Brian Suniga's Amended Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 and refusing to certify any issue for consideration by the United States Court of Appeals for the Fifth Circuit. *See* ECF No. 82 (hereinafter, "Op."). Mr. Suniga, through undersigned counsel, respectfully requests pursuant to Fed. R. Civ. P. 59(e) that the Court reconsider its ruling and amend or alter its judgment and grant relief, or, alternatively, that the Court grant a certificate of appealability ("COA").

### STANDARD GOVERNING RULE 59(e)

"A Rule 59(e) motion briefly suspends finality to enable a district court to fix any mistakes and thereby perfect its judgment before a possible appeal." *Banister v. Davis*, 590 U.S. 504, 516 (2020); *see also White v. New N.H. Dep't of Emp't Sec.*, 455 U.S. 445, 450 (1982) (explaining rule "was adopted to make clear that the district court possesses the power to rectify its own mistakes in the period immediately following the entry of judgment") (internal quotation marks omitted). Rule 59(e) "is properly invoked to correct manifest errors of law or fact." *In re Transtexas Gas Corp.*, 303 F.3d 571, 581 (5th Cir. 2002). A district court has broad discretion to grant a motion to alter or amend judgment. *Lavespere v. Niagra Mach. & Tool Works*, 910 F.2d 167, 174 (5th Cir. 1990), *abrogated on other grounds by Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075–76 (5th Cir. 1994). Moreover, Rule 59(e) does not set forth any particular grounds for relief. *Id.* Rather, a court may appropriately grant Rule 59(e) relief after weighing relevant circumstances on a case-by-case basis. *Id.*

As explained below, this Court has committed factual and legal errors that should result in the amendment of the judgment.

### STANDARD GOVERNING
### CERTIFICATE OF APPEALABILITY

Under 28 U.S.C. § 2253(c)(2), a court should grant a certificate of appealability where a habeas petitioner makes a "substantial showing of the denial of a federal constitutional right." As the Supreme

3

Court reiterated in *Buck v. Davis*, 580 U.S. 100 (2017), the COA inquiry is not coextensive with the merits of the claim. "At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" *Id.* at 115 (quoting *Miller–El v. Cockrell*, 537 U.S. 322, 327 (2003)). When considering whether to grant a COA, a court should resolve any doubts in favor of the petitioner. *Whitehead v. Johnson*, 157 F.3d 384, 386 (5th Cir. 1998). "In a capital case, the nature of the penalty is a proper consideration" to weigh in favor of granting a COA. *Barefoot v. Estelle*, 463 U.S. 880, 893 (1983). Petitioner need not "show[] that the appeal will succeed." *Miller-El*, 537 U.S. at 337. Rather, all he must do is prompt a reasonable debate based on a brief "overview of [his] claims." *Id.* at 336. A court should not decline an application "even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." *Buck*, 580 U.S. at 117 (quoting *Miller-El*, 537 U.S. at 338).

**I.    This Court Should Reconsider Its Denial of Habeas Relief and a Certificate of Appealability on Mr. Suniga's Claim that His Rights Under the Fifth, Sixth, Eighth, and Fourteenth Amendments Were Violated When He Was Tried in a Venue that Was Subjected to Pervasive and Prejudicial Pretrial Publicity Which Denied Him a Fair Trial (Federal Habeas Claim II).**

Mr. Suniga was denied due process and a fair trial due to pervasive and highly inflammatory media coverage released during his jury selection, just weeks before his capital trial commenced. The media repeatedly linked Mr. Suniga and the murder for which he was being tried to gang violence and specifically described Mr. Suniga as a member of Tango Blast, which was portrayed as a particularly violent gang ravaging West Texas. This pervasive publicity was understandably impactful in the small community of Lubbock County, in which murders were rare. It was also undeniably prejudicial, as it informed the jury that Mr. Suniga was a brutal gang member before a single piece of evidence was

4

received, thereby predisposing the jury not only to find Mr. Sunga guilty, but also to credit a central component of the prosecution's case for future dangerousness and, ultimately, a sentence of death.

Well-established Supreme Court precedent holds that, where a petitioner challenges his conviction based on prejudicial pretrial press, the reviewing court must determine if the jury's verdict was "induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print." *Patterson v. Colorado ex rel. Attorney General of Colo.*, 205 U.S. 454, 462 (1907). In some cases, the relevant media coverage is of such a nature that the court may presume a prejudicial impact on the jury "without pausing to examine a particularized transcript of the voir dire" or considering other evidence of juror impartiality. *Skilling v. United States,* 561 U.S. 358, 379 (2010) (quoting *Rideau v. Louisiana*, 373 U.S. 723, 726–27 (1963)). But even outside of these cases, a petitioner is entitled to relief upon showing that the trial court failed to adopt sufficient measures to safeguard his constitutional rights to a fair and impartial jury. *See, e.g.*, *Murphy v. Florida*, 421 U.S. 794, 799 (1975) (scrutinizing the record for "any indications in the totality of circumstances that petitioner's trial was not fundamentally fair"); *Skilling,* 561 U.S. at 385–87 (considering, after determining that no presumption of prejudice was warranted, whether the trial court's voir dire and other procedures failed to "adequately detect and defuse juror bias" resulting from media coverage).

This Court's determination that Mr. Suniga is not entitled to relief or a COA on this claim suffers from two fundamental flaws. The first is that the Court conducted an unduly narrow analysis as to whether Mr. Suniga was entitled to a presumption of prejudice. The second is that the Court failed to give *any* consideration to whether, even absent presumed prejudice, the record as a whole establishes that the inflammatory media coverage had a "substantial and injurious influence on the jury's verdict" at either the guilt or penalty phase of Mr. Suniga's trial. *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993). Under either theory, Mr. Suniga is entitled to relief or, at a minimum, a grant of COA on this claim.

5

### A. This Court erred in its analysis of presumptive prejudice.

In its analysis of Mr. Suniga's claim that the content, timing, and impact of the pretrial publicity in his case entitles him to a presumption of prejudice, this Court recognized that "several" factors weigh on the question, including:

> "the size and characteristics of the community in which the crime occurred," whether the publicity contained a "confession or other blatantly prejudicial information," the time between the event charged in the indictment and the trial, [and] whether the trial resulted in acquittal on any charges or any other result that undermines the presumption of juror bias.

Op. at 45 (quoting *Skilling*, 561 U.S. at 382–85). However, the Court then went on to conclude that a presumption of prejudice is unwarranted largely because the facts alleged by Mr. Suniga did not precisely match the facts of any prior case in which the presumption has been applied by the Supreme Court.

For instance, the Court determined that the size of the relevant community weighed against a finding of presumptive prejudice in this case simply because "Lubbock County's total population approaches 300,000, nearly double the size of the small Louisiana parish from which the *Rideau* [*v. Louisiana*] case originated." *Id.* at 47. But the Court failed to acknowledge that Lubbock County's population was much closer to that in *Rideau* than to Houston at the time of the trial in *Skilling* or to Washington, D.C., at the time of the trial in *Mu'Min v. Virginia*, 500 U.S. 415 (1991), another case in which the Supreme Court considered presumptive prejudice. *See Skilling*, 561 U.S. at 382, 384 (noting that "more than 4.5 million individuals" were eligible to serve on Mr. Skilling's jury and concluding that "Houston's size and diversity diluted the media's impact" in that case); *Mu'Min*, 500 U.S. at 429 (determining that the potential for prejudice was mitigated by the size of the "metropolitan Washington[, D.C.,] statistical area, which has a population of over 3 million"). This Court also ignored that murders were relatively rare in Lubbock County, which further distinguished this case from *Mu'Min*, in which the Supreme Court highlighted that, "unfortunately, hundreds of murders are

6

committed each year" in the Washington metro region. 500 U.S. at 429. And, by focusing strictly on a numerical comparison with the population in *Rideau*, this Court failed to account for the fact that the trial court in Mr. Suniga's case had opened jury selection by telling the veniremembers that they "probably have heard about or read about" the crime in this case. ECF No. 51-32 at 10. It also ignored the words of the prosecutor, who commented: "[w]hen we have a murder in Lubbock, it makes the news," and that he then distinguished Lubbock from Houston, where a murder "may or may not make the news, because it was an almost everyday event." *Id.* at 18. These comments show that, even if more populous than the relevant community in *Rideau*, the "size and characteristics" of Lubbock County virtually guaranteed that a large percentage of veniremembers had been exposed to the prejudicial press coverage.

Turning to the next factor, this Court downplayed the prejudicial nature of the press coverage because, unlike in the *Rideau* case, the stories here did not contain "any irrefutable evidence of Suniga's guilt." Op. at 46–47. But Mr. Suniga's claim argued that the media—which erroneously linked the Rowser murder to the Tango Blast gang, described as "one of the most dangerous gangs in Texas . . . due to their relationship with Mexican Cartels," ECF No. 17-6 at 127, and identified Mr. Suniga as a Tango Blast member—was prejudicial not only on the issue of guilt, but also on the question of future dangerousness. Thus, the fact that the coverage did not "irrefutabl[y]" establish Mr. Suniga's guilt did not render it benign—beyond the issue of guilt, it directly colored a question that would inform the jury's decision as to whether Mr. Suniga lived or died: his future dangerousness.

This Court also stated that none of the press was "factually inaccurate," noting that "there was no evidence . . . suggesting David Rowser's murder was in any way gang-related." Op. at 46–47. But that is precisely the reason that the media coverage was so harmful, as the stories that ran during jury selection directly suggested otherwise. *See, e.g.*, ECF No. 17-6 at 127 (April 23, 2014 article, which carried the headline "New [Department of Public Safety] Report Highlights Gang Activity in

7

Lubbock," but which immediately began detailing the Rowser murder and Mr. Suniga's case, including discussing evidence obtained by police at the crime scene); *id.* at 139–59 (defense motion explaining that a May 2, 2014 article that extensively featured Lieutenant Billy Koontz of the Lubbock County Sherrif's Office, a prosecution witness in this trial—referring to him as a "gang expert" and quoting him as to the significance of gang tattoos, including for the Tango Blast gang, which used star tattoos—had been published the day after a local news story ran about this case that had included photos of Mr. Suniga in detention that clearly highlighted his own tattoos, including a star tattoo). Indeed, the trial judge himself acknowledged that the media was erroneously linking the Rowser murder to gang violence when he addressed several empaneled jurors concerning the April 23, 2014 article described immediately above, stating: "the news story . . . didn't really have anything to do with this case, *but somehow they decided to tie it into it*." ECF No. 49-21 at 10 (emphasis added). Thus, the pretrial coverage was both inaccurate and highly damaging—both to the questions of guilt and Mr. Suniga's future dangerousness.

 As to the timing of the coverage, this Court merely noted that "[a]lmost two years passed between David Rowser's murder and the start of jury selection for Suniga's trial," Op. at 47, but failed to address the fact that the prejudicial stories were released *during jury selection*, just weeks prior to the start of trial. Thus, this case is distinguishable from *Skilling*, in which the Supreme Court stressed not only that "over four years elapsed between Enron's bankruptcy and Skilling's trial," but also that "the decibel level of media attention" had diminished over the course of that four-year period. *See* 561 U.S. at 383; *see also Patton v. Yount*, 467 U.S. 1025, 1032 (1984) (pretrial publicity did not violate due process of defendant, in part, because trial was held "at a time when prejudicial publicity was greatly diminished and community sentiment had softened").

 Finally, this Court failed to even mention the fact that, unlike in *Skilling*, in which the jury acquitted the defendant of nine charged counts, the jury's verdict in this case "did not undermine in

8

any way the supposition of juror bias." *Skilling*, 561 U.S. at 383 (noting the same was true in each of the three cases in which the Supreme Court had previously applied a presumption of prejudice).

In sum, this Court's approach to the presumptive-prejudice analysis was unduly narrow. As the Supreme Court recently affirmed, the *Rideau* case is merely an application of "the underlying fundamental fairness principle in the jury-impartiality context." *Andrew v. White*, 145 S. Ct. 75, 82 (2025). Neither that case nor any other single case could establish precise parameters for a showing of presumptive prejudice from pretrial media. Rather, the "inquiry is necessarily case specific." *Skilling*, 561 U.S. at 439 (Sotomayor, J., joined by Breyer & Stevens, JJ., dissenting) (rejecting that the Supreme Court has ever "treated the notion of presumptive prejudice . . . formalistically"). And, "[t]o the extent that" this Court "thought itself constrained by" the Antiterrorism and Effective Death Penalty Act ("AEDPA") to limit *Rideau* to its facts, the Court "was mistaken." *Andrew*, 145 S. Ct. at 82. As explained in *Andrew*, "[g]eneral legal principles can constitute clearly established law for purposes of AEDPA so long as they are holdings of [the Supreme] Court." *Id.*; *see also Lockyer v. Andrade*, 538 U.S. 63, 72 (2003) (determining that the principle that a "gross disproportionality principle is applicable to sentences for terms of years" is clearly established for AEDPA purposes, even though it arises out of a "thicket of Eighth Amendment jurisprudence" and lacks "precise contours").

> **B.** **This Court erroneously failed to consider whether Mr. Suniga is entitled to relief based on the record as a whole.**

Even assuming that this Court was correct in determining that the pretrial publicity in Mr. Suniga's case did not warrant a presumptive finding of prejudice, the Court should not have ended its inquiry at that point. Instead, the Court was then bound to "examine[] the particulars of the jury selection process to determine whether it sufficed to produce a jury untainted by pretrial publicity and community animus." *Skilling*, 561 U.S. at 440 (Sotomayor, J., dissenting). Several aspects of the jury selection in this case—most of which were not even mentioned in the Court's opinion—show that

9

the trial court failed to adopt the measures necessary under the circumstances to ensure an unbiased jury.

<u>First</u>, nine of Mr. Suniga's twelve jurors were never individually questioned about the potential effects of the provocative media coverage unleashed in the weeks immediately preceding the start of trial. Although all veniremembers had been asked about their exposure to relevant media in the juror questionnaire, the answers to that inquiry were necessarily limited to press that was published or aired prior to March 13, 2014, when the potential jurors completed the questionnaire. *See* ECF No. 17-6 at 120. And, by the time the defense alerted the court to the prejudicial media coverage on April 24, 2014, nine jurors had already been empaneled. Thus, when defense counsel filed their first motion for a change of venue—based on the April 23, 2014 article discussed above and similar media coverage that had appeared since the start of jury selection—they requested that the nine jurors already empaneled and the remaining venire be dismissed. *Id.* at 113–26. In the alternative, the defense asked that each of the nine empaneled jurors be individually questioned "in detail" as to the extent of their exposure to media coverage and that counsel for the parties be allowed to ask follow-up questions. ECF No. 17-6 at 120–21. In response, the trial court reconvened the nine empaneled jurors on April 28, 2014. Prior to posing a single question, however, the judge admonished the jurors that the purpose of calling them was to "make sure" they had not violated his prior instructions to avoid any media regarding the case. ECF No. 49-21 at 11. The judge then warned the jurors what could happen if they had not observed that instruction, saying:

> [T]here are two things that I could do that would make it very difficult for y'all. One is to sequester you until the case is complete. That means you could stay in a hotel room, not be able to read anything or watch anything on television about the case for the duration until we finish. And . . . I [have] learned [from prior experience] that [is] not a very happy process for anybody involved. So the other is to have a change of venue. To move the case outside of our community somewhere else[] where there's not as much news coverage.

*Id.* at 11–12. Only then did the judge ask the nine jurors, as a group, whether any of them had "read anything or s[een] anything . . . in the news last week?" *Id.* at 12. The record does not reflect any response from any juror, and the judge immediately said: "Okay. Good." *Id.* No follow-up questions were posed by the court or counsel for either party.

In other words, the only indication that none of the nine jurors had been exposed to the prejudicial media was the fact that none chose to volunteer—in open court before their fellow jurors and the parties—that he or she had (perhaps inadvertently[1]) not only violated the judge's instructions, but was therefore subjecting the entire group of jurors to measures that would "make it very difficult for" all of them. This was plainly insufficient. In *Skilling*, the Supreme Court credited jurors' assurances that they had not been tainted by media exposure in part because the trial court in that case "did not simply take venire members . . . at their word," but rather "followed up with each individually to uncover concealed bias." 561 U.S. at 394–95; *see also id.* at 440–41 (Sotomayor, J., dissenting) (recognizing that, because "some prospective jurors will deliberately hide their prejudices" and others "'may unwittingly [be] influenced' by the fervor that surrounds them," a trial court "must carefully consider the knowledge and attitudes of prospective jurors and then closely scrutinize the reliability of their assurances of fairness") (quoting *Murphy*, 421 U.S. at 803).

That such individual questioning and close follow-up was important here is starkly illustrated by the voir dire of another veniremember who was questioned on April 24, 2014. When this veniremember was first asked whether she had recently consumed any media about this case, she explained that she had seen the televised story the night before showing Mr. Suniga's picture and

---

[1] As defense counsel had highlighted to the trial court when first raising the issue on April 24, 2014, it would not be surprising if the empaneled jurors had read the April 23, 2014 story or watched the related news broadcast even if they had been diligently trying to avoid media related to the case, as both stories purported to be focused on gang violence and it would not have been clear from the headline or lead-in that the story was actually primarily about Mr. Suniga and his trial. *See* ECF No. 49-20 at 16–17.

11

"talk[ing] about the gangs," but then went on to say that there was not anything that would "affect" her ability to be a juror, "good or bad." ECF No. 49-20 at 209–10. However, when this same venireperson was later specifically asked whether there was anything she had "heard in the media" that caused her to "already form an opinion as to whether or not this Defendant is guilty," she answered: "Yeah, probably," and was removed for cause. *Id.* at 212. Absent the same type of questioning, on an individual basis, of the nine jurors already empaneled as of April 23, 2014, this Court cannot have confidence that the jurors in fact remained free from the improper extrajudicial influences admitted to by this stricken veniremember.

<u>Second</u>, the trial court erred by denying all three of the defense's motions to change venue. In the first motion, filed on April 25, 2014, the defense noted the heightened standards required in capital cases and argued that the media reports—which detailed the facts of the case, talked about the violent nature of gangs, and tied Mr. Suniga to gang violence—were prejudicial and could impact the issue of future dangerousness. ECF No. 49-21 at 21–24. The court denied that motion just days after hearing the veniremember discussed directly above candidly admit that the recent media had caused her to prejudge Mr. Suniga's guilt, and despite the court itself having acknowledged that the press had inaccurately linked Mr. Suniga's case with an uptick in violent gang activity in the area. *Id.* at 25; *see also id.* at 10 (trial court telling nine empaneled jurors about the article on gang violence, noting that the subject "didn't really have anything to do with this case, but somehow they decided to tie it into it"). The second motion for change of venue was filed on May 5, 2014, and relied upon, inter alia, the story described above quoting prosecution witness Lt. Koontz as a "gang expert." ECF No. 17-6 at 136–63. The second motion incorporated all of the arguments regarding the prejudicial impact of the press coverage made in the first motion, and also argued that the news article featuring Lt. Koontz constituted improper bolstering of a prosecution witness, and that both Koontz and another law enforcement officer quoted in the same article had violated a gag order issued by the court just days

12

before the article ran. *See id.*; *see also* ECF No. 49-26 at 92. The second motion was denied on May 6, 2014, without a hearing or any additional inquiry of the seated jurors. ECF No. 49-27 at 9. On June 13, 2014, as the trial began, the defense again moved to change venue; this third request was also denied. ECF No. 49-28 at 20.

Third, the trial court not only denied the defense's repeated and well-supported requests to change venue, but also denied the alternative remedies requested in the event venue was not changed. The first such alternative—allowing the defense to individually question the nine jurors already empaneled—is addressed above. The second came in the defense's second motion for change of venue, in which counsel requested that if venue were not moved, the trial be continued until the impact of the prejudicial media coverage decreased. *See* ECF 17-6 at 147. A similar request for continuance was made in the alternative when counsel renewed the venue change motion on June 13, 2014. *See* ECF No. 49-28 at 20. The propriety of such a measure is illustrated by the Supreme Court's own jurisprudence recognizing that the amount of time between inflammatory press coverage and trial is a critical factor in assessing a claim that the press had deprived the defendant of a fair trial. *See, e.g., Skilling*, 561 U.S. at 383; *Patton*, 467 U.S. at 1032. Yet the trial court here refused even a brief continuance. Meanwhile, the single measure that the court did adopt to stem the prejudicial impact of the press coverage—namely, granting the defense's April 23, 2014 request for a gag order—proved to be meaningless when two law enforcement officers blatantly violated the order just days after it was issued and the only response was that the judge indicated he was "somewhat miffed." ECF No. 49-27 at 9.

Fourth, the trial court erred by denying the defense's motion to strike potential Juror 99 for cause after he stated he had seen news coverage that had talked "about gangs in Texas" and "this case," including the suspects' specific "gang affiliation." ECF No. 49-22 at 213–14, 265–70. While Juror 99 also said he had not formed an opinion about the case, the Supreme Court has made clear

13

that such declarations need not be accepted at face value. *See, e.g.*, *Irvin v. Dowd*, 366 U.S. 717, 727–28 (1961) (finding actual prejudice despite jurors' assurances they could be impartial); *see also Murphy*, 421 U.S. at 803 (recognizing that potential jurors "may unwittingly have been influenced" by disqualifying biases). Here, Juror 99 had clearly been tainted by inaccurate media tying the case to gang violence, but the court forced the defense to use a peremptory strike to keep him off of Mr. Suniga's jury. *See* ECF No. 49-22 at 306–08. Notably, in *Skilling*, the Supreme Court had stressed that "peremptory challenges . . . provide protection against prejudice," and found it significant that Mr. Skilling's trial court "exercised its discretion to grant the defendants two extra peremptories." 561 U.S. at 386 n.21 (quoting *United States ex rel. Darcy v. Handy*, 351 U.S. 454, 462 (1956)) (cleaned up). The opposite approach was taken by the trial court here.

Collectively, the foregoing establishes that the trial court failed to adopt adequate measures under the circumstances to "detect and defuse juror bias" resulting from the prejudicial pretrial press coverage. *Skilling*, 561 U.S. at 385. And, as result, Mr. Suniga has shown that the inflammatory media had a "substantial and injurious influence on the jury's verdict" at either the guilt or penalty phase of Mr. Suniga's trial. *Brecht*, 507 U.S. at 623.

### C.     Mr. Suniga is entitled to relief, or at least a COA, on this claim.

The connection of Mr. Suniga to a gang that was reportedly one of the most dangerous in the area was unquestionably negative, and the fact that this media coverage increased during jury selection increased the likelihood of prejudice. The protections afforded by the Sixth, Eighth, and Fourteenth Amendments are of a constitutional dimension, and reversal is required here because the pretrial publicity in Mr. Suniga's case prevented his trial and sentencing from being conducted fairly and impartially.

At the very least, the Court should certify Claim II for appeal. A COA is appropriate because reasonable jurists "could debate whether . . . the petition should have been resolved in a different

14

manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 336. Mr. Suniga's claim, which the Court rejected on the basis of erroneous legal analyses, is more than debatable, and it justifies a COA if the Court does not grant relief.

## CONCLUSION

For all of the above reasons, the Court should grant the motion pursuant to Rule 59 to alter or amend judgment and grant Mr. Suniga relief from his conviction and sentence. Alternatively, the Court should grant a certificate of appealability on the claim for relief described above.

Respectfully submitted,

/s/ Anne Fisher
ANNE FISHER
PA Bar No. 94180
Federal Community Defender for the
Eastern District of Pennsylvania
Suite 545 West, The Curtis Center
601 Walnut Street
Philadelphia, PA 19106
(215) 928-0520
Annie_Fisher@fd.org

Dated: September 30, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I served the foregoing on the following person by ECF filing:

Molly Knowles
Assistant Attorney General
Office of the Attorney General of Texas
Post Office Box 12548
Austin, Texas 78711-2548

/s/ Anne Fisher
Anne Fisher

Dated: September 30, 2025