UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

BRIAN CLIFF SUNIGA,

     Petitioner,

v.

     No. 5:22-CV-124-H

ERIC GUERRERO, Director, Texas
Department of Criminal Justice,
Correctional Institutions Division,

     Respondent.

### MEMORANDUM OPINION AND ORDER

On the night after Christmas in 2011, Brian Suniga murdered David Rowser. A Lubbock County jury found Suniga guilty and sentenced him to die. In a Memorandum Opinion and Order, this Court denied Suniga's habeas petition and his request for a Certificate of Appealability (COA). Dkt. No. 82. Now, Suniga asks the Court to reconsider its decision denying his pretrial-publicity claim and denying him a COA. Dkt. No. 85. His motion, which repeatedly misreads the record and misconstrues the Court's analysis, is unpersuasive. Because he fails to demonstrate any manifest error of law or fact, the Court denies the motion and denies his renewed request for a COA.

### 1.   Background

The facts of this case and its procedural history are discussed at length in the Court's prior Memorandum Opinion and Order. *See* Dkt. No. 82 at 1–20. Brian Suniga walked into a Lubbock Italian restaurant on the night of December 26, 2011. *Id.* at 1–2. He robbed the store at gunpoint, and, when David Rowser entered the room unaware of the holdup, Suniga shot the young man three times. *Id.* at 1–3. Rowser died in his brother's arms. *Id.* The State of Texas pursued a capital-murder charge based on the "overwhelming" evidence

of Suniga's guilt. *Id.* at 52. In May 2014, a Lubbock County jury convicted Suniga of capital murder and separately returned answers to the Texas capital sentencing special issues that mandated imposition of the death penalty. *Id.* at 7, 17. Suniga's conviction was affirmed on appeal, the United States Supreme Court denied certiorari, and Suniga's subsequent petition for state habeas corpus relief was denied. *Id.* at 18–19; *see Suniga v. State*, No. AP-77,041, 2019 WL 1051548 (Tex. Crim. App. Mar. 6, 2019) (rejecting direct appeal).

Suniga then pursued federal habeas relief before this Court, but to no avail. In a Memorandum Opinion and Order dated September 2, 2025, the Court denied Suniga's amended petition for a writ of habeas corpus (Dkt. No. 36) and denied his request for a COA. Dkt. No. 82. Suniga filed a motion to reconsider the Court's Memorandum Opinion and Order as to one specific claim: whether the trial court violated his right to a fair trial by failing to grant a change of venue in light of the pretrial publicity surrounding his case (Dkt. No. 85). The State responded (Dkt. No. 86), though Suniga did not file a reply. The motion is now ripe.

## 2.    Legal Standards

Federal Rule of Civil Procedure 59(e) permits a party to file "[a] motion to alter or amend a judgment . . . no later than 28 days after the entry of the judgment." The Court has discretion in whether to grant the motion. *Schiller v. Physicians Res. Grp., Inc.*, 342 F.3d 563, 567 (5th Cir. 2003). However, the Court may not alter or amend its judgment for any reason it finds persuasive. Instead, the movant "must clearly establish either a manifest error of law or fact or must present newly discovered evidence." *Id.* (quoting *Rosenzweig v. Azurix Corp.*, 322 F.3d 854, 863–64 (5th Cir. 2003)). Where the petitioner seeks to assert a manifest error of law or fact, he must show an error that is "plain and indisputable, and that

amounts to a complete disregard of the controlling law or the credible evidence in the record." *Manifest Error*, Black's Law Dictionary (10th ed. 2014); *Puga v. RCX Solutions, Inc.*, 922 F.3d 285, 293 (5th Cir. 2019). If the movant cannot demonstrate these grounds for relief, then relief is unavailable. *Jennings v. Towers Watson*, 11 F.4th 335, 345 (5th Cir. 2021); *Demahy v. Schwarz Pharma, Inc.*, 702 F.3d 177, 182 (5th Cir. 2012); *Schiller*, 342 F.3d at 567. In contrast, "rehashing evidence, legal theories, or arguments that could have been offered or raised before the entry of judgment" are unpersuasive grounds to alter or amend. *Templet v. HydroChem Inc.*, 367 F.3d 473, 478–79 (5th Cir. 2004).

Moreover, Suniga's claims are governed by the Antiterrorism and Effective Death Penalty Act (AEDPA). *See* Dkt. No. 82 at 20–21. Under AEDPA, "a federal court may disturb a final state-court conviction in only narrow circumstances." *Brown v. Davenport*, 596 U.S. 118, 125 (2022). Suniga can prevail only if he shows that the underlying state-court merits decision was either "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

A state court's decision is "contrary to" clearly established law if it "applies a rule that contradicts the governing law set forth" in Supreme Court cases or "confronts a set of facts that are materially indistinguishable from a [Supreme Court decision] and nevertheless arrives" at a different result. *Mitchell v. Esparza*, 540 U.S. 12, 15–16 (2003) (citation omitted); *Norris v. Davis*, 826 F.3d 821, 827 (5th Cir. 2016) (same). The federal habeas court's review of claims is "limited to the record that was before the state court that adjudicated the [habeas] claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

A state court's decision involves "an unreasonable application" of clearly established law if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Terry Williams v. Taylor*, 529 U.S. 362, 407–08 (2000); *Roberts v. Thaler*, 681 F.3d 597, 604 (5th Cir. 2012). The state court decision may not be merely wrong: it must be "objectively unreasonable." *McDaniel v. Brown*, 558 U.S. 120, 133 (2010). The ruling must be "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

Finally, Suniga renews his request for a COA. A COA will be granted only if a petitioner makes a substantial showing of the denial of a constitutional right. *Tennard v. Dretke*, 542 U.S. 274, 282 (2004); *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003). To prevail, Suniga must show that reasonable jurists could debate whether the petition should have been resolved in a different manner or that the issues presented are adequate to deserve proceeding further. *Tennard*, 542 U.S. at 282; *Miller-El*, 537 U.S. at 336.

**3.    Analysis**

Suniga's motion centers on the Court's analysis of his second claim for habeas relief. Dkt. No. 85 at 5–6. In his amended habeas petition, Suniga "argue[d] that he was denied a fair trial in violation of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights when the trial court denied his multiple motions requesting a change of venue." Dkt. No. 82 at 42. Suniga raises two arguments in his motion to reconsider: (1) that the Court manifestly erred in its conclusion that "[t]he [Texas Court of Criminal Appeals (TCCA)] reasonably rejected Suniga's claims" with respect to the presumption-of-prejudice standard, *id.* at 45; and

(2) that the Court failed to consider whether, even absent the presumption of prejudice, media publicity infected his case with actual prejudice. *See* Dkt. No. 85.

At the outset, the Court observes a conceptual flaw in Suniga's motion. He argues at length that the Court erred in its analysis of prejudice and as to whether he is entitled to a COA. *See generally id.* And while the Court considers Suniga's arguments one-by-one as to this Court's *own* analysis, this argument sidesteps the essential role of federal habeas review. Here, the Court's role is limited to providing relief where the state merits decision is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Thus, whether this Court manifestly erred is immaterial except, if by virtue of that error, it means the TCCA's rejection of Suniga's appeal was contrary to, or an unreasonable application of, clearly established law. On review of Suniga's arguments, the Court concludes that none are persuasive.

**A.    The Court did not manifestly err in its presumption-of-prejudice analysis.**

"A fair trial in a fair tribunal is a basic requirement of due process." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 551 (1976) (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)). "So when 'extraordinary local prejudice' prevents impartiality, courts must transfer the trial to a location where an impartial jury can be drawn." *United States v. Webster*, 102 F.4th 471, 479 (D.C. Cir. 2024) (quoting *Skilling v. United States*, 561 U.S. 358, 378 (2010)). That standard, however, is not easy to satisfy. "Jurors are not required to be 'totally ignorant of the facts and issues involved.'" *Skilling*, 561 U.S. at 381 (quoting *Irvin v. Dowd*, 366 U.S. 717, 722 (1961)). And the fact that a trial is well-covered by the local press "does not necessarily produce prejudice." *Id.* Indeed, in such situations, "scarcely any of those best qualified to

serve as jurors will not have formed some impression or opinion as to the merits of the case." *Id.* (quoting *Irvin*, 366 U.S. at 722).  The Court must grant relief where the facts show "[a] presumption of prejudice"—something that "attends only the extreme case." *Id.*  In other words, Suniga can only prevail under this standard if the "prejudicial publicity so poisoned the proceedings that it was impossible for [him] to receive a fair trial by an impartial jury." *United States v. Capo*, 595 F.2d 1086, 1090 (5th Cir. 1979).

In determining whether the facts establish such a severe level of prejudice, a court's review is holistic.  It consists of, among other things, the nature of the community where the crime occurred, the nature of the pretrial publicity (its frequency, accuracy, sensational content, and so forth), the time between the crime and trial, the questions asked at voir dire, and other facts that may or may not "undermine in any way the supposition of juror bias." *See Skilling*, 561 U.S. at 382–85.  These factors are not exhaustive because the core question underlying the presumption-of-prejudice standard is whether "12 impartial individuals could not be empaneled" to decide the defendant's guilt and punishment. *Skilling*, 561 U.S. at 382; *Irvin*, 366 U.S. at 723 (asking whether "the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court"); *Andrew v. White*, 604 U.S. 86, 94 (2025) (observing that juror impartiality is determined by "the underlying fundamental fairness principle").

Suniga does not raise new evidence.  Rather, he says that this Court ignored certain favorable facts.  The Court understands Suniga to therefore insist that the Court's analysis of the *Skilling* factors produced a manifest error of law.  Suniga's objections are to (1) the Court's analysis of Lubbock County's population size, Dkt. No. 85 at 7; (2) the Court's supposed failure to consider Lubbock County's homicide rate, *id.* at 7–8; (3) the Court's

analysis of the media coverage after Rowser's murder, *id.* at 8–9; and (4) the Court's supposed failure to consider the outcome of Suniga's trial as evidence of a presumption of prejudice, *id.* at 9–10.  He also suggests that the Court reached its conclusion by improperly playing a matching game to the facts of *Rideau*.  *See Andrew*, 604 U.S. at 94 (noting that clearly established law is not necessarily limited to the facts of a given case).

### i.    Lubbock County's Population Size

Suniga asserts that the Court "failed to acknowledge that Lubbock County's population was much closer" to the parish described in *Rideau v. Louisiana*, 373 U.S. 723 (1963), than to the counties described in *Skilling* and *Mu'Min v. Virginia*, 500 U.S. 415 (1991).  As he would have it, the Court should have considered that, on a spectrum, Lubbock County is much more like rural Louisiana than the bustling cities of Houston or Washington.  Dkt. No. 85 at 7.  At the same time, the Court should not have been "focus[ed] strictly on a numerical comparison" between population centers; it ought to have accounted for Lubbock's crime statistics and the alleged saturation of the public with stories of Suniga's case.  *Id.*

The Court rejects Suniga's framing.  The assertion that the Court ought to have heavily weighed population size yet also eschewed "a numerical comparison" is contradictory on its face.  *See id.*  For its part, the TCCA did not engage in a numbers game. This was the correct course: The small size of a community does not singularly warrant a presumption of prejudice.  As the Supreme Court noted in *Irvin*—a case arising out of a murder in rural Indiana—the requirement of a totally ignorant jury is "an impossible standard," and juror knowledge alone is insufficient to taint a trial.  366 U.S. at 723. Instead, it was "the pattern of deep and bitter prejudice shown to be present throughout the

community" in that case—where a majority of jurors thought the petitioner was guilty before trial—that required the conviction to be vacated. *Id.* at 727. Similarly, *Rideau* was not singularly concerned with the population of Calcasieu Parish (which, at over 100,000 residents, was—and still is—larger than most U.S. counties). Instead, the Court held that it was the overwhelming saturation of prejudicial television reports, combined with the easy spread of information in the somewhat small community, which deprived the defendant of due process. 373 U.S. at 726–27.

Moreover, to the extent a community's "size and diversity" is relevant in a given case, it is because it may "dilute[] the media's impact" on the veniremen. *Skilling*, 561 U.S. at 384. This is an easy lesson: When a jury pool is "large" and "diverse," "the suggestion that 12 impartial individuals could not be empaneled is hard to sustain." *Id.* at 382; *Mu'Min*, 500 U.S. at 429 (county of nearly 200,000 in the Washington metro was large enough to mitigate publicity problems); *Webster*, 102 F.4th at 480–81 (reaching the same conclusion for the District of Columbia proper). And, in light of *Irvin*, the mere absence of these factors does not suggest a presumption is warranted. *See Suniga*, 2019 WL 1051548, at *18 ("Extensive knowledge of the case or defendant in the community as a result of pre-trial publicity is not sufficient . . . .").

The TCCA instead focused on whether there was "some showing of prejudicial or inflammatory [media] coverage." 2019 WL 1051548, at *18 (citing *Gonzalez v. State*, 222 S.W.3d 446, 450 (Tex. Crim. App. 2007)). The TCCA thus considered news reports on the trial, their content, and mitigating actions undertaken by the trial court. *Suniga*, 2019 WL 1051548, at *18–19. This Court, in reviewing the TCCA decision, did the same. Dkt. No. 82 at 47. And it also accounted for the frequency of murders in the Lubbock area. *Id.* at

65–71.  As a result, the TCCA affirmed Suniga's conviction in a manner that was neither

contrary to, nor involved an unreasonable application of, clearly established federal law.

And, in turn, this Court neither erred nor manifestly erred in its consideration of Lubbock

County's population size.[1]

### ii.    Lubbock County's Homicide Rate

Suniga says that "[t]his Court . . . ignored that murders were relatively rare in

Lubbock County," that "this Court failed to account for the fact that the trial court in

[Suniga's] case had opened jury selection by telling the veniremembers that they 'probably

have heard about or read about' the crime in the case," and that the Court "ignored the

words of the prosecutor, who commented: '[w]hen we have a murder in Lubbock, it makes

the news.'"  Dkt. No. 85 at 7–8 (quoting Dkt. No. 51-32 at 10, 18).  Had the Court taken

these facts into consideration, Suniga says, the Court would have known that Lubbock

County's makeup "virtually guaranteed that a large percentage of veniremembers had been

exposed to the prejudicial press coverage."  *Id.* at 8.

Suniga's argument disregards the plain letter of the TCCA's merits opinion and this

Court's Memorandum Opinion and Order.  The TCCA discussed the role of news reports in

relation to the voir dire, though it did not rely on the exact quotes identified here.  *See* 2019

WL 1051548, at \*14–19.  This Court did the same, emphasizing that the trial judge who

presided over Suniga's voir dire "had the firsthand opportunity to hear venire members,

discuss the jurors' familiarity with the crime and the suspect, and discuss how publicity

---

[1] Because the TCCA's analysis was not required to weigh population size in the manner that Suniga desires, any error on this Court's part in discussing the population size would not be a manifest error.  Even so, the Court notes that its discussion of this point was correct.  Lubbock County has a population of approximately 300,000 and is racially diverse.  Dkt. No. 82 at 65.  It is by no means a small backwater.  Thus, to the extent it is relevant, Lubbock's population size weighs against the presumption of prejudice.

affected jurors' ability to render a verdict based on the law and the evidence presented at trial." Dkt. No. 82 at 47.  That same judge ultimately denied Suniga's motions for a change of venue.  *Id.*  Moreover, this Court addressed Lubbock County's homicide rate and record of prosecuting capital murder when it rejected Suniga's discriminatory-animus argument as "unpersuasive."  *Id.* at 71.

At any rate, the raw data, standing alone, does not point to a presumption of prejudice.  The frequency of crime in a community is relevant insofar that the publicity around the crime is more likely to attract the jurors' attention.  Murders in Lubbock County are common enough, as in any large community, to happen with a degree of regularity. There were about 50 death-penalty-eligible murders in Lubbock County between 1995 and early 2014, *id.* at 65–66, at a rate of between 2 and 3 eligible murders per year.  To be sure, that number is not as high as the rate in *Mu'Min*, 500 U.S. at 429, but it is high enough that any longtime Lubbock resident would not be shocked and fixated on the event in the same way that the citizens of a completely peaceful locale might react.  The story of a murder might "make[] the news," Dkt. No. 85 at 7–8, but it would only be part of a stream of stories in addition to the other panoply of crimes that catch the public's attention.

Standing alone, Lubbock County's murder rate does not point to a presumption of prejudice.  Thus, the Court properly concluded that the TCCA affirmed Suniga's conviction in a manner that was neither contrary to, nor involved an unreasonable application of, clearly established federal law.

### iii.   Media Coverage of the Murder

Suniga makes two lines of attack against the Court's analysis of the media coverage. First, he says that "this Court downplayed the prejudicial nature of the press coverage" by

noting that none of the stories "contain[ed] 'any irrefutable evidence of Suniga's guilt.'" Dkt. No. 85 at 8 (quoting Dkt. No. 82 at 46–47).  As he sees it, the Court assumed the reporting was "benign," when, in fact, the prejudicial reporting about Suniga's gang membership "directly colored" the jury's finding of his future dangerousness and eligibility for the death penalty.  *Id.*  Second, Suniga says the Court "failed to address the fact that the prejudicial stories were released during jury selection."  *Id.* at 9.  Together, he says, these errors create the need for a presumption of prejudice.

The Court disagrees.  First, the challenge underlying this motion to reconsider is whether the TCCA acted contrary to clearly established law or applied it in an unreasonable manner.  28 U.S.C. § 2254(d)(1).  Even if this Court "downplayed" the facts as Suniga claims, that does not address the question of the *TCCA*'s rejection of appeal on the merits.  The TCCA engaged in no such downplay.  It discussed the news reports at length.  *Suniga*, 2019 WL 1051548, at *18–19.  It also observed that "the news stories were accurate and objective in their coverage, and the information they conveyed—that [Suniga] was believed or alleged to belong to a dangerous gang—was not itself prejudicial and inflammatory."  *Id.* at *19.  For these reasons, the release of information during jury selection did not create a presumption of prejudice.  *Id.*  Again, the TCCA did not act contrary to, or unreasonably apply, clearly established federal law.  Even if Suniga's assertions about this Court's analysis were correct, they would not change the sound analysis of the TCCA.

However, Suniga's assertions about this Court require a response, as they wholly misrepresent this Court's analysis.  The Court never assumed and never asserted that the local news reports were "benign." Dkt. No. 85 at 8.  It is hard to imagine there is such a thing as a benign and wholly unprejudicial accusation of murder.  Instead, the Court

followed *Skilling*, which considers whether the news reports, though "not kind," nevertheless "contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Skilling*, 561 U.S. at 382. Though the news reports here were indeed unkind to Suniga in the basic sense of accusing him of murder, none were so blatantly prejudicial as to warrant a presumption of prejudice.

To the extent Suniga seeks to re-urge the claim that the local press's reporting was too prejudicial to permit a trial in Lubbock County, the Court remains unpersuaded. The reporting in this case compares favorably to *Skilling*. There, the defendant was accused of participating in the infamous fraud scheme that destroyed Enron, a large Houston energy company. *Id.* at 368–69. There were thousands of stories about Enron's demise leading up to Skilling's trial in Houston, but the reporting was "mostly . . . objective and unemotional." *Id.* at 369–70 (brackets omitted). The Supreme Court affirmed the Fifth Circuit's finding that Skilling received a fair trial. *Id.* at 315.

Suniga's case is similar to *Skilling* in that the reports here are objective and unemotional. No, they were not "kind." *Id.* at 382. One report (published during voir dire) showed Suniga's booking photo, Dkt. No. 17-6 at 141; another reported that Suniga was suspected to be a Tango Blast gangster and accused of committing the murder, *id.* at 127. But the reports contain nothing irrefutable, such as a confession, or anything so "dramatic[]" that their claims were "likely imprinted indelibly in the mind of anyone" who read them. *Skilling*, 561 U.S. at 382–83. The Lubbock press published the accusations in a professional, impartial tone. If anything, the facts here are even less amenable to a finding of a presumption of prejudice than *Skilling*, where news reports called the defendant a liar

and an "idiot" whose actions left thousands in poverty. *Id.* at 429 (Sotomayor, J., concurring in part and dissenting in part). Nothing in the Lubbock press's short and fact-of-the-matter remarks come close to tainting the jury pool so deeply as to raise a presumption of prejudice.[2]

Second, Suniga's assertion that this Court did not address the news stories published during jury selection is misdirection. *See* Dkt. No. 85 at 9. Even had this Court erred in the manner Suniga claims, it would not address the underlying TCCA analysis. That court—at length—discussed the stories published during jury selection. *Suniga*, 2019 WL 1051548, at *18–20. It still concluded that "the news coverage was not inherently prejudicial and inflammatory" and that "pre-trial publicity [did] not impede[] [Suniga's] ability to select a fair and impartial jury." *Id.* at *20.

And, yet again, Suniga's depiction of this Court's analysis is contrary to reality. The Court explicitly took note of these articles as "the pretrial news media reports about gang activity in West Texas" and likewise found they were insufficiently "pervasive" to create a presumption of prejudice. Dkt. No. 82 at 46–47. Suniga appears to have thought the Court had nothing to say because it noted that "[a]lmost two years passed between David Rowser's murder and the start of jury selection for Suniga's trial." Dkt. No. 85 at 9 (quoting Dkt. No. 82 at 47) (alteration in original). But the Court was merely addressing one of the *Skilling* factors, which asks whether a "trial swiftly followed a widely reported crime." 561 U.S. at 383. That factor is distinct from the other *Skilling* factor Suniga raises—whether

---

[2] Suniga claims that one article "identifie[s]" him as a Tango Blast member. Dkt. No. 85 at 8. But, again, the article reported it as a mere accusation. The Court disagrees that the same article "directly suggested" that the murder was gang-related, as opposed to being a crime convicted by a suspected gangster. *Id.* Even if any of these articles could be read for that conclusion, Suniga's claims do not come remotely close to the sort of facts that would raise a presumption of prejudice.

"reporters covered [the defendant] throughout this period"—which the Court addresses above. *Id.*

Suniga re-challenges the Court's finding as to the nature of coverage during voir dire by comparing his case to *Skilling*. In his view, *Skilling* "stressed not only that 'over four years [had] elapsed between Enron's bankruptcy and Skilling's trial,' but also that 'the decibel level of media attention' had diminished over the course of that four-year period." Dkt. No. 85 at 9 (quoting *Skilling*, 561 U.S. at 383). But that same passage of *Skilling* stands for near the opposite conclusion because the Court emphasized that "reporters covered Enron-related news throughout this period." 561 U.S. at 383. Indeed, the trial court in *Skilling* took action to address potential prejudice in the days preceding voir dire, *id.* at 385, and Skilling only raised his objection for the period of time before the jury was empaneled, *id.* at 382 n.14. The mere fact of a news article's publication during trial means little to nothing if, as here, the jurors had not heard of the articles and where the trial court took action to root out any potential prejudice. *See* Dkt. No. 82 at 47. And, once again, a juror's mere exposure to information does not, in and of itself, create a presumption of prejudice. *Irvin*, 366 U.S. at 723.

Thus, the Court did not err, let alone manifestly err, in holding that the TCCA's analysis was neither contrary to, nor involved an unreasonable application of, clearly established law.

### iv.    The Verdict

Suniga also complains that "this Court failed to even mention the fact that . . . the jury's verdict in this case 'did not undermine in any way the supposition of juror bias.'" Dkt. No. 85 at 9–10 (quoting *Skilling*, 561 U.S. at 383). The TCCA did not address this

factor, but its omission, and this Court's omission, were not in error.  In *Skilling*, the Court found that the supposition was undermined because the jurors voted to acquit the defendant of nine counts.  561 U.S. at 383.  Here, in contrast, the jury declined to acquit Suniga and condemned him to the most solemn of punishments.

But the jury is not required to make a peace offering whenever there is some accusation of bias, and the absence of any mitigating conduct in the jury's verdict does not create a presumption of prejudice.  Suniga offers no case law to support that position, nor could he.  The *Mu'Min* Court affirmed a defendant's conviction and death sentence where the jury engaged in no mitigating conduct whatsoever and where, as here, the other factors did not favor a presumption of prejudice.  *See* 500 U.S. 415.  The TCCA did not act contrary to, nor unreasonably apply, clearly established law in passing over this factor.  And this Court neither erred nor manifestly erred in doing the same.

### v.    The Facts of *Rideau*

Finally, Suniga suggests that the Court limited itself to the facts of *Rideau* in applying the *Skilling* factors.  Dkt. No. 85 at 10.  That is error, he says, because "[g]eneral legal principles can constitute clearly established law for purposes of AEDPA so long as they are holdings of [the Supreme] Court."  *Andrew*, 604 U.S. at 94.  Suniga's contention is wrong on two points.

First, the TCCA did not discuss *Rideau*, so any supposed error on the part of this Court would not, per se, disturb the underlying conclusion that the TCCA did not act contrary to, nor unreasonably apply, clearly established law.  Second, this Court did not make the mistake Suniga claims.  The Court took account of multiple cases, including *Irvin*, *Rideau*, and *Skilling*.  *See* Dkt. No. 82 at 45–47.  In doing so, the Court properly recognized

that the presumption of prejudice arises only in an "extreme case." *Id.* at 45 (quoting *Skilling*, 561 U.S. at 381). The analysis naturally considers the facts of other cases as a means of comparison. *See Skilling*, 561 U.S. at 381–82. The facts of *Skilling*, *Rideau*, and other cases are useful to this Court just as they have been useful to Suniga, who has repeatedly analogized to *Skilling*, *Rideau*, and other cases to support his argument. However, the Court's analysis sought out the underlying principles of those cases and did not play a matching game. This Court, like the TCCA, considered all other facts that might point to a presumption of prejudice, and it thus did not err or manifestly err. *See* Dkt. No. 82 at 46 (noting that presumption attends trials with "extensive and pervasive, carnival-like atmospheres").

### vi. Other factors favored the Court's finding that Suniga was not entitled to a presumption of prejudice.

To be clear, "[a] presumption of prejudice . . . attends only the extreme case." *Skilling*, 561 U.S. at 381. And the posture of a federal habeas proceeding is limited. Even had the TCCA not taken appropriate consideration of the factors above, it did not act in a manner contrary to, or unreasonably apply, clearly established law in concluding that a presumption of prejudice was unwarranted in light of the remaining factors. And this Court did not err or manifestly err in concluding the same. After all, as Suniga concedes, no case can "establish precise parameters for a showing of presumptive prejudice from pretrial media," and "the 'inquiry is necessarily case specific.'" Dkt. No. 85 at 10 (quoting *Skilling*, 561 U.S. at 439 (Sotomayor, J., concurring in part and dissenting in part)).

In particular, the TCCA placed great weight upon the trial judge's mitigating role. *See Suniga*, 2019 WL 1051548, at *14–20 (discussing the trial judge's mitigating role at length). This Court did, too. *See* Dkt. No. 82 at 43, 47. For instance, both the TCCA and

– 16 –

this Court discussed the trial judge's decision to (1) issue a gag order to prevent future exposure, and (2) empanel the selected jurors to ensure none of them had seen the news coverage.  *See Suniga*, 2019 WL 1051548, at *15, 19; Dkt. No. 82 at 43.  Both courts agreed: "We afford great deference to the trial judge, who heard the responses of the jurors during voir dire, because he was in a better position to resolve issues involving testimony and other questions of fact by observing the demeanor of witnesses and scrutinizing their veracity face-to-face." *Suniga*, 2019 WL 1051548, at *18; Dkt. No. 82 at 47 (citing *Skilling*, 561 U.S. at 386, for the same proposition).  In other words, trial judges have a better lay of the land compared to judges sitting in appellate and habeas review.  *Skilling*, 561 U.S. at 386–87.

This factor is important because it goes a great way to mitigate any of the potential problems Suniga raises.  The question here is whether the trial court could have secured "12 impartial individuals" to determine Suniga's guilt or innocence and the possible punishment for his alleged conduct.  *Id.* at 382 (citing *Mu'Min*, 500 U.S. at 429).  Because the trial court took thorough action to prevent prejudice from seeping into the trial process, it is far less likely that a presumption of prejudice would be warranted in any case.

Second, this Court further noted that "the pretrial publicity relevant to Suniga's trial did not even begin to approach the extensive and pervasive, carnival-like atmospheres the Supreme Court has described." Dkt. No. 82 at 46 (citing *Skilling*, 561 U.S. at 380).  Two cases illustrate this point.  In *Estes v. Texas*, the defendant's pretrial hearings featured a dozen cameramen photographing the proceedings, cables and wires strewn about the courtroom, microphones placed at the jury box and judge's bench, and more.  381 U.S. 532, 536 (1965).  Some of the veniremen were present in the courtroom.  *Id.*  And in *Sheppard v. Maxwell*, "bedlam reigned at the courthouse during the trial" as "newsmen took over practically the

entire courtroom, hounding most of the participants in the trial." 384 U.S. 333, 355 (1966). The reporters were placed in front of the bar next to the jurors, whose names and addresses were widely publicized and who were treated as local "celebrities." *Id.* at 355, 353.

Suniga's case, already quite serene, stands in near perfection in comparison to *Estes* and *Sheppard*. Suniga's trial featured no press interference in the courtroom, no stalking of jurors, no pervasive or intrusive reports, or any sort of behavior that would suggest pervasive and infectious prejudice. What little reports the press issued were mitigated by the trial judge's gag order and conduct at voir dire. Tellingly, Suniga speculates that jurors may have been exposed to coverage but that "none chose to volunteer." Dkt. No. 85 at 12. By speculating in this way, Suniga implicitly concedes that the facts of this case are far from the carnivalesque scenarios of *Estes*, *Sheppard*, and *Rideau* and far from any reasonable finding that a presumption of prejudice is warranted.

Given the weight of these factors, the TCCA did not act contrary to, nor unreasonably apply, clearly established law. And this Court did not err, let alone manifestly err, in declining to find a presumption of prejudice. Suniga's presumption-of-prejudice claim therefore fails.

### B.    Suniga's actual-prejudice claim is improperly presented, procedurally defaulted, and would have been denied on the merits.

Suniga urges that, even if he is not entitled to a presumption of prejudice, the Court failed to consider his claim of actual prejudice and found that the trial court failed to "adopt the measures necessary under the circumstances to ensure an unbiased jury." Dkt. No. 85 at 11. The Court is unpersuaded for three reasons. First, Suniga's claim is not properly presented in his habeas petition. Second, even if it were, he did not present this claim in

– 18 –

state court, so his claim would be procedurally defaulted.  Third, even if the Court could consider his claim, it would deny the claim on the merits.

First, Suniga failed to present his actual-prejudice claim in this Court.  A habeas petition must "specify all the grounds for relief available" to the petitioner and "state the facts supporting each ground."  *Mayle v. Felix*, 545 U.S. 644, 649 (2005) (quotation omitted).  It is not enough to make a passing gesture or a "conclusory" claim.  *Harper v. Lumpkin*, 64 F.4th 684, 691 (5th Cir. 2023).  The argument must "give the state court a fair opportunity to consider the claim."  *Id.*

Here, Suniga makes two references to actual prejudice in his 203-page petition.  Dkt. No. 36 at 102–03, 105.  Both times, Suniga's references to actual prejudice are mixed with a broader discussion of the presumption of prejudice.  His lengthiest discussion begins mid-paragraph in a recitation of the presumption-of-prejudice factors.  *Id.* at 102.  The discussion ends two paragraphs later with a discussion of "the likelihood of prejudice" wrought by news coverage during voir dire in relation to the juror W.H., who was purportedly exposed to the pretrial publicity.  *Id.* at 103–04.  In this context, the reader might naturally read his argument to be offering evidence of his presumption-of-evidence claim, rather than raising a distinct legal argument of actual prejudice.  *See Skilling*, 561 U.S. at 385.  That sort of mixed-in claim turns Suniga's habeas petition into a "matryoshka doll[]."  *Harper*, 64 F.4th at 692.  In such cases, as here, where the petitioner's claim is embedded and dispersed throughout a distinct but closely related argument, the claim is not properly presented before the Court.

Second, even if the actual-prejudice claim were properly presented here, the Court did not err in declining to consider the claim because it was procedurally defaulted.  "A federal habeas claim is procedurally defaulted when the state court has based its rejection of

– 19 –

the claim on a state procedural rule that provides an adequate basis for relief, independent of the merits of the claim." *Gutierrez v. Stephens*, 590 F. App'x 371, 383 (5th Cir. 2014) (quoting *Hughes v. Quarterman*, 530 F.3d 336, 341 (5th Cir. 2008)).  Review of such claims are barred "unless the petitioner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Id.* (quoting *Hughes*, 530 F.3d at 341).  Among the "independent and adequate state procedural rule[s]" are Texas's abuse-of-the-writ doctrine.  *Reed v. Stephens*, 739 F.3d 753, 767 (5th Cir. 2014) (quoting *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)).  That doctrine prevents Texas courts from "consider[ing] the merits of or grant[ing] relief based on [a] subsequent application" unless certain exceptions apply, such as a claim that was not "and could not have been presented previously in a timely application."  Tex. Code Crim. P. art. 11.071, § 5(a)(1).

Suniga's actual-prejudice claim is procedurally defaulted for this reason.  In his state habeas petition, Suniga urged that, "[d]ue to extensive pretrial publicity, the community, and the jury selected from it, was so preconditioned to a particular view of the evidence, and so prejudiced against [him], that it was highly improbable" that an impartial "jury could be picked."  Dkt. No. 17-1 at 86.  In other words, he asserted that his case gave rise to a presumption of prejudice.  Indeed, Suniga's original petition did not claim the jurors themselves were actually prejudiced, but that they were exposed to prejudicial evidence outside the record and reached their verdict on those grounds.  *See id.* at 504–06.  That distinction is key, as a Court might find the consideration of outside evidence to require a new trial even in the face of undisputed evidence that the jurors "felt no prejudice against [the] petitioner as a result" of the outside evidence.  *Marshall v. United States*, 360 U.S. 310,

312 (1959).  As a result, Suniga's state petition failed to argue actual prejudice.  Because none of the exceptions to abuse-of-the-writ doctrine apply here, his claim is procedurally defaulted.  *See Hughes*, 530 F.3d at 342.

Third, Suniga cannot establish actual prejudice in the jury.  This point is relevant because his procedurally defaulted claim could survive procedural default provided that he demonstrates good cause, that a fundamental miscarriage of justice would ensue or that actual prejudice resulted as a result of the alleged violation.  *See id.*  Because Suniga does not address the first and second exceptions, demonstrating actual prejudice in the violation by means of showing "actual prejudice in the jury" is his only path around the bar.  *See Webster*, 102 F.4th at 481.  But "[d]emonstrating actual prejudice in the jury is an arduous task." *Webster*, 102 F.4th at 481.  When the presumption of prejudice is inapplicable, the petitioner must "show that the particular jurors selected for service in his case were biased against him." *Busby v. Dretke*, 359 F.3d 708, 725 (5th Cir. 2004).  Moreover, the question is not one of whether a juror is exposed to certain information, but whether "'the nature and strength of the opinion formed' by a juror before trial 'necessarily' shows her to be partial."  *Webster*, 102 F.4th at 481 (quoting *Irvin*, 366 U.S. at 723).

Suniga's motion for reconsideration does not single out any one juror as having an actual bias against him.  He merely states that some veniremen had been exposed to media and that the nine jurors—though questioned together—were never individually questioned about their exposure.  Dkt. No. 85 at 11–13, 14–15.  The only suggestion that news media rendered any one juror prejudiced comes from the amended habeas petition, where Suniga (albeit indistinctly from his presumption argument) raises an allegation regarding juror W.H.  Dkt. No. 36 at 101–02.  Years after the trial, W.H. recalled the crime as a gang

initiation. *Id.* This, Suniga alleges, "is clearly based on pretrial publicity which tied gang violence directly to this case." *Id.* at 103.

But that is far from clear. While some of the news reports could be read to impute a gang aspect to the crime, none of them claimed that it was an initiation, as W.H. recalls the event. Moreover, extensive evidence during the penalty phase established that Suniga was a member of the Tango Blast gang. Dkt. No. 82 at 67. His "membership . . . was not seriously in dispute at the time of trial." *Id.* at 72. Suniga's petition even challenges his trial attorney's effectiveness in "fail[ing] to attack the State's implicit accusation that David Rowser's shooting was gang-related and fail[ing] to . . . attack the credibility of David Luna, a gangster who identified Suniga as a Tango Blast member." *Id.* at 101. It is perfectly likely that W.H. was recalling the allegations imputed at trial or was simply misremembering the facts of a case from years prior.

At any rate, the standard for relief is that the challenged juror is "necessarily" partial. *Irvin*, 366 U.S. at 723. Suniga has shown no evidence that "would require a finding of constitutional unfairness as to . . . the character of the jurors actually selected." *Busby*, 359 F.3d at 725 (quoting *Dobbert v. Florida*, 432 U.S. 282, 303 (1977)). Even W.H., the lone juror whom he assails, has said nothing that would require a finding of unfairness because nothing in his testimony suggests that his knowledge came from outside sources, or that he relied on those sources over and above the "overwhelming" evidence at trial. Dkt. No. 82 at 52. The Court does not have a basis to find that any jurors held actual prejudice against Suniga in his trial.

For that reason, the Court need not delve deeply into the voir dire process. Where there is no presumption of prejudice or evidence of actual prejudice, the trial court has little

"reason . . . to discredit the jurors' promises of fairness," particularly in light of the trial court's continuous and appropriately thorough efforts to prevent publicity from tainting the jury pool or affecting the jury's deliberation.[3] *Skilling*, 561 U.S. at 394–95. Because no underlying claim of actual prejudice in the jury exists, Suniga cannot show that he has been actually prejudiced by the procedural bar against this claim.

**4.      The Court denies Suniga's request to reconsider its denial of a COA**

Suniga also moves for the Court to reconsider its decision to deny Suniga a COA. His arguments for granting a COA are no different than the rejected arguments above. As before, reasonable minds could not disagree that the trial court did not violate Suniga's rights in denying his motions for a change of venue. *See Miller-El*, 537 U.S. at 338. The Court denies the request.

**5.      Conclusion**

Suniga's motion to reconsider asserts that the Court failed to properly analyze the *Skilling* factors. However, the ultimate inquiry here is not merely whether this Court erred, but whether it erred in analyzing the TCCA's affirmance of Suniga's capital-murder conviction. The TCCA neither acted contrary to nor unreasonably applied clearly established law. And this Court's analysis was appropriately thorough in the absence of any meaningful evidence in Suniga's favor that would give rise to a presumption of prejudice. Each individual *Skilling* factor weighs against such a finding, so Suniga is not entitled to a presumption of prejudice. Further, Suniga's last-minute actual-prejudice claim is

---

[3] While Suniga's habeas petition raised challenges about his number of peremptory strikes, he now argues for the first time that he suffered actual prejudice because he had to use a peremptory strike to remove a venireman, Juror 99, who was actually biased. Dkt. No. 85 at 14–15. But "[i]f a defendant elects to cure a trial judge's erroneous for-cause ruling by exercising a peremptory challenge, and is subsequently convicted by a jury on which no biased juror sat," then "he has not been deprived of any . . . constitutional right." *Skilling*, 561 U.S. at 395 n.31 (citation modified).

improperly presented, procedurally defaulted, and fails on the merits.  The Court did not

err, much less manifestly err, in denying Suniga's habeas claim and request for a COA.

Thus, the Court denies Suniga's motion to reconsider and his renewed COA request (Dkt.

No. 85).

So ordered on July 13, 2026.

_____

JAMES WESLEY HENDRIX
UNITED STATE DISTRICT JUDGE